*Decision will be entered under Rule 50.*

PPG Industries, Inc., Petitioner *v.* Commissioner of Internal Revenue, Respondent

Docket No. 5842–66. Filed December 31, 1970.

*Ira T. Wender, Peter L. Briger, Carl E. Glock, Jr., Charles R. Pascoe, and Kenneth P. Simon,* for the petitioner.
*Donald W. Howser* and *Gary L. Stansbery,* for the respondent.

Mulroney, *Judge:* This case involves income tax deficiencies determined by respondent for the years 1960 and 1961 in the respective amounts of $2,811,000.86 and $2,684,387.67 and additional deficiencies in income tax claimed by respondent by amendments to his answer in the amounts of $300,564 and $324,194 for the years 1960 and 1961, respectively. Concessions involving several issues have been made by

both parties. The remaining issues before this Court are (1) whether respondent correctly allocated income in 1960 and 1961 to petitioner from Pittsburgh Plate Glass International S.A. (petitioner's wholly owned Swiss subsidiary) in 1960 and 1961 under section 482 of the Internal Revenue Code of 1954;[1] (2) whether gains realized by petitioner in 1960 and 1961 from the transfer by petitioner to Pittsburgh Plate Glass International S.A. of patents and technology are taxable as capital gains or as ordinary income; (3) whether the transfer of certain stock by petitioner's Brazilian subsidiary to Pittsburgh Plate Glass International S.A. in 1961 resulted in a constructive dividend to petitioner in the amount of $455,959; (4) whether respondent correctly allocated income in the amount of $27,304 in 1960 to petitioner from its Brazilian subsidiary under section 482 of the Internal Revenue Code of 1954 as a result of an interest-free loan made by petitioner to the subsidiary; and (5) whether the transfer of certain assets in 1960 by Distribuidora Quimica S.A. (an Argentine corporation which was a second-tier subsidiary of petitioner) to Pittsburgh Plate Glass Argentina S.A. resulted in a constructive dividend to petitioner.

### FINDINGS OF FACT

PPG Industries, Inc. (hereinafter called petitioner), a manufacturer of glass, fiber glass and paint products, was incorporated under the laws of Pennsylvania in 1883. Its principal office and place of business at the time the petition in this case was filed was Pittsburgh, Pa. Petitioner filed its Federal tax returns for the years here involved with the district director of internal revenue at Pittsburgh, Pa. At all times here relevant petitioner kept its books and prepared its Federal income tax returns on a calendar year basis and on an accrual method of accounting.

Petitioner is successor in interest to Columbia-Southern Chemical Corp. (hereinafter called Columbia-Southern), a wholly owned subsidiary that was merged into petitioner on December 31, 1960.

Petitioner's operating divisions during the years here involved included a glass division, a chemical division, a paint and brush division, and a fiber glass division.

After World War II there was a great shortage of glass in the United States. In the years 1955 and 1956 petitioner bought more glass from foreign suppliers than it sold to foreign customers. In 1957 petitioner's productive facilities caught up with demand. Prior to 1957, petitioner's physical facilities and the domestic demand for glass limited the amount of glass products it could export.

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise specified.

Prior to 1958 petitioner had investments in approximately 37 foreign corporations. Among these the principal operating companies in which petitioner had a controlling interest were Duplate Canada, Ltd., a Canadian corporation hereinafter called Duplate (glass), Canadian Pittsburgh Industries, Ltd., a Canadian corporation hereinafter called CPI (glass), Societe Anonyme des Glaces de Courcelles, a Belgian corporation hereinafter called Courcelles (glass), and Standard Chemical Ltd., a Canadian corporation hereinafter called Standard Chemical. Petitioner's foreign investments included a minority interest in Cristalerias de Chile S.A., a Chilean corporation (glass), Cia Comercial de Vidros do Brasil, a Brazilian corporation hereinafter called CVB (glass), Cia Anonima Industrias Miller de Venezuela, a Venezuelan corporation hereinafter called Miller de Venezuela (glass), Cristalerias Rigolleau S.A., an Argentine corporation (glass), Cia Vidraria Santa Marina, a Brazilian corporation hereinafter called Santa Marina (glass), Industrias Reunidas Vidrobras Limitada, a Brazilian corporation hereinafter called Vidrobras (paint), Pinturas Pittsburgh de Mexico S.A., a Mexican corporation hereinafter called Pinturas Pittsburgh (paint), and Pinturas Tucan S.A., a Venezuelan corporation hereinafter called Pinturas Tucan (paint).

Prior to 1958 petitioner had been relatively inactive in licensing foreign rights to its technology and in expanding manufacturing activities abroad.

For at least 30 years prior to 1958 petitioner had an export department to handle its export sales of glass, paint, and fiber glass products outside the Western Hemisphere. The export department did not handle chemical sales.

Prior to 1959 petitioner operated a Western Hemisphere trade corporation, Pittsburgh Plate Glass Export Corp. (hereinafter called PPGE) which was organized in 1955. For all practical purposes PPGE was integrated with the export department. Petitioner's export chemical sales in the Western Hemisphere were included among the products handled by PPGE. Columbia-Southern did not actively seek export markets for its chemical products. Generally, it accepted orders only when approached by foreign customers.

Petitioner's export department and PPGE handled the sales of petitioner's products to Duplate and CPI as well as other export sales. They made most of the non-Canadian export sales through commission agents and distributors located abroad. The export department accepted orders from customers, placed orders with the factories, expedited the orders, helped customers with their problems, and handled export documentations.

Petitioner established the prices for export sales handled by PPGE as well as by petitioner's export department. The export department

usually sold petitioner's products, particularly glass products, at prices that yielded a higher profit than on domestic sales. These higher prices tended to restrict export sales. The export department could not on its own initiative grant special allowances and discounts. Export department personnel were not free to travel in order to develop new, or maintain existing, export markets without the specific approval of petitioner's executive vice president. The export department did not have personnel skilled in financing export sales but depended upon petitioner's treasurer for guidance in credit matters.

In 1958, and for some years prior to that, Leland Hazard (who in 1958 was general counsel, vice president, and a director of the petitioner) was aware of the opportunities for American capital and American skills in the European markets. Hazard, who was influential in the formation of Pittsburgh Plate Glass International S.A., had for years endeavored to have petitioner for an international subsidiary.

Pittsburgh Plate Glass International S.A. (hereinafter called PPGI) was incorporated under the laws of Switzerland in July 1958 as a wholly owned subsidiary of petitioner. The decision to form PPGI was made by petitioner's board of directors on April 1, 1958. The controlling purposes behind petitioner's decision to organize PPGI as its international subsidiary were (1) to expand the sale of petitioner's products outside the United States, (2) to develop opportunities outside the United States for the exploitation of petitioner's technology, and (3) to develop opportunities outside the United States for investments where equity interests could be built around the manufacture of products using petitioner's technology. It was also petitioner's intention that PPGI would manage petitioner's existing foreign investments. To accomplish these purposes most effectively, petitioner considered it would be advisable to place all of its export sales, foreign licensing, and investment activities into a single autonomous entity under independent management.

During its formative period the affairs of PPGI were conducted by a shareholder's executive board, as provided by Swiss law, which consisted of several executive officers of the petitioner. The members of the shareholder's executive committee included petitioner's president, vice president and manager of the glass division, vice president and manager of the paint division, general counsel, controller, chairman of the board of directors, and the president of Columbia-Southern. When PPGI became fully staffed in 1959 to engage in international business, the shareholder's executive board acted in an advisory capacity to the president and management of PPGI. On August 3, 1960, the shareholder's executive board was replaced by a shareholder's advisory committee to act as petitioner's attorney, vote

petitioner's stock in PPGI, maintain a surveillance over petitioner's investment in PPGI, and report to petitioner's board of directors. Since its incorporation, PPGI has had a board of administrators which is comparable to a board of directors.

When PPGI began its operations it took over the export business previously handled by petitioner's export department and by PPGE. Both the Duplate and the CPI accounts were large accounts at this time, with Duplate being PPGI's largest account. PPGI took over all agents and distributors who had previously been used by petitioner's export department and by PPGE. Most of the personnel in petitioner's export department and in PPGE became employees of PPGI.

During the years 1960 and 1961, PPGI was fully staffed to engage in international business. When PPGI began its operations in 1959 its corporate headquarters were in Geneva, Switzerland, with an operating branch in Havana, Cuba. Its Havana office had a staff of about 60 individuals, with 45 of the staff engaged in sales. Due to political conditions in Cuba, PPGI closed its Havana office on October 12, 1960, and 3 days later opened a branch in San Juan, Puerto Rico, with a staff of about 45 or 50 individuals. On March 1, 1963, PPGI moved its San Juan branch to Pittsburgh. During the years 1960 and 1961 PPGI had at least three employees in its Geneva office.

At a meeting of the shareholder's executive board on December 22, 1958, the basic organization of PPGI was established, placing responsibility for sales of glass, paint, chemicals, and related techniques in different world areas in the several executives of PPGI who were as follows: Dwight R. Means, president and chief executive officer; John H. Henshaw, vice president; Bjorn Holmstrom, vice president and technical director; S. W. Dodge, vice president (finance) ; M. W. Hibschman, vice president and general counsel; and H. E. Schultz, sales and technical director (Western Hemisphere). Means, a chemical engineer with many years experience in the chemical business, had been executive vice president of Columbia-Southern. He served as president of PPGI until he was forced to retire by illness in 1960 when he was replaced as president by Francis W. Theis, also a chemical engineer, who remained in that capacity until 1961. Bjorn Holmstrom succeeded Theis and served as president of PPGI from 1961 to 1963 when he was succeeded by Henshaw who has remained as president of PPGI until the present time.

Before joining PPGI Henshaw had been the general export manager for petitioner from 1945 until the end of 1958 and, during the period from 1955 through 1958, he had also served as president of the Pittsburgh Plate Glass Export Corp. From late 1961 until early in 1963, Henshaw was in charge of the Puerto Rico office of petitioner.

Henshaw, as vice president of PPGI, received total compensation in 1960 and 1961 in the respective amounts of $38,790 and $36,583. Compensation of several PPGI employees in sales (primarily on the sales manager level) ranged from about $15,200 to $21,000 annually during 1960 and 1961.

On or about December 18, 1958, the controller's office of petitioner's glass division prepared an analysis of the factory cost of 11 glass products produced by petitioner and also prepared a list of proposed sales discounts for the glass products to be sold by petitioner to PPGI. The analysis showed the following facts with respect to ⅛-inch polished plate glass:

|  | | *Per square foot* |
|---|---|---|
| Trade domestic price (including packaging) | | $0. 60 |
| Discount of 40 percent [1] | | 0. 24 |
| Net price to PPGI | | 0. 36 |
| Factory costs: | | |
| Inventoriable cost | $0. 23 | |
| Factory fixed | 0. 06 | |
| Research | 0. 02 | |
| SG and Administrative | 0. 02 | |
| Total | | 0. 33 |
| Markup over total cost | | 10 percent |
| Projected net profit | | $0. 03 |

[1] The actual discount subsequently allowed PPGI on ⅛-inch polished plate was 39 percent interest of 40 percent.

In a memorandum prepared by the controller's office of the glass division under date of January 9, 1959, dealing with tentative sales discounts for glass products sold by petitioner to PPGI, it was stated that "Discounts for other products, except the low volume ones and those normally sold at a loss, were determined in proportion to ⅛″ Polished Plate according to their profitability when sold domestically. The low and small volume products were given a flat 5% discount."

The January 9, 1959, memorandum also referred to an attached schedule which showed an estimate of income from sales to PPGI based upon the 1957 export volume, using the average price of glass products sold by petitioner in 1957 to domestic customers. Such estimate of income indicated that at domestic prices the 1957 volume of glass export sales would have yielded a net income of $2,351,000, or 25.2 percent of sales ($9,323,000). On the basis of proposed prices to PPGI (using the tentative discounts in the attached schedules), the estimated net income that would be realized from the 1957 export sales volume was $502,000, or 6.7 percent of sales ($7,474,000). The memorandum stated that the costs used in making the above income

estimates were based upon an overall glass division volume near the 1957 level and probably did not include all of the special type packing necessary for non-Canadian exports.

Based upon the domestic price lists as shown on the December 18, 1958, analysis which was prepared by the controller's office of the glass division and using the actual price discounts as they appeared in the basic agreement subsequently executed by petitioner and PPGI on January 1, 1959, covering the terms and conditions of the sale of products by petitioner to PPGI the profit (per square foot or, in the case of Clear and Solex Bent Duplate, per windshield) on the principal items of plate glass products sold to PPGI would be as shown below:

| Type of glass | Domestic list price | Discount allowed | Price to PPGI | Total cost [1] | Profit to petitioner | Profit after actual 1960–1961 volume discount [2] |
|---|---|---|---|---|---|---|
| ⅛ in. polished plate | $0.60 | $0.234 | $0.366 | $0.32 | $0.046 | $0.02 |
| ¼ in. polished plate | 0.62 | 0.242 | 0.378 | 0.335 | 0.043 | 0.026 |
| ⅛ in. Solex | 0.87 | 0.435 | 0.435 | 0.32 | 0.115 | 0.092 |
| ¼ in. Solex | 0.90 | 0.450 | 0.45 | 0.355 | 0.095 | 0.071 |
| Clear bent duplate | 34.06 | 13.62 | 20.44 | 14.32 | 6.12 | 5.00 |
| Solex bent duplate | 35.44 | 14.18 | 21.26 | 14.32 | 6.94 | 5.77 |

[1] Reduced by 50 percent of the selling, general, and administrative costs shown on the Dec. 18, 1958, analysis. Such costs were in the range of $0.02–$0.03 for the polished plate and solex products and $0.32 for the bent duplate products.
[2] Using an average volume discount of 5.5 percent which actually applied to sales of glass *and* paint products in 1960–61 to PPGI.

Based upon (1) the price of glass products to PPGI as shown in the above table and (2) the average volume discount of 5.5 percent actually granted to PPGI in 1960–61 on glass and paint products, petitioner's net profit (per square foot) on sales of glass products to PPGI would be as follows:

| | Price to PPGI after volume discount | Profit | Percentage of profit to sales |
|---|---|---|---|
| | | | *Percent* |
| ⅛ in. Polished plate | $0.346 | $0.026 | 7.5 |
| ¼ in. Polished plate | 0.357 | 0.022 | 6.2 |
| ⅛ in. Solex | 0.411 | 0.091 | 22.2 |
| ¼ in. Solex | 0.425 | 0.070 | 16.5 |
| Clear bent duplate | 19.32 | 5.00 | 25.9 |
| Solex bent duplate | 20.09 | 5.77 | 28.7 |

The basic agreement executed between petitioner and PPGI defining the obligations, rights, and duties of each party was made effective as of January 1, 1959, and a similar basic agreement executed between Columbia-Southern and PPGI was also made effective as of the same date. The basic agreements set forth PPGI's marketing functions, with the principal provisions in the agreements relating to requirement obligations and prices.

In determining the prices petitioner would charge PPGI for its products, initial price guidelines were prepared by Leland Hazard who had been vice president, general counsel, and a director of petitioner from 1947 through 1958 and a director-consultant from 1959 to 1965. These guidelines reflected (1) the need of petitioner's division heads, who were responsible for the profits made on the sales of products to PPGI, to maintain their profits and (2) the need of PPGI to finance its newly undertaken and costly business activities which included opening up new markets, creating opportunities to exploit technology, and creating opportunities for equity investment.

The price guidelines embodied the general principle that the petitioner's price to PPGI should always yield petitioner a profit of a least 10 percent of net sales and in no event were goods to be sold at less than inventoriable cost plus 25 percent. The actual prices of individual products incorporated in the basic agreements were ultimately computed within each operating division in accordance with the price guidelines.

The basic agreement covering the sale of petitioner's glass and paint products to PPGI included the following provisions and conditions:

1. The prices to be paid for the majority of the products were set forth in schedules attached to the contract. The prices in the schedules were stated in terms of percentage of discount from petitioner's published lists, schedules, and other quotations of general application to the pricing of such products in the domestic market. The prices to be paid by PPGI to petitioner were subject to change in order to reflect any changes in petitioner's domestic prices. Prices on new products were to be negotiated by the parties so as to "yield [petitioner] above cost a profit margin substantially equal to the average profit margin realized by [petitioner] on sales to PPGI of the category of subject products the most nearly similar in character, quality, quantity and use to these subject products so to be priced."

2. Requisitions by PPGI for petitioner's products were to be prepared and forwarded from PPGI's branch office in Havana, Cuba, to petitioner.

3. The usual terms and conditions applicable to petitioner's domestic prices were to be applicable to the sales to PPGI to the extent not inconsistent with the terms of the basic agreement.

4. Title and risk of loss with respect to the products in each shipment destined for Canada or Mexico remained in petitioner until the products were placed on board the carrier at the point of origin; and title and risk of loss with respect to products in shipments destined overseas remained in petitioner until the products arrived at the point of embarkation from the United States.

5. Petitioner agreed to prepare the shipping documents as diverted by PPGI. Such shipping documents were to provide for the retention of title by PPGI to the products involved until delivery of such products by PPGI outside the United States.

6. Section 2.11 of the agreement provided for a schedule of credits to be applied quarterly to the amounts owing by PPGI to petitioner in connection with the purchase of petitioner's products. In any quarter in which the aggregate purchases by PPGI of petitioner's paint and glass products exceeded $2 million there was to be a reduction in the amount payable by PPGI for such products in a percentage amount based upon a graduated scale. No discount was applicable until purchases exceeds $2 million per quarter. Purchases of $2 million up to $2,200,000 were to receive a discount up to 3 percent to be determined by interpolation. Such discount was applicable against the total purchases in the quarter including the first $2 million. The discount percentages increased up to 10 percent for sales of $3 million and above. This section of the agreement further provided as follows:

But in no event shall the aggregate amount to be paid by [PPGI] to [petitioner] for such subject products with respect to any quarter-annual period be less, after application of any reduction as above provided, than an amount which will yield to [petitioner] the aggregate inventoriable value or replacement cost, whichever is higher, of such subject products plus twenty-five percent (25%) of such value or cost.

The agreement stated that the purpose of the volume discount was to provide an inducement for PPGI to promote and expand in foreign countries trade in petitioner's products and to promote, develop, negotiate, and acquire investments which would bear upon the enhancement of such trade in such products and otherwise secure and exploit profit-making opportunities, and to promote the sale and exchange of licensing of patents, technology, trade secrets, and trademarks bearing upon the subject products, which intangible properties PPGI agreed to acquire from petitioner; and to assume the responsibility for and undertake the management of certain properties, stock, and other interests of petitioner outside the United States as might be requested by petitioner.

7. Petitioner agreed to supply (at the request of PPGI) technical services, technical personnel, and facilities requisite for the making of technological surveys and market surveys and other investigations requisite to PPGI's investments outside the United States. PPGI agreed to reimbuse petitioner for its expenditures.

8. PPGI agreed, at the request of petitioner and to the extent that PPGI was equipped and staffed to do so, to supply technical services, technical personnel, and facilities requisite for the making of tech-

nological surveys, market surveys, and other investigations desired by petitioner and to assist petitioner in the management of its holdings outside the United States, for which petitioner would reimburse PPGI for its expenditures.

The above provisions in the basic agreement covering paint and glass products are generally similar to the provisions in the basic agreement between PPGI and Columbia-Southern covering the sale of chemical products by Columbia-Southern to PPGI.

· The basic agreements required PPGI to buy from petitioner, and petitioner to sell to PPGI, 85 percent of PPGI's product needs. The basic agreements were to continue from year to year unless either party gave 60 days' notice of termination.

On October 28, 1959, the two basic agreements were amended effective as of January 1, 1959, providing PPGI would receive a commission of 2 percent on all sales by petitioner and Columbia-Southern of glass, paint, or chemical products destined directly or indirectly to customers (other than PPGI) outside the United States. The amendment applied only to those sales in which the customers insisted on making the purchase in the United States from petitioner after unsuccessful efforts by petitioner to persuade such customers to purchase products from PPGI. The amendments stated that such sales would be recognized as purchases by PPGI under the provisions in the basic agreements for the allowance of volume discounts to PPGI. The reason for the amendments was stated as follows: "Through an oversight the Basic Agreement did not cover sales of * * * products by [petitioner] to customers other than [PPGI], which products are destined directly or indirectly to customers outside the United States, such sales being attributable in whole or in part to the sales, promotional and advertising activities of [PPGI] outside the United States."

The two basic agreements were further amended effective April 1, 1960. These amendments related in part to PPGI's difficulties in making sales in Cuba because of the Castro regime. Under the amendments petitioner agreed to pay PPGI a 15-percent commission on all direct sales of paint products to Cuban customers and an 11-percent commission on all other direct sales to Cuban customers, and Columbia-Southern agreed to pay PPGI a 10-percent commission on direct sales to Cuban customers. The petitioner-PPGI basic agreement was further amended on July 21, 1960, and again on June 5, 1961, to change the discounts on certain enumerated glass products. After Columbia-Southern was merged into petitioner on December 31, 1960, the two basic agreements and the amendments thereto were consolidated by an agreement effective October 1, 1961, between petitioner and PPGI.

The July 21, 1960, amendment increased the discounts on prices for Solargray, rough plate, Solex, and Graylite window glass, while the discount for automotive bent and tempered glass was decreased. In the June 5, 1961, amendment, the discount on ⅛-inch and ¼-inch plate glass (Solex) was decreased. The October 1, 1961, amendment both increased and decreased discounts on various sizes of metal edge Twindow.

Volume discounts are common in world markets and were an integral part of the international glass trade in 1958. Petitioner granted the following volume discounts on the products PPGI sold in 1960 and 1961:

### 1960

|  | Percent |  |
|---|---|---|
| Glass | 5. 302 | ($458, 267÷$8, 644, 097) |
| Paint | 4. 815 | (26, 828÷ 557, 148) |
| Chemicals | none | |

### 1961

|  | Percent |  |
|---|---|---|
| Glass | 5. 629 | ($419, 959÷$7, 460, 137) |
| Fiber glass | 5. 755 | (5, 755÷ 100, 000) |
| Paint | 5. 029 | (29, 098÷ 578, 624) |
| Chemicals | none | |

Petitioner's cost of manufacturing products (with the exception of the byproduct caustic soda) sold domestically was the same as for the products that petitioner sold to PPGI.

In 1960 and 1961 PPGI could have purchased plate or window glass in most foreign markets for lower prices than it paid to petitioner.

Glass export sales of PPGI in 1960 and 1961 included, in addition to plate and window glass, automotive bent and tempered glass, building glass, and optical glass.

In 1960 and 1961 more than one-half of the glass sold by petitioner to PPGI was ¼-inch and ⅛-inch plate glass. During this period ⅛-inch plate glass generally sold at about the same price as ¼-inch plate glass. Throughout 1960 and 1961 the price to PPGI for ¼-inch plate glass and ⅛-inch plate glass was consistently 39 percent below petitioner's published quotations to the trade.

For ⅛-inch plate glass the petitioner-PPGI basic agreement called for a 39-percent discount below the prices quoted in circular letter No. 562 dated June 27, 1956, and for ¼-inch plate glass the petitioner-PPGI basic agreement called for a 39-percent discount below the price quoted in circular letter No. 559 dated June 15, 1956. The prices quoted in these circular letters for ⅛- and ¼-inch plate glass were almost identical:

STOCK SHEETS [1]

| Brackets | Glazing quality | Mirror | |
| | | Glazing quality | |

| Square feet | ⅛ in. | ¼ in. | ⅛ in. | ¼ in. |
|---|---|---|---|---|
| 10–15 | $0.51 | $0.51 | $0.57 | $0.57 |
| 15–25 | 0.51 | 0.51 | 0.59 | 0.59 |
| 25–50 | 0.53 | 0.53 | 0.63 | 0.63 |
| 50–75 | | 0.56 | | 0.66 |
| 75–100 | | 0.57 | | 0.70 |
| 100–120 | | 0.62 | | |
| 120–200 | | 0.91 | | |

CUT SIZES [1]

| Brackets | Glazing quality | Mirror | | | |
| | | Glazing quality | | Silvering quality | |

| Square feet | ⅛ in. | ¼ in. | ⅛ in. | ¼ in. | ⅛ in. | ¼ in. |
|---|---|---|---|---|---|---|
| Up to 1 | $0.27 | $0.27 | $0.34 | $0.34 | $0.36 | $0.36 |
| 1–2.67 | 0.34 | 0.34 | 0.38 | 0.38 | 0.40 | 0.40 |
| 2.67–5 | 0.46 | 0.46 | 0.49 | 0.49 | 0.51 | 0.51 |
| 5–7 | 0.51 | 0.51 | 0.54 | 0.54 | 0.56 | 0.56 |
| 7–10 | 0.58 | 0.58 | 0.60 | 0.60 | 0.62 | 0.62 |
| 10–15 | 0.60 | 0.60 | 0.63 | 0.63 | 0.65 | 0.65 |
| 15–75 | 0.60 | 0.60 | 0.66 | 0.66 | 0.68 | 0.68 |
| 25–50 | 0.69 | 0.65 | 0.69 | 0.69 | | 0.71 |
| 50–75 | | 0.69 | | 0.80 | | 0.82 |
| 75–100 | | 0.75 | | | | |
| 100–120 | | 0.82 | | | | |
| 120–200 | | 1.16 | | | | |

[1] The unit of sales applicable to these pricelists was a carload lot. As a special accommodation, order for plate glass cut sizes for specific requirements would be accepted for shipment in less than carload quantities. There were additional charges for boxing ranging from $8 to $16 per case, depending upon the square feet of glass per case.

Petitioner's published quotations to the domestic trade were not firm prices but rather were the starting point for negotiated prices.

During 1960 and 1961 ⅛-inch plate glass was produced in Europe and after 1959 such European plate glass competed in the United States with domestic plate glass.

In 1960 and 1961 U.S. domestic chemical prices were higher than the prices in most of the markets in which PPGI sold chemical products. In 1960 and 1961, due to the depressed state of some chemical prices, the prices petitioner charged PPGI for chemical products were too high to permit PPGI to earn a fair profit on these products. PPGI repeatedly bargained for lower prices. On occasion, PPGI persuaded petitioner to increase its discounts for chemical products.

For a period of more than 60 years that ended in the early 1950's, W. P. Fuller Co., an unrelated corporation, was petitioner's independent West Coast distributor purchasing petitioner's products (primarily glass) for resale. Petitioner made shipments to Fuller's warehouses as well as directly to Fuller's customers. Petitioner gave W. P. Fuller Co. an extra discount on glass ranging from 5 to 15 percent, which discount was comparable to the volume discount subsequently granted by petitioner to PPGI. The Fuller discount applied to ship-

ments made from petitioner's factories directly to Fuller's customers. These direct shipments were a substantial portion of petitioner's sales to Fuller.

In the 1950's Columbia-Southern in a long-term contract for the sale of chlorine to Union Carbide Corp. granted the purchaser a special discount equivalent to a volume discount with the result that the net price was substantially lower than the normal domestic market price.

Petitioner paid PPGI a 2-percent commission on all direct export sales. The bulk of the commission sales was of chemical products. The commission was paid on sales to PPGI's customers who wanted to take delivery in the United States or to customers who, during PPGI's formative period, insisted on being invoiced by petitioner for a variety of reasons.

The commission of 2 percent was compensation for the substantial sales functions performed in connection with the commission sales and was also intended to compensate PPGI for providing a worldwide marketing staff and marketing network for petitioner's products. In some instances the commission was paid on sales by petitioner to competitors of PPGI such as brokers who had bid successfully on business in direct competition with PPGI.

In 1961 PPGI worked for about 3 months through an agent in Turkey to get a sizable caustic soda order. PPGI lost the business to Imperial Chemical Industries, Ltd., a leading United Kingdom chemical producer. Imperial Chemical had underbid PPGI with caustic soda purchased from petitioner for a price less than the price at which petitioner had offered the material to PPGI. The caustic soda sold by Imperial Chemical in Turkey had a value of approximately $230,000 to $240,000.

In 1961 PPGI had nearly completed a $188,000 sale in Indonesia of anhydrous caustic soda only to learn that the Central Bank of Indonesia had ruled that the payee of a letter of credit must be a resident of the country of origin of the merchandise. As a consequence, petitioner had to invoice the sale.

Under a 1954 agreement with Columbia-Southern, Columbian Carbon Co. (a domestic corporation) bought silica pigment products from Columbia-Southern for resale outside the United States and Canada. PPGI called upon foreign agents of Columbian Carbon to determine the international market for these products and such information, which was not available from Columbian Carbon, was supplied to Columbia-Southern. Use of such information enabled Columbia-Southern to adjust its output and increase its sales. In 1960 the annual sales to Columbian Carbon were approximately $500,000.

From April 1, 1960 (the effective date of the amendments to the basic agreements giving PPGI commissions ranging from 10 percent to 15 percent on direct sales by petitioner to customers in Cuba), through December 31, 1960, petitioner paid commissions to PPGI for its efforts in helping petitioner make direct sales of approximately $40,000 to Cuba.

Commissions paid to PPGI in 1960 on export sales of glass and paint products made by petitioner amounted to about $14,000 and about $25,000 in 1961. Commissions paid to PPGI on export chemical sales amounted to about $74,000 in 1960 and $35,000 in 1961.

Pittsburgh Corning Corp. (hereinafter called Pittsburgh Corning) was owned by petitioner and Corning Glass Works in equal shares. Corning Glass Works was unrelated to petitioner.

PPGI and Pittsburgh Corning entered into an agreement effective January 1, 1960, which provided that PPGI would be the exclusive agent of Pittsburgh Corning in designated foreign countries for the sale of "subject products" manufactured by Pittsburgh Corning which included glass blocks, Foamglas insulations, and refractory materials. The agreement made PPGI the exclusive agent of Pittsburgh Corning in all foreign countries other than Canada with respect to such products, except that for Foamglas insulation most European countries and the United Kingdom were excluded from the agency territory.

The agency agreement between PPGI and Pittsburgh Corning included the following provisions:

1. PPGI agreed to conduct its operations in behalf of Pittsburgh Corning through offices and subagencies in the designated foreign countries to be maintained at the expense of PPGI. PPGI could elect not to disclose to customers that Pittsburgh Corning was its principal. All orders for Pittsburgh Corning products destined to countries covered by the agency agreement were to be routed exclusively through PPGI and all inquiries for Pittsburgh Corning products from such countries were to be referred to PPGI.

2. Pittsburgh Corning agreed to prepare all shipping documents at its own cost.

3. PPGI agreed to prepare collection invoices and forward them to customers of Pittsburgh Corning products. Amounts collected by PPGI were to be remitted to Pittsburgh Corning. PPGI assumed the credit risk and agreed to indemnify Pittsburgh Corning for accounts remaining unpaid for 1 year after date of shipment, less PPGI's commissions.

4. Pittsburgh Corning agreed to inform PPGI from time to time of the specified quantities of subject products available for sale in the designated countries, together with the prices, terms, and conditions under which orders for such products could be taken by PPGI on

behalf of Pittsburgh Corning. PPGI agreed to solicit orders and transmit them to Pittsburgh Corning for acceptance, confirmation, and shipment.

5. Pittsburgh Corning agreed to pay to PPGI commissions of 10 percent of the sales price of glass products and 7½ percent of the sales price of Foamglas. If the invoice price to a customer was greater than Pittsburgh Corning's applicable distributor price, then Pittsburgh Corning would pay the excess to PPGI in addition to the commission. The commissions due PPGI were payable upon receipt of payment by Pittsburgh Corning.

6. The term of the contract was for 1 year and then from year to year if each party notified the other within 60 days prior to the end of the year of its intention to continue the agreement. The agreement was subject to termination by either party at any time on 60 days' written notice. When the agreement terminated, there would be an accounting between the parties and PPGI would be paid commissions with respect to sales for which Pittsburgh Corning had received payment, with the remaining compensation to PPGI payable when Pittsburgh Corning received payment.

PPGI sold the Pittsburgh Corning products through the same agencies that handled the glass products produced by petitioner. The same agency contracts covered the products of both petitioner and Pittsburgh Corning. PPGI generally paid its agents a commission of 5 percent on glass blocks and 4 percent on Foamglas insulation. The principal products of Pittsburgh Corning handled by PPGI were glass blocks.

PPGI carried on all correspondence and billings on its own letterheads and billheads.

PPGI received commissions in the amounts of $63,696 and $96,182 in 1960 and 1961, respectively, from the sale of Pittsburgh Corning products. The gross sales by PPGI of Pittsburgh Corning products in 1960 and 1961 were in the approximate amounts of $616,000 and $706,000, respectively.

The agency agreement between PPGI and Pittsburgh Corning was an arm's-length transaction. In 1964 PPGI terminated the agency with respect to Foamglas because it became unprofitable at the 7½-percent commission rate.

PPGI performed the following functions with its independent marketing organization: (1) Determined which existing markets to expand and which new markets to try to create; (2) determined the method and means of exploiting markets; (3) determined how to service customers; (4) determined what products to promote; (5) determined prices for its various products in the various markets;

(6) determined the form of payment as well as the credit terms for customers; and (7) determined methods of shipment and means for expediting shipment.

PPGI was able to expand the export markets it acquired from petitioner, petitioner's export corporation (PPGE) and Columbia-Southern. PPGI substantially increased the sales of glass products to CPI (the Canadian corporatiton controlled by petitioner). In 1960 PPGI made net sales of glass products to CPI in the amount of $814,990 and in 1961 the net sales to CPI increased to $1,335,709. During the period from 1959 through 1967, PPGI's sales to CPI have approximately tripled.

In 1959 PPGI had 86 export glass customers, all of them acquired from petitioner and its export corporation (PPGE). By 1965 PPGI had increased the number of its export glass customers to 568 and by 1967 to more than 700.

Through the year 1961 petitioner's Canadian subsidiaries, Duplate and CPI, were managed by W. Eric Phillips who was also a director and stockholder of petitioner. The operation of these Canadian subsidiaries by Phillips was autonomous. CPI, which was wholly owned by petitioner in 1960 and 1961, was a glass and paint distributor. It sold glass to users of the product (manufacturers) as well as to dealers. It also performed contract work, such as glazing buildings. Duplate, which was two-thirds owned by petitioner in 1960 and 1961, fabricated glass parts for the automotive original equipment market in Canada, the largest single Canadian market for glass products. Its customers consisted of the Canadian subsidiaries of General Motors Corp., Ford, and Chrysler. Duplate's sales to these customers were on a yearly contract basis. In addition to automotive parts, Duplate fabricated double-glazed units, aircraft windshields, and a wide variety of tempered glass for the building trade. Standard Chemical, which was wholly owned by petitioner in 1960 and 1961, was a distributor and manufacturer of chemicals in Canada.

Petitioner's sales account with Duplate, beginning before petitioner acquired control of Duplate, had grown over a period of years when it was handled by petitioner's export department and it became PPGIs largest customers when PPGI went into operation. The sale of petitioner's products to CPI was similarly a large account when PPGI was formed.

PPGI executed written agreements with Duplate and CPI effective as of January 1, 1959, and with Standard Chemical effective February 1, 1960. Under the CPI agreement, CPI was obligated to purchase from PPGI 35 percent of CPI's annual requirements for plate glass, sheet glass, and special glass products not produced in Canada and PPGI was obligated to sell to CPI up to 85 percent of CPI's requirements for

such products. The amount of the purchases between 35 percent and 85 percent were to be set by CPI. The percentage requirements were limited to products not produced in Canada. Under the CPI agreement all prices charged by PPGI were to be as favorable as those PPGI charged any other jobber or mirror manufacturer. The Duplate agreement (covering plate glass and sheet glass products) was substantially similar to the CPI agreement except that PPGI's prices had to be as favorable as PPGI's prices to any of its customers. Under the Standard Chemical agreement, it was obligated to purchase from PPGI 60 percent of Standard Chemical's annual requirements for non-Canadian products. Under the Standard Chemical agreement all prices were to be competitive with those available to Standard Chemical from other sources. A cash discount of 1 percent was allowed under the agreements on all sales to Duplate and CPI.

PPGI's agreements with Duplate and CPI contained price schedules for most of the glass products involved. The prices for products not specified in the schedules were to be those set forth in PPGI's pricelist applicable to the Canadian market. The prices designated in the schedules were to point of entry in Canada designated by Duplate or CPI, with freight collect, but with freight equalization to be allowed from certain points of origin in the United States.

During the period when PPGI had its office in Havana, it was linked with petitioner's foreign-service departments by teletype service. No teletype service existed between the Havana office and petitioner's Canadian subsidiaries. When PPGI moved its office to Puerto Rico, teletype service linked it both to the Canadian subsidiaries of petitioner as well as to petitioner's foreign-service departments.

The bulk of the glass sold by PPGI to Duplate in 1960 and 1961 was plate glass which Duplate used to laminate, bend, and cut to shape for automotive uses. Substantially all of the glass used by Duplate for laminating was purchased from PPGI.

No distinction was made with respect to Canadian shipments in establishing the prices paid by PPGI to petitioner. PPGI obtained the same discounts on the shipments to Canada as on sales to customers in other countries. Shipments to the Canadian subsidiaries were made by rail and truck from petitioner's warehouses and factories in the United States.

The records of PPGI indicate that its total gross income from the sale of glass products to Duplate and CPI (computed after deductions from sales of freight equalization, outgoing transportation, and volume discounts) amounted to approximately $2,611,000 in 1960 and 1961, and its total gross income (similarly computed) from the sale of glass products to others during these 2 years amounted to about $1,369,000.

On occasion Compagnie de Saint Gobain, an important producer of glass products in Europe, has used one of its subsidiaries, Claritude Ltd., to sell glass products to another of its subsidiaries, Improglass Ltd.

At least until the year 1959, CPI bought glass products from several domestic and European glass producers unrelated to petitioner. During 1960 and 1961 CPI did not limit its purchases of glass products to PPGI but also obtained such glass products from at least one other manufacturer, Compagnie de Saint Gobain. At least until the year 1959 Duplate also purchased glass products from European glass manufacturers as well as from petitioner. During the years 1960 and 1961, Duplate continued to purchase glass from suppliers other than PPGI. During the years 1960 and 1961 Standard Chemical purchased substantial quantities from producers unrelated to petitioner.

In 1959 PPGI made sales of glass products to customers other than petitioner's Canadian subsidiaries (Duplate and CPI of about $2,500,000. By the end of 1967 these sales had increased to about $7,500,-000. PPGI also increased the sales of chemical products over the years to Standard Chemical (petitioner's controlled Canadian subsidiary) and to customers in Asian, Middle Eastern, and African markets.

PPGI increased the export sales of paint products from 1960 through 1967, a period marked by increasing competition from local manufacturers of such products in the foreign markets. In 1960 PPGI sold paint products in the amount of $600,000 or $700,000 and during the first quarter of 1968, its paint sales were at an annual rate of about $3 million. In 1959 PPGI had approximately 154 export paint customers, most of them acquired from petitioner and from PPGE (the export corporation). By 1965 PPGI increased this number to 240 and by 1968 to over 300 export paint customers.

PPGI was able to create new export markets for petitioner's products. PPGI had a small volume of business in Europe in 1960 and 1961. Subsequently, PPGI succeeded in creating substantial new markets in various European countries. PPGI opened new markets for petitioner's glass products in Australia, New Zealand, and Brazil and also opened new markets for petitioner's chemical products in Argentina and Mexico.

Since its formation in 1959 PPGI adopted an aggressive, flexible price policy enabling it to meet competitive prices in the various markets of the world. In 1960 and 1961 PPGI's sales personnel constantly kept informed of the prices its competitors charged in the world markets. PPGI made adjustments from time to time in the price of glass to Duplate (petitioner's controlled Canadian subsidiary) so that Duplate could sell fabricated glass to Canadian automotive manufac-

turers and other customers at competitive prices. PPGI also made adjustments from time to time in the price of glass sold to CPI (petitioner's controlled Canadian subsidiary) to enable CPI to meet competition in the Canadian market from other suppliers. These adjustments to the prices charged to CPI included advertising allowances, rebates, and commissions on certain glass shipments.

In making sales of glass products in foreign markets PPGI followed the prevailing custom of granting various discounts on such sales, including cash discounts, volume discounts, and discounts for membership in an association. Where necessary, PPGI reduced prices and sold products at a loss in order to obtain and keep a foothold in certain markets.

PPGI worked directly with freight forwarders and shipping companies to reduce freight costs of its chemical sales. In connection with sales of caustic soda in Argentina PPGI devised a plan for shipping liquid caustic soda instead of anhydrous caustic soda thereby realizing a reduction in freight costs.

PPGI had a marketing organization which was adequately staffed to deal with the various aspects of export marketing, including customer contact and service, contract negotiations, marketing research, technical assistance, and credit arrangements. In marketing petitioner's products, PPGI relied in part on a network of foreign commission agents or representatives. PPGI had a sales manager, with assistants, for each of the main product lines it sold, i.e., glass products, paint products, and chemical products.

During the period from 1959 through 1961, PPGI executed approximately 50 agency agreements with agents in numerous foreign countries and foreign areas in South America, Europe, Africa, the Near East, and Asia covering the sale of glass products, paint products, and chemicals. PPGI expanded the number of its foreign commission agents for chemical products from about 19 or 20 early in 1959 to about 30 or 31 by the end of 1961.

Generally, an agency covered a territory of one or more countries. A typical agency contract provided that the agent would be the sole and exclusive agent in the designated country or countries for the listed products. The agency might be for both glass and paint products or only one of them. The agent was to conduct his operations through offices and subagencies and all orders were to be forwarded to PPGI's Havana office or its Santurce (Puerto Rico) office. All orders for shipments were to be routed exclusively through the agent and every inquiry that PPGI might receive from the agent's territory for any of the listed products was to be referred to the agent unless otherwise specified by the customer. PPGI was to keep the agent informed of the specific quantities of products available for sale in his territory and

the relevant prices, terms, and conditions. The agent was to furnish PPGI with full information as to the customer's financial and credit standing. All orders were subject to acceptance by PPGI. Provision was made for insurance on shipments. The agency contract continued from year to year and was terminable on 60 days' notice from the end of the year. When an agreement terminated, an accounting would be made between PPGI and the agent, with the agent being paid commissions on sales for which PPGI had received payment—otherwise the agent's commissions would be payable when PPGI received payment from the customer.

The agency contracts covered the products of both petitioner and Pittsburgh Corning Corp. Agents were paid commissions ranging from 1½ percent to 15 percent. Generally, however, the agents were paid a commission of 5 percent on glass products with the exception of a 4-percent commission on Foamglas insulation, a commission of 10 percent on special glass orders, a commission of 5 percent on industrial paint, and 10 percent on other paint products.

PPGI's marketing staff had full responsibility for sales trips and about one-half their time was spent in traveling. Such trips resulted in increased sales and also served to tighten PPGI's marketing organization. PPGI kept in close contact with its major customers, such as Duplate and CPI, making adjustments in terms and prices to enable customers to meet their competition and expediting the delivery of products when necessary. PPGI made constant efforts to service its customers, assisting them in marketing the products PPGI sold to them, tailoring the products to meet the competition encountered by the customers, and making other efforts to improve the quality of the service PPGI offered to its customers. PPGI also sold products for unrelated manufacturers.

PPGI made market studies for petitioner's chemical products to determine the potential of old and new markets.

In 1960 and 1961 PPGA (the wholly owned subsidiary of PPGI in Argentina) had alkali storage tanks in Argentina. PPGI also had an alkali storage tank in Cuba. PPGI had some inventories in transit and in bonded warehouses and some few commission agents of PPGI kept inventories. Generally, however, PPGI ordered products directly from petitioner and petitioner would send them directly to PPGI's customers.

PPGI carried marine and war risk insurance on all shipments and, upon request, would take out insurance covering all risks from warehouse to warehouse, covering such items as breakage, water damage, and other contingencies.

PPGI bore the credit risk on all sales. Its controller-general worked with the marketing staff on credit matters. PPGI's customers for the most part paid PPGI in anywhere from 30 to 180 days. PPGI however

would generally pay petitioner within 10 days from the date of billing and no later than 30 days.

In 1960 and 1961 PPGI paid for advertising materials such as color cards, booklets, and other sales literature it used to promote sales.

Much of PPGI's export business consisted of small sales scattered throughout the world and it was necessary to meet the differing quality and packing requirements of this multiplicity of customers. PPGI's agents supplied the necessary shipping instructions which were obtained by the agents from the customers. PPGI's marketing organization was prepared to deal with most of the major languages of the world as well as the laws and customs and documentary requirements of various foreign countries.

All customer complaints were directed to PPGI, which dealt with such complaints and took whatever action was required. In the case of glass and paint products PPGI, directly or indirectly (through the petitioner's foreign service departments), made every effort to expedite shipments to customers. In the case of chemicals, PPGI expedited shipments directly by contacting the plant of origin.

Petitioner established special departments to service some of its larger customers. It created the Detroit Automotive Glass Sales office to service the Detroit automotive manufacturers, to market products, and to perform other general marketing functions. Petitioner also organized two foreign-service departments, one for glass products and one for paint products. The petitioner's foreign-service department for glass products performed the following functions for PPGI: (1) Received PPGI's sales orders and routed them to the appropriate factory; (2) expedited these orders in accordance with instructions from PPGI; (3) prepared necessary export documents; (4) notified PPGI of petitioner's prices for new glass products upon request; (5) acted as PPGI's liaison with petitioner in obtaining the technical, commercial, and other information requested by PPGI.

The preparation of invoices and the expediting of shipments were the largest activities of petitioner's foreign-service department (glass). Invoices on Canadian sales were sent to a bank in Canada for endorsement and passage of title in Canada. Invoicing of foreign shipments by the foreign-service department (glass) was complicated by the details involved and the requirements of timely mailing to Canada for endorsement without incurring demurrage charges on shipments.

PPGI sent its orders for glass products to the foreign-service department (glass) from Havana by teletype and from Puerto Rico by Telex. PPGI confirmed all wired orders by mail. The foreign-service department (glass) had 12 employees in 1959 and 10 when it was disbanded in 1963. In 1960 the cost of operating the foreign-service department (glass) was $126,183 and in 1961 the cost was $125,995.

In 1960 the salary of John de Bruyn Kops, the coordinator of the foreign-service department (glass), was $16,700 and in 1961 it was $17,200. He formerly had been petitioner's sales representative to the Canadian glass trade (1946–52) and then general sales manager of CPI's window glass division. In 1960 and 1961 the next highest paid employee in petitioner's foreign-service department (glass) earned less than $7,000 per year.

Petitioner's foreign-service department (paint) performed the following functions for PPGI: (1) Received sales order from PPGI and routed such orders to the appropriate factories; (2) expedited the sales orders in accordance with instructions from PPGI; and (3) supplied prices of petitioner's new paint products to PPGI upon request. This department consisted of four employees with a coordinator, Robert E. Kenward. During the period he served as coordinator, Kenward also performed other duties for petitioner unrelated to export sales.

At a meeting of petitioner's board of directors held on December 12, 1962, the impact of the Revenue Act of 1962 on the operations and organization of PPGI was discussed and the decision was reached to move PPGI's trading office from Puerto Rico to Pittsburgh. The board of directors also voted to elect to use the minimum distribution provisions of the Revenue Act of 1962 for all controlled foreign subsidiaries considered as a group. The board further decided (1) that petitioner would make no more transfers of technology to PPGI; (2) to amend existing agreements for the sale of technology by petitioner to PPGI by eliminating PPGI's obligation to make prescribed installment payments and to substitute therefor PPGI's obligation to pay petitioner 70 percent of PPGI's gross income from licenses of such technology until the full amount of PPGI's outstanding obligation was paid; and (3) that petitioner should purchase PPGI's investments in various countries.

The move by PPGI of its trading office from Puerto Rico to Pittsburgh reduced PPGI's expenditures by approximately $150,000 per year, which reduction included the Telex service expenditures of about $50,000 per year. A reduction in the number of employees also contributed to the decrease in expenditures after the move to Pittsburgh. Most of the personnel in petitioner's foreign-service departments were integrated into the PPGI organization in 1963 with some 14 employees (formerly with petitioner's foreign-service department) replacing a like number of employees who had worked for PPGI in its Puerto Rico office. The move to Pittsburgh also eliminated the extra compensation for PPGI's employees while they worked in Havana and Puerto Rico.

During the period 1959 through 1961, PPGI had personnel experienced in licensing glass, paint, and chemical technology in foreign countries. PPGI only acquired technology from petitioner when it appeared that PPGI could profitably exploit such technology in the

near future. PPGI generally had five or six employees in the field contacting potential licensees and it was active in the effort to acquire new licensees, furnishing them with assessment data and other detailed information bearing upon the profitable uses of a license. PPGI serviced its licensees by forwarding them updated technology and marketing reports and kept informed of the needs of its licensees. PPGI also arranged meetings between licensees and petitioner's technical staff when necessary. Petitioner was compensated for its services to PPGI's licensees.

After the adoption of the Revenue Act of 1962, petitioner's board of directors decided to license technology directly and PPGI performed services for petitioner in connection with the transfers of technology by petitioner to third parties. PPGI was not compensated for these services.

From 1959 through 1961 PPGI explored opportunities outside the United States for investments in new or existing companies capable of using petitioner's technology. PPGI's staff made intensive studies and marketing surveys in different world areas. On occasion PPGI retained professional counsel to make studies of foreign investment opportunities.

From its organization through 1962, PPGI made the following investments: (1) A 50/50 joint venture with A.K.U., a Dutch company, to form N.V. Silenka A.K.U., a Dutch company engaged in the manufacture of fiber glass yarn in the Netherlands; (2) a 50/50 joint venture with Rumianca S.p.A., a large Italian chemical company, to form Chimica Sarda S.p.A., an Italian company engaged in the production of chlorinated hydrocarbons in Sardinia; (3) entered into a joint venture with Societa Edison to form Pennitalia S.p.A., an Italian company engaged in the production of sheet glass in Salerno, Italy. PPGI had more than a 50-percent interest in Pennitalia; (4) a wholly owned Argentine subsidiary (Pittsburgh Plate Glass Argentina) to engage in the warehousing and distribution of petitioner's chemical products. PPGI capitalized this subsidiary with approximately $300,000; (5) acquired a 25-percent interest in Les Usines J.G. deConinck & Fils S.A., a Belgian paint manufacturer, in consideration for cash plus the right to use PPGI's paint and coating technology; (6) acquired a 7½-percent interest in Les Soudieres Reunies La Madeleine-Varangeville S.A., a French chemical producer, in exchange for the right to use PPGI's soda ash technology; and (7) acquired more than a 50-percent interest in a French paint manufacturer (Peintures Corona & Huileries De Valencienes).

From its organization through 1962 PPGI studied a number of investment opportunities that, for various reasons, it did not pursue such as (1) the economic feasibility of constructing sheet glass factories in Argentina, Puerto Rico, Jamaica, and India; (2) the economic feasi-

bility of constructing a fiber glass plant in Chile; (3) the economic feasibility of constructing cement plants in Argentina, Puerto Rico, and Jamaica; (4) the economic consequences of acquiring paint factories in Brazil, Venezuela, Mexico, and France; and (5) the economic consequences of investments in a chromium chemicals plant in Mexico, soda ash plants in India and Brazil, and a chlorine-caustic soda plant in Australia.

Following the enactment of the Revenue Act of 1962 petitioner acquired PPGI's interests in N.V. Silenka A.K.U., Chimica Sarda S.p.A., Pennitalia S.p.A., and Peintures Corona & Huileries De Valencienes.

From 1959 through 1961 PPGI managed all of petitioner's foreign investments outside of Canada. On September 30, 1960, petitioner transferred its direct holdings in the following companies to PPGI as a contribution to PPGI's capital: Cristalerias de Chile S.A.; C.V.B.; Cia Vidraria Santa Marina; and Cristalerias Rigolleau S.A.

In 1960 and 1961 Societe Anonyme des Glaces de Courcelles, a Belgian glass distributor, was a wholly owned foreign subsidiary of petitioner. Nearly all of Courcelles's sales were of $\frac{1}{4}$-inch plate glass purchased in stock sheets from Franiere, a Belgian subsidiary of Compagnie de Saint Gobain (a large scale producer of plate and window glass). Courcelles cut and packed the glass it purchased from Franiere and resold it chiefly to customers in Europe and also to customers in numerous other world markets.

In 1960 and 1961 PPGI purchased 2,703,000 square feet and 3,450,000 square feet, respectively, of $\frac{1}{4}$-inch plate glass from petitioner. PPGI had a contractual right under the basic agreement with petitioner to purchase uncut and unpacked $\frac{1}{4}$-inch plate glass in stock sheets, after allowance for a 39-percent discount and a 5-percent volume discount from list price, at net prices of about $0.29 per square foot in the 10—25 square feet bracket to about $0.52 per square foot in the 120—200 square feet bracket.

In 1960 PPGI paid petitioner $0.36 per square foot for $\frac{1}{4}$-inch plate glass before the volume discount. After a volume discount of about 5.302 percent received by PPGI for glass purchased in 1960 the net price to PPGI for $\frac{1}{4}$-inch plate glass was $0.34 per square foot. In 1961 PPGI paid petitioner $0.34 per square foot for $\frac{1}{4}$-inch plate glass before the volume discount. After a volume discount of about 5.629 percent received by PPGI for glass, it purchased in 1961 the net price to PPGI for $\frac{1}{4}$-inch plate glass was $0.32 per square foot.

In 1960 and 1961 the sales by petitioner's glass division to PPGI of $\frac{1}{4}$-inch plate glass amounted to $972,000 and $1,164,000, respectively. In 1960 and 1961 the sales of $\frac{1}{8}$-inch plate glass by petitioner's glass division to PPGI amounted to $3,068,000 and $2,866,000, respectively.

Throughout 1960 and 1961 the market price for ⅛-inch plate glass was identical or nearly identical with the market price for ¼-inch plate glass.

In 1960 and 1961 PPGI paid substantially the same price to petitioner for ⅛-inch and ¼-inch plate glass.

In 1960 and 1961 Courcelles paid an average of approximately $0.20 per square foot for stock sheets of ¼-inch plate glass purchased from Franiere. Courcelles' total costs during this period after direct cutting and packaging expenses and fixed, selling, general, and administrative expenses were an average of approximately $0.41 per square foot. Courcelles' net sales prices during this period were an average of about $0.48 or $0.49 per square foot for the ¼-inch plate glass. Courcelles' cost of cutting and packing averaged 7.7 cents in 1960 and 8.4 cents in 1961.

In 1960 and 1961 petitioner cut and packed the 10–25 square feet sizes of glazed quality ¼-inch plate glass for $0.09 per square foot. In the brackets 25–50 square feet and higher, this cost ranged from $0.12 to $0.25 per square foot.

In 1960 and 1961 the Franklin Glass Co. was a domestic manufacturer and distributor of plate glass with a plant in Butler, Pa. In 1960 and 1961 the Franklin Glass Co. was not related to petitioner. During these years petitioner sold a substantial amount of plate glass products to the Franklin Glass Co. at prices lower than those it charged PPGI. On ¼-inch plate glass petitioner charged Franklin Glass Co. from $0.01 to $0.06 per square foot less than it charged PPGI, depending on the size bracket. On Solargray glass petitioner's prices to Franklin Glass Co. were from $0.03 to $0.17 per square foot less than the prices it charged PPGI, depending on the size bracket.

In 1960 and 1961 DuPont sold Dulux and Duco automotive refinishing materials to outside distributors at lower prices than PPGI was able to buy comparable products from petitioner. During this same period PPGI bought some Federal specification paints, including such items as spray can coatings, from outside suppliers at lower prices than PPGI was able to buy comparable paints from petitioner.

In 1961 petitioner sold caustic soda in the amount of approximately $230,000 to $240,000 to Imperial Chemical Industries, Ltd. (a leading chemical producer in the United Kingdom and a competitor of PPGI), at a price lower than the price PPGI was then paying petitioner for such product. In 1961 Columbia-Southern sold about 70,000 tons of liquid caustic soda to the Olin Mathieson Co. for $25 per ton. In 1961 PPGI paid petitioner about $27 per ton for a substantial amount of such caustic soda.

Except for a determination of pretax profits from the paint sales to PPGI in 1959, 1960, and at least a part of 1961, the petitioner did not make any determinations in its books and records or financial

statements of its pretax profits for 1960 and 1961 from sales to PPGI or from commission export sales. In 1967 petitioner's counsel retained C. Paul Jannis, a certified public accountant and a partner in Price Waterhouse & Co., to determine petitioner's profit on these sales.

PPGI's audited and unaudited financial statments for 1960 cover the 13-month period from December 1, 1959, through December 31, 1960. PPGI's audited financial statments for 1960 and 1961 do not show PPGI's trading profit by product group. However, the unaudited financial statments of PPGI for 1960 and 1961 show trading profit by product group.

C. Paul Jannis in March 1968 undertook the assignment to determine the net income or trading profit of PPGI by product groups for the years 1960 and 1961. He undertook to divide PPGI's trading profit into four major product groups—glass, fiber glass, paint, and chemicals; to subdivide glass into CPI, Duplate, and other sales; to subdivide chemical into Standard Chemical, PPGA, and other sales; and to reconstruct PPGI's operating statements for the years 1960 and 1961.

Petitioner's books and records and internal financial statements contain information on profitability by four basic organizational units. In 1960 and 1961 petitioner's glass division was subdivided into three profit centers, each consisting of a product group: (1) Window glass; (2) plate glass; and (3) building and optical products. In 1960 and 1961 petitioner's chemical division was subdivided into 15 profit centers, each consisting of a product group: (1) Soda ash; (2) chlorine; (3) caustic soda; (4) calcene and silica pigments; (5) calcium chloride; (6) titanium tetrachloride; (7) hypochlorites; (8) solvents and chlorobenzenes; (9) agricultural chemicals; (10) ammonia; (11) chrome products; (12) hydrogen peroxide; (13) barium products; (14) barberton cement; and (15) E.D.C. and miscellaneous. In 1960 and 1961 petitioner's fiber glass division and its paint and brush division each constituted a profit center.

Petitioner's books and records and internal financial statements are set up to show the profit contribution and net profit of each profit center. Sales are broken down in the books and records into major categories. For instance, the plate glass profit center included such subcategories as Detroit automotive sales and export sales. With the exception of the internal financial statements of the paint and brush division for 1960 and 1961 which indicate the net profit (or loss) on sales to PPGI, the petitioner's books and records and internal financial statements do not show the net profit for the different sales categories but do reflect their profit contribution.

To determine the net profit of petitioner's export sales, Jannis used the profit-contribution method. Profit contribution is the excess

of net sales over inventoriable costs (cost of goods sold). Under the profit-contribution method, all costs of a profit center that can be directly traced to· a particular type of sale are allocated to that sale, and all common costs of a profit center are allocated to a particular type of sale by the ratio of the profit contribution of that type of sale to the total profit contribution of that profit center. The common costs allocated by Jannis using the profit-contribution method were period or fixed costs of production, research, engineering, selling, advertising, general, and administrative expenses.

From the books and records and internal financial statements of petitioner Jannis obtained the net sales to PPGI and the inventoriable costs of such sales for each of the three profit centers in the glass division, for all of the 15 profit centers of the chemical division except for caustic soda, for the paint and brush division, and for the fiber glass division. He obtained from trial balances and from contemporaneously prepared reports the volume discounts that petitioner granted PPGI and allocated them to petitioner's profit center in accordance with net sales. He obtained the net commission export sales for petitioner's fiber glass division and for the three profit centers in the glass division from contemporaneously prepared quarterly reports. He obtained the net commission export sales for petitioner's paint and brush division from petitioner's internal financial statements. Because it was impossible to obtain the inventoriable cost of the products sold in commission sales in the glass, paint and brush, and fiber glass divisions, Jannis obtained the inventoriable cost of such sales by multiplying the total inventoriable cost for each profit center by the ratio of that profit center's net commission export sales to the total net sales.

Jannis obtained the net commission export sales for all of the 15 profit centers in petitioner's chemical division (except for caustic soda) from petitioner's internal financial statements. He obtained the inventoriable cost for the chemical products sold in commission export sales from petitioner's books and records and internal financial statements.

In 1960 and 1961 petitioner was a large producer of chlorine and caustic soda in the United States. During these years petitioner had the following chemical plants ranked in order of size of potential caustic soda and chlorine production: (1) Lake Charles, La.; (2) Natrium, W. Va.; (3) Barberton, Ohio; and (4) Corpus Christi, Tex. Under the electrolytic process used by petitioner for producing chlorine, electricity is passed through a brine solution causing the brine to disassociate into chlorine gas and sodium. The sodium reacts with the water present to form hydrogen and caustic soda. Due to the chemical nature of salt, it is inevitable that for each atomic weight unit of chlorine produced by electrolysis 1.1 atomic weight units of caustic soda are produced.

Petitioner and other segments of the chemical industry consider the caustic soda resulting from the electrolytic production of chlorine as a byproduct. In the last 15 to 20 years the demand for chlorine has grown at a far greater pace than the demand for caustic soda. Among the growing uses for chlorine are chlorinated synthetics, polyvinyl chloride, chlorinated organics (including cleaning solutions), chlorinated pigments, and the use of chlorine for treating municipal water supplies and bleaching.

By 1956 the electrolytic process supplied all the caustic soda required in the United States. By 1957 the total caustic soda produced in the United States by the electrolytic process exceeded the sales and ordinary uses of such caustic soda.

In 1952 petitioner's surface storage capacity for caustic soda was 55,000 tons and by September 1960 it had reached 172,000 tons. In 1960 petitioner's total caustic soda production was about 600,000 tons and in 1961 it was about 580,000 tons. By 1960 petitioner's caustic soda storage tanks were completely full and it was not economically feasible for petitioner to continue building new storage facilities. Caustic soda is hazardous and during 1960 and 1961 the disposition of caustic soda was curtailed by pollution abatement statutes.

In 1960 and 1961 petitioner attacked the immediate problem of excess caustic soda in three ways: (1) It investigated and found some additional internal or captive uses for caustic soda; (2) it contacted caustic soda producers who were using the more expensive lime-soda process and managed to sell caustic soda to some of them; and (3) it sought (with little success) to persuade users of other alkalis to substitute petitioner's caustic soda.

Among petitioner's additional captive uses for excess caustic soda in 1960 and 1961 were: (1) Carbonating 18,350 tons in 1960 and 16,639 tons in 1961 for use as a replacement for soda ash for brine treatment (yielding petitioner the equivalent of $13 a ton for the caustic soda); (2) using 2,151 tons in 1960 and 1,860 tons in 1961 as a replacement for soda ash in making bicarbonate of soda (yielding petitioner the equivalent of $8 a ton for the caustic soda); (3) using 48 tons in 1960 and 54 tons in 1961 in petitioner's silicate furnace operation (yielding petitioner the equivalent of $8 a ton for the caustic soda); (4) using 23,463 tons in 1960 and 29,537 tons in 1961 as a replacement for lime in petitioner's ammonia-soda operation (yielding petitioner the equivalent of $6.50 a ton for the caustic soda); and (5) neutralizing 684 tons in 1960 and 624 tons in 1961 with muriatic acid to form salt (resulting in a loss to petitioner of $2.50 a ton on the caustic soda). Petitioner disposed of a total of 52,148 tons of caustic soda in 1960 and a total of 53,550 tons of caustic soda in 1961 through additional captive use.

In 1960 and 1961 petitioner filled its caustic soda orders from its plants that had the greatest excess caustic soda, regardless of their distance from the customer. Petitioner absorbed the additional shipping costs. In 1960 petitioner contracted with a domestic chemical producer (which in 1960 planned to build a modern chlorine-caustic soda electrolytic plant) to sell liquid caustic at $25 a ton and eventually shipped them about 70,000 tons of caustic soda. At that time the domestic price for this type of caustic soda was $50 to $55 a ton. In 1960 and 1961, when the world markets were flooded with caustic soda, petitioner sold about 54,000 tons and about 56,000 tons, respectively, of caustic soda in the export market.

During 1960 and 1961 petitioner disposed of a total of approximately 106,000 tons and 135,000 tons, respectively, of caustic soda out of its total caustic soda production of about 600,000 tons and 580,000 tons, respectively.

In 1960 and 1961 petitioner realized net profit before taxes on sales of chlorine as follows:

| Year | Net profit | Percentage of net sales |
|---|---|---|
| 1960 | $9,386,100 | 37.3 |
| 1961 | 9,770,800 | 40.2 |

There is a recognized method of accounting for byproducts. Generally, byproduct accounting relates to products produced jointly with other products from common cost input factors and which are of minor economic value compared with the major products. Under the byproduct accounting method no cost is assigned to the byproduct up to the point at which it splits off from the other products. Only those costs incurred after the split-off point, such as further processing, packaging, or selling costs, are assigned to the byproduct.

In computing the net sales of caustic soda to PPGI and the net commission export sales of caustic soda made by petitioner in 1960 and 1961, Jannis used petitioner's internal financial statements. In computing the inventoriable cost of such sales, however, Jannis used a variation of the byproduct method of accounting. In addition to charging the byproduct for selling, general, and administrative expenses, and production costs incurred after the split-off point, Jannis also charged export caustic soda with certain period, research, and development costs.

From petitioner's books and records Jannis obtained the following further processing costs for caustic soda:

| | 1960 | 1961 |
|---|---|---|
| Sales to PPGI | $257,700 | $325,600 |
| Commission export sales | 58,200 | 237,600 |

These costs were adopted by Jannis as the inventoriable costs of caustic soda in his computation of the pretax profit on petitioner's sales of caustic soda.

Under petitioner's normal accounting method, the joint costs of producing chlorine and caustic soda prior to the split-off point were divided between the two products on the basis of atomic weight, 1.1 units of cost to caustic soda for each unit of cost to chlorine.

In 1960 87.3 percent ($5,738,000 ÷ $6,577,000) and in 1961 85.4 percent ($5,479,000 ÷ $6,417,000) of the sales made by petitioner's plate glass profit center to PPGI were of primary plate. By contrast, in 1960 33.2 percent ($51,123,000 ÷ $153,895,000) and in 1961 38.4 percent ($44,631,000 ÷ $116,343,000) of the sales made by petitioner's plate glass profit center were of primary plate.

The products from petitioner's plate glass profit center consist of primary plate and fabricated plate. Fabricated plate consists of tempered, laminated, and bent plate. The two elements in the cost of manufacturing fabricated plate are (1) the cost of manufacturing the raw plate and (2) the cost of fabricating the raw plate.

In his computation of the net profit of the plate glass profit center on export sales, Jannis allocated to export sales all of the plate glass profit center's primary and fabricated period costs on the basis of profit contribution, i.e., the ratio within the profit center of the profit contribution on sales to PPGI to the total profit contribution for the profit center. He apportioned the glass division's research expenses in 1960 and 1961 to export sales on the basis of profit contribution.

Columbia-Southern's actual research and development expenses for 1960 were $5,781,000 and petitioner's chemical division budgeted research and development expenses for 1961 were $6,129,000. Jannis apportioned all of these expenditures to export sales on the basis of profit contribution. In the internal financial statements for petitioner's glass and chemical divisions depreciation is determined by reference to replacement cost rather than historical cost. Jannis allocated this replacement cost depreciation to net export sales on the basis of profit contribution.

Jannis allocated direct export office selling expenses of $126,000 in 1960 and $85,000 in 1961 to petitioner's net export sales of chemical products. He also apportioned the 1960 and 1961 advertising, general, and administrative expenses of petitioner's chemical division to net export sales on the profit-contribution basis.

Jannis allocated direct export selling expenses of approximately $126,000 in each of the years 1960 and 1961 to petitioner's net export sales of glass products. He also apportioned the 1960 and 1961 advertising, general, and administrative expenses of petitioner's glass division to net export sales on the profit-contribution basis.

Jannis based his computation of petitioner's net profit on sales to PPGI and on commission export sales on book net income rather than taxable net income. Petitioner's book net income in 1960 for its glass, paint and brush, and fiber glass divisions was approximately $49 mil-

lion while its taxable income for that year was about $48,200,000. In 1961 petitioner's book net income from its glass, chemical, paint and brush, and fiber glass divisions was about $47,500,000 while its taxable income was approximately $46,700,000.

In determining PPGI's income for 1960 and 1961 Jannis worked principally from PPGI's general ledgers and from its trial balances. He determined the commissions petitioner paid to PPGI on export sales from contemporaneously prepared quarterly reports. Volume discounts granted to PPGI by petitioner were determined in part from PPGI's general ledger. In determining the portion of PPGI's 1960 selling, general, and administrative expenses allocable to other income, Jannis worked directly from PPGI's unaudited internal financial statements.

The determination of PPGI's net sales in 1960 and 1961 made by Jannis differs from the net sales shown in PPGI's audited and unaudited financial statements in that amounts for export freight equalization, outgoing transportation and duty, and cash discounts have not been deducted from gross sales. Instead, these items were treated as selling expenses.

Jannis' determination of commissions allowed to PPGI by its affiliates in 1960 and 1961 differs from PPGI's financial statements in that Jannis' computation shows gross commissions paid by petitioner to PPGI. In 1960, some of these commissions had not been listed separately on PPGI's records but instead had been used as an offset against PPGI's cost of goods sold. In 1961 these commissions appeared as an offset to PPGI's selling and general expenses on its audited financial statements.

Jannis' determination of PPGI's selling, general, and administrative expenses for 1960 and 1961 differs from PPGI's audited financial statements for 1960 and 1961 in that it has been reduced by amounts allocable to other income.

Jannis' determination of PPGI's selling, general, and administrative expenses for 1961 differs from PPGI's audited and unaudited financial statements by disregarding the reduction of the bad debt reserve by the amount of $206,000 that appears in PPGI's financial statements.

In determining PPGI's income by product group, Jannis allocated all expenses directly identified with a specific product in the general ledger and trial balances of PPGI to that specific product, and he allocated all other expenses to the several products on the basis of profit contribution. Jannis did not accept the allocations of expenses appearing in the unaudited financial statements of PPGI for 1960 and 1961 which (unlike the audited financial statements of PPGI for those years) show net profit by product group.

Jannis computed petitioner's and PPGI's income in 1960 and 1961 on export sales of petitioner's products as follows:

Summary of "Pretax Profit" to Petitioner on Sales to and Commission Transactions With PPGI and to PPGI on Such Transactions and Sales to Customers

(In thousands of dollars)

| | Petitioner | | | PPGI | | | Eliminations on | | Combined total |
|---|---|---|---|---|---|---|---|---|---|
| | Commission sales | Sales to PPGI | Together | Commission transactions | Sales to customers | Together | Commission transactions | Intercompany sales | |
| **Glass division:[1]** *Calendar year 1960* | | | | | | | | | |
| Net sales and transfers (after volume discount) | $123 | $7,811 | $7,934 | $123 | $10,555 | $10,678 | ($123) | ($7,811) | $10,678 |
| Inventoriable costs | 66 | 5,162 | 5,228 | 123 | 8,186 | 8,309 | (123) | (7,811) | 5,603 |
| Period costs, research and engineering development | 29 | 1,304 | 1,333 | | | | | | 1,333 |
| Selling and administrative expenses | 9 | 397 | 406 | | 968 | 968 | | | 1,374 |
| Commissions | 6 | | 6 | (6) | | (6) | | | |
| | 110 | 6,863 | 6,973 | 117 | 9,154 | 9,271 | (123) | (7,811) | 8,310 |
| Pretax profit (or loss) | 13 | 948 | 961 | 6 | 1,401 | 1,407 | | | 2,368 |
| **Fiber glass division[1] C. & R. (paint and brush) division:** | | | | | | | | | |
| Net sales and transfers (after volume discount) | 323 | 467 | 790 | 323 | 699 | 1,022 | (323) | (467) | 1,022 |
| Inventoriable costs | 205 | 359 | 564 | 323 | 530 | 853 | (323) | (467) | 627 |
| Period costs, research and engineering development | 33 | 30 | 63 | | | | | | 63 |
| Selling and administrative expenses | 52 | 47 | 99 | | 129 | 129 | | | 228 |
| Commissions | 8 | | 8 | (8) | | (8) | | | |
| | 298 | 436 | 734 | 315 | 659 | 974 | (323) | (467) | 918 |
| Pretax profit (or loss) | 25 | 31 | 56 | 8 | 40 | 48 | | | 104 |
| **Columbia-Southern Chemical Corp.:[2]** | | | | | | | | | |
| Net sales and transfers (after volume discount) | 2,190 | 3,558 | 5,748 | 2,190 | 5,054 | 7,244 | (2,190) | (3,558) | 7,244 |
| Inventoriable costs | 712 | 1,817 | 2,529 | 2,190 | 3,976 | 6,166 | (2,190) | (3,558) | 2,947 |
| Period costs research and engineering development | 774 | 898 | 1,672 | | | | | | 1,672 |
| Selling and administrative expenses | 164 | 216 | 380 | | 1,122 | 1,122 | | | 1,502 |
| Commissions | 74 | | 74 | (74) | | (74) | | | |
| | 1,724 | 2,931 | 4,655 | 2,116 | 5,098 | 7,214 | (2,190) | (3,558) | 6,121 |
| Pretax profit (or loss) | 466 | 627 | 1,093 | 74 | (44) | 30 | | | 1,123 |

See footnotes at end of table.

Summary of "Pretax Profit" to Petitioner on Sales to and Commission Transactions With PPGI and to PPGI on Such Transactions and Sales to Customers—Continued

| | Petitioner — Commission sales | Petitioner — Sales to PPGI | Petitioner — Together | PPGI — Commission transactions | PPGI — Sales to customers | PPGI — Together | Eliminations — Commission transactions | Eliminations — Intercompany sales | Combined total |
|---|---|---|---|---|---|---|---|---|---|
| **Calendar year 1960—Continued** | | | | | | | | | |
| **Total:** | | | | | | | | | |
| Net sales and transfers (after volume discount) | $2,636 | $11,836 | $14,472 | $2,636 | $16,308 | $18,944 | ($2,636) | ($11,836) | $18,944 |
| Inventoriable costs | 983 | 7,338 | 8,321 | 2,636 | 12,692 | 15,328 | (2,636) | (11,836) | 9,177 |
| Period costs, research and engineering development | 836 | 2,232 | 3,068 | | | | | | 3,068 |
| Selling and administrative expenses | 225 | 660 | 885 | | 2,219 | 2,219 | | | 3,104 |
| Commissions | 88 | | 88 | (88) | | (88) | | | |
| | 2,132 | 10,230 | 12,362 | 2,548 | 14,911 | 17,459 | (2,636) | (11,836) | 15,349 |
| Pretax profit (or loss) | 504 | 1,606 | 2,110 | 88 | 1,397 | 1,485 | | | 3,595 |
| **Total pretax profit only:** | | | | | | | | | |
| Percentage of net sales | | | 14.6% | | | 7.8% | | | 19.0% |
| Split of combined total profit | | | 58.7% | | | 41.3% | | | 100.0% |
| **Calendar year 1961** | | | | | | | | | |
| **Glass division:** | | | | | | | | | |
| Net sales and transfers (after volume discount) | $67 | $7,026 | $7,093 | $67 | $9,386 | $9,453 | ($67) | ($7,026) | $9,453 |
| Inventoriable costs | 36 | 4,517 | 4,553 | 67 | 7,040 | 7,107 | (67) | (7,026) | 4,567 |
| Period costs, research and engineering development | 17 | 1,358 | 1,375 | | | | | | 1,375 |
| Selling and administrative expenses | 7 | 416 | 423 | | 1,074 | 1,074 | | | 1,497 |
| Commissions | 1 | | 1 | (1) | | (1) | | | |
| | 61 | 6,291 | 6,352 | 66 | 8,114 | 8,180 | (67) | (7,026) | 7,439 |
| Pretax profit (or loss) | 6 | 735 | 741 | 1 | 1,272 | 1,273 | | | 2,014 |
| **Fiber glass division:** | | | | | | | | | |
| Net sales and transfers (after volume discount) | 136 | 85 | 221 | 136 | 107 | 243 | (136) | (85) | 243 |
| Inventoriable costs | 88 | 61 | 144 | 136 | 94 | 230 | (136) | (85) | 153 |
| Period costs, research and engineering development | 57 | 26 | 83 | | | | | | 83 |
| Selling and administrative expenses | 24 | 11 | 35 | | 5 | 5 | | | 40 |
| Commissions | 3 | | 3 | (3) | | (3) | | | |
| | 167 | 98 | 265 | 133 | 99 | 232 | (136) | (85) | 276 |
| Pretax profit (or loss) | (31) | (13) | (44) | 3 | 8 | 11 | | | (33) |

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| **C. & R. (paint and brush) division:** | | | | | | | | | |
| Net sales and transfers (after volume discount) | 286 | 496 | 782 | 286 | 721 | 1,007 | (286) | (496) | 1,007 |
| Inventoriable costs | 179 | 353 | 532 | 286 | 550 | 836 | (286) | (496) | 586 |
| Period costs, research and engineering development | 32 | 42 | 74 | | 112 | 112 | | | 74 |
| Selling and administrative expenses | 47 | 63 | 110 | | | | | | 222 |
| Commissions | 24 | | 24 | (24) | | (24) | | | |
| | 282 | 458 | 740 | 262 | 662 | 924 | (286) | (496) | 882 |
| Pretax profit (or loss) | 4 | 38 | 42 | 24 | 59 | 88 | | | 125 |
| **Chemical division:** | | | | | | | | | |
| Net sales and transfers (after volume discount) | 1,726 | 2,301 | 4,027 | 1,726 | 3,239 | 4,965 | (1,726) | (2,301) | 4,965 |
| Inventoriable costs | 804 | 1,433 | 2,237 | 1,726 | 2,553 | 4,279 | (1,726) | (2,301) | 2,489 |
| Period costs, research and engineering development | 379 | 384 | 763 | | 879 | 879 | | | 763 |
| Selling and administrative expenses | 98 | 109 | 207 | | | | | | 1,086 |
| Commissions | 35 | | 35 | (35) | | (35) | | | |
| | 1,316 | 1,926 | 3,242 | 1,691 | 3,432 | 5,123 | (1,726) | (2,301) | 4,338 |
| Pretax profit (or loss) | 410 | 375 | 785 | 35 | (193) | (158) | | | 627 |
| **Total:** | | | | | | | | | |
| Net sales and transfers (after volume discount) | 2,215 | 9,908 | 12,123 | 2,215 | 13,453 | 15,668 | (2,215) | (9,908) | 15,668 |
| Inventoriable costs | 1,102 | 6,364 | 7,466 | 2,215 | 10,237 | 12,452 | (2,215) | (9,908) | 7,795 |
| Period costs, research and engineering development | 485 | 1,810 | 2,295 | | 2,070 | 2,070 | | | 2,295 |
| Selling and administrative expenses | 176 | 599 | 775 | | | | | | 2,845 |
| Commissions | 63 | | 63 | (63) | | (63) | | | |
| | 1,826 | 8,773 | 10,599 | 2,152 | 12,307 | 14,459 | (2,215) | (9,908) | 12,935 |
| Pretax profit (or loss) | 389 | 1,135 | 1,524 | 63 | 1,146 | 1,209 | | | 2,733 |
| **Total pretax profit only:** | | | | | | | | | |
| Percentage of net sales | | | 12.6% | | | 7.7% | | | 17.4% |
| Split of combined total profit | | | 55.8% | | | 44.2% | | | 100.0% |

1 Fiber glass division's net sales of $368 to PPGI (cost of sales $214) and commission sales of $21 included in glass division above.

2 Columbia-Southern Chemical Corp. was a wholly owned subsidiary of petitioner until the close of 1960, at which time it was liquidated and became petitioner's chemical division.

The following comparative ratios (expressed in terms of percentages) are based on the above computations for 1960 and 1961:

### 1. Ratio of Pretax Profits to Consolidated Net Export Sales

| | Petitioner | PPGI |
|---|---|---|
| 1960 | 11.2 percent (2,110/18,944) | 7.8 percent (1,485/18,944) |
| 1961 | 9.7 percent (1,524/15,668) | 7.7 percent (1,209/15,668) |

### 2. Ratio of Pretax Profit to Consolidated Pretax Profit on Net Exports Sales

| | Petitioner | PPGI |
|---|---|---|
| 1960 | 58.7 percent (2,110/3,595) | 41.3 percent (1,485/3,595) |
| 1961 | 55.8 percent (1,524/2,733) | 44.2 percent (1,209/2,733) |

### 3. Ratio of Pretax Profit to Net Export Sales

| | Petitioner | PPGI |
|---|---|---|
| 1960 | 14.6 percent (2,110/14,472) | 7.8 percent (1,485/18,944) |
| 1961 | 12.6 percent (1,524/12,123) | 7.7 percent (1,209/15,668) |

Jannis computed PPGI's income (by division) for 1960 and 1961 as follows:

| | Total for year 1960 | Glass | | | |
|---|---|---|---|---|---|
| | | CPI | Duplate | Other | Total |
| *Calendar year ended Dec. 31, 1960* | | | | | |
| Gross sales | $16,336,062 | $815,200 | $6,391,247 | $3,363,068 | $10,569,515 |
| Returns and allowances | 27,830 | 210 | 4,522 | 9,331 | 14,063 |
| Net sales | 16,308,232 | 814,990 | 6,386,725 | 3,353,737 | 10,555,452 |
| Cost of goods sold | 13,176,454 | 619,642 | 5,407,262 | 2,617,193 | 8,644,097 |
| Less: Volume discount | 485,095 | 35,264 | 282,816 | 140,187 | 458,267 |
| Net cost of goods sold | 12,691,359 | 584,378 | 5,124,446 | 2,477,006 | 8,185,830 |
| Gross profit on sales | 3,616,873 | 230,612 | 1,262,279 | 876,731 | 2,369,622 |
| Commissions allowed by affiliates | 88,174 | | | 5,570 | 5,570 |
| Gross income from selling | 3,705,047 | 230,612 | 1,262,279 | 882,301 | 2,375,192 |
| S. G. & A. expenses: | | | | | |
| Commissions paid | 381,175 | | | 191,366 | 191,366 |
| Freight equalization | 110,969 | 8,939 | 77,666 | 1,075 | 87,680 |
| Outgoing transportation and duty | 809,708 | 24,681 | 708 | 55,191 | 80,580 |
| Cash discounts allowed | 95,797 | 1,618 | 60,771 | 27,960 | 90,349 |
| Employee salaries and benefits | 567,234 | 34,797 | 190,508 | 132,323 | 357,628 |
| Employee expenses | 144,406 | 8,634 | 47,271 | 32,833 | 88,738 |
| Bad debts | 6,304 | | | 4,131 | 4,131 |
| Advertising | 37,924 | | | 24,848 | 24,848 |
| Professional services | 84,884 | 5,411 | 29,627 | 20,578 | 55,616 |
| Telephone and telegraph | 39,813 | 2,538 | 13,896 | 9,651 | 26,085 |
| Other deductions | 181,105 | 11,546 | 63,210 | 43,904 | 118,660 |
| Less: Apportioned to technical sales | (240,100) | (15,307) | (83,801) | (58,206) | (157,314) |
| Total selling, general, and administration expense | 2,219,219 | 82,857 | 399,856 | 485,654 | 968,367 |
| Net income from selling | 1,485,828 | 147,755 | 862,423 | 396,647 | 1,406,825 |

| | Total for year 1960 | Glass | | | |
| --- | --- | --- | --- | --- | --- |
| | | CPI | Duplate | Other | Total |

*Calendar year ended Dec. 31, 1960—Continued*

Other income:
| | | | | | |
| --- | --- | --- | --- | --- | --- |
| Revenue from TKH | 173,466 | | | | |
| Commissions earned (Pittsburgh-Corning) | 63,696 | | | | |
| Royalties | 10,197 | | | | |
| Interest and dividends | 44,587 | | | | |
| Profit on sale of securities | 165 | | | | |
| Miscellaneous | 16,045 | | | | |
| Total other income | 308,156 | | | | |

Other expenses:
| | | | | | |
| --- | --- | --- | --- | --- | --- |
| Amortization of TKH | 623,466 | | | | |
| Miscellaneous | 329,728 | | | | |
| Apportioned S.G. & A. expense | 240,100 | | | | |
| Total other expenses | 1,193,294 | | | | |
| Net other income and expenses | 885,138 | | | | |
| Net income before tax | 600,690 | | | | |

| | Paint total | Chemical | | | |
| --- | --- | --- | --- | --- | --- |
| | | Standard Chemical | P.P.G.A., S.A. | Other | Total |

*Calendar Year Ended Dec. 31, 1960*

| | Paint total | Standard Chemical | P.P.G.A., S.A. | Other | Total |
| --- | --- | --- | --- | --- | --- |
| Gross sales | $699,912 | $883,799 | $341,480 | $3,841,356 | $5,066,635 |
| Returns and allowances | 616 | | | 13,151 | 13,151 |
| Net sales | 699,296 | 883,799 | 341,480 | 3,828,205 | 5,053,484 |
| Cost of goods sold | 557,148 | 836,967 | 249,562 | 2,888,680 | 3,975,209 |
| Less: Volume discount | 26,828 | | | | |
| Net cost of goods sold | 530,320 | 836,967 | 249,562 | 2,888,680 | 3,975,209 |
| Gross profit on sales | 168,976 | 46,832 | 91,918 | 939,525 | 1,078,275 |
| Commissions allowed by affiliates | 8,470 | | | 74,134 | 74,134 |
| Gross income from selling | 177,446 | 46,832 | 91,918 | 1,013,659 | 1,152,409 |
| S.G. & A. expenses: | | | | | |
| Commissions paid | 44,525 | | | 145,284 | 145,284 |
| Freight equalization | | 23,289 | | | 23,289 |
| Outgoing transportation and duty | 1,259 | | | 727,869 | 727,869 |
| Cash discounts allowed | 4,154 | | | 1,294 | 1,294 |
| Employee salaries and benefits | 57,066 | 6,620 | 12,996 | 132,924 | 152,540 |
| Employee expenses | 16,942 | 1,681 | 3,299 | 33,746 | 38,726 |
| Bad debts | 294 | | | 1,879 | 1,879 |
| Advertising | 1,771 | | | 11,305 | 11,305 |
| Professional services | 3,964 | 1,098 | 2,156 | 22,050 | 25,304 |
| Telephone and telegraph | 1,859 | 515 | 1,011 | 10,343 | 11,869 |
| Other deductions | 8,458 | 2,343 | 4,600 | 47,044 | 53,987 |
| Less: Apportioned to technical sales | (11,213) | (3,106) | (6,098) | (62,360) | (71,573) |
| Total selling, general, and administrative expenditures | 129,079 | 32,440 | 17,964 | 1,071,369 | 1,121,773 |
| Net income from selling | 48,367 | 14,392 | 73,954 | (57,710) | 30,636 |

| | Total for year 1961 | Glass | | | |
| --- | --- | --- | --- | --- | --- |
| | | CPI | Duplate | Other | Total |
| *Calendar Year Ended Dec. 31, 1961* | | | | | |
| Gross sales | $13,910,856 | $1,389,874 | $5,420,239 | $2,788,013 | $9,598,126 |
| Returns and allowances | 458,262 | 54,165 | 124,439 | 33,512 | 212,116 |
| Net sales | 13,452,594 | 1,335,709 | 5,295,800 | 2,754,501 | 9,386,010 |
| Cost of goods sold | 10,691,613 | 959,434 | 4,327,242 | 2,173,461 | 7,460,137 |
| Less: Volume discount | 454,812 | 49,060 | 250,385 | 120,514 | 419,959 |
| Net cost of goods sold | 10,236,801 | 910,374 | 4,076,857 | 2,052,947 | 7,040,178 |
| Gross profit on sales | 3,215,793 | 425,335 | 1,218,943 | 701,554 | 2,345,832 |
| Commissions allowable by affiliates | 62,517 | | | 1,313 | 1,313 |
| Gross income from selling | 3,278,310 | 425,335 | 1,218,943 | 702,867 | 2,347,145 |
| S.G. & A. expenses: | | | | | |
| Commissions paid | 277,679 | | | 158,998 | 158,998 |
| Freight equalization | 50,213 | 2,867 | 38,442 | 18 | 41,327 |
| Outgoing transportation and duty | 1,019,228 | 127,243 | 127,668 | 107,744 | 362,655 |
| Cash discounts allowed | 86,160 | | 54,099 | 22,567 | 76,666 |
| Employee salaries and benefits | 468,203 | 61,863 | 177,730 | 102,195 | 341,788 |
| Employee expenses | 115,634 | 14,694 | 42,214 | 24,272 | 81,180 |
| Bad debts | 15,675 | | | 7,276 | 7,276 |
| Advertising | 41,910 | | | 10,630 | 10,630 |
| Professional services | 42,406 | 5,603 | 16,097 | 9,256 | 30,956 |
| Telephone and telegraph | 57,481 | 7,186 | 20,647 | 11,872 | 39,705 |
| Other deductions | 121,389 | 16,039 | 46,079 | 26,496 | 88,614 |
| Less: Apportioned to technical sales | (226,594) | (29,940) | (86,015) | (49,459) | (165,414) |
| Total selling, general, and administrative expenditures | 2,069,384 | 205,555 | 436,961 | 431,865 | 1,074,381 |
| Net income from selling | 1,208,926 | 219,780 | 781,982 | 271,002 | 1,272,764 |
| Other income: | | | | | |
| Revenue from TKH | 181,244 | | | | |
| Commissions earned (Pittsburgh-Corning) | 96,182 | | | | |
| Royalties | 37,248 | | | | |
| Interest and dividends | 113,444 | | | | |
| Profit on sale of securities | 423,866 | | | | |
| Miscellaneous | 74,890 | | | | |
| Total other income | 926,874 | | | | |
| Other expenses: | | | | | |
| Amortization of TKH | 604,268 | | | | |
| Miscellaneous Cuban office expense | 66,074 | | | | |
| Miscellaneous | 39,438 | | | | |
| Reversal of bad debt expense (1959) | (206,004) | | | | |
| Apportioned S.G. & A. expense | 226,594 | | | | |
| Total other expenses | 730,370 | | | | |
| Net other income and expenses | 196,504 | | | | |
| Net income before tax | 1,405,430 | | | | |

| | Fiber glass | Paint | Chemical | | | |
|---|---|---|---|---|---|---|
| | Other | Other | Std. Chemical | P.P.G.A., S.A. | Other | Total |
| *Calendar Year Ended Dec. 31, 1961* | | | | | | |
| Gross sales | $107,016 | $725,338 | $543,685 | $316,119 | $2,620,572 | $3,480,376 |
| Returns and allowances | 68 | 4,766 | | 275,000 | 16,312 | 241,312 |
| Net sales | 106,948 | 720,572 | 543,685 | 91,119 | 2,604,260 | 3,239,064 |
| Cost of goods sold | 100,000 | 578,624 | 480,138 | 227,425 | 1,845,289 | 2,552,852 |
| Less: Volume discount | 5,755 | 29,098 | | | | |
| Net cost of goods sold | 94,245 | 549,526 | 480,138 | 227,425 | 1,845,289 | 2,552,852 |
| Gross profit on sales | 12,703 | 171,046 | 63,547 | (136,306) | 758,971 | 686,212 |
| Commissions allowable by affiliates | 2,750 | 23,945 | | | 34,509 | 34,509 |
| Gross income from selling | 15,453 | 194,991 | 63,547 | (136,306) | 793,480 | 720,721 |
| S.G. & A. expenses: | | | | | | |
| Commissions paid | 2,000 | 36,100 | | | 80,581 | 80,581 |
| Freight equalization | | | 8,886 | | | 8,886 |
| Outgoing transportation and duty | | 953 | 483 | 126,415 | 528,722 | 655,620 |
| Cash discounts allowed | 204 | 3,942 | 5,081 | | 267 | 5,348 |
| Employee salaries and benefits | 1,873 | 24,815 | 7,679 | | 92,048 | 99,727 |
| Employee expenses | 236 | 18,524 | 1,594 | | 19,100 | 20,694 |
| Bad debts | | 2,084 | | | 6,315 | 6,315 |
| Advertising | | 31,089 | | | 191 | 191 |
| Professional services | 170 | 2,248 | 695 | | 8,337 | 9,032 |
| Telephone and telegraph | 34 | 2,643 | 1,162 | | 13,937 | 15,099 |
| Other deductions | 485 | 6,434 | 1,991 | | 23,865 | 25,856 |
| Less: Apportioned to technical sales | (906) | (12,009) | (3,716) | | (44,549) | (48,265) |
| Total selling, general, and administrative expense | 4,096 | 111,823 | 23,855 | 126,415 | 728,814 | 879,084 |
| Net income from selling | 11,357 | 83,168 | 39,692 | (262,721) | 64,666 | (158,363) |

A schedule prepared by the controller's office of petitioner's glass division covering the first 9 months of 1959 shows a net income of $380,335 earned by petitioner on sales of glass products to PPGI in the amount of $5,036,138. The schedule was prepared by using a 7-month average of standard variable costs of products and multiplying this figure by the units sold. Period, research, selling, general, and administrative costs were then added to the variable cost figure. To determine these additional costs, the variable cost was multiplied by a percentage figure. The schedule shows that for a large group of glass products sold by petitioner to PPGI these additional costs averaged 58.9 percent of the variable costs.

The internal financial statement of PPGI covering a 13-month period ending December 31, 1960, shows net income from the sale of glass products, paint products and chemicals as follows:

(In thousands)

| | Total | Glass | Paint | Chemicals |
|---|---|---|---|---|
| Gross sales | $17,793.9 | $11,597.0 | $745.8 | $5,451.0 |
| Less: Retail and allowance | 30.8 | 17.0 | .6 | 13.1 |
| Freight equalization | 113.2 | 89.9 | | 23.2 |
| Outgoing transportation | 873.2 | 85.7 | 1.3 | 786.1 |
| Cash discounts allowed | 103.5 | 97.7 | 4.3 | 1.3 |
| Total sales deductions | 1,120.8 | 290.5 | 6.3 | 823.9 |
| Net sales | 16,673.0 | 11,306.5 | 739.4 | 4,627.0 |
| Cost of sales | 14,324.6 | 9,463.1 | 594.7 | 4,266.7 |
| Gross income before volume discount | 2,348.4 | 1,843.4 | 144.6 | 360.3 |
| Volume discount | 541.1 | 512.1 | 29.0 | |
| Gross income after volume discount | 2,889.5 | 2,355.5 | 173.6 | 360.3 |
| Percent of net sales: | | | | |
| Before volume discount | 14.1 | 16.3 | 19.6 | 7.8 |
| After volume discount | 17.3 | 20.8 | 23.5 | 7.8 |
| Selling and administration expenses: | | | | |
| Selling [1] | $867.7 | $427.4 | $185.0 | $356.0 |
| Administrative | 564.1 | 219.4 | 16.7 | 139.5 |
| Incentive compensation | 59.5 | | | |
| Apportioned to technical services | (273.6) | | | |
| Net expenses | 1,217.7 | 646.8 | 201.8 | 495.6 |
| Net income from sales | 1,671.8 | 1,708.6 | (28.1) | (135.3) |
| Percent of net sales | 10.0 | 15.1 | (3.8) | (2.9) |

[1] Reduced by the amount of $67,100 representing commissions paid to PPGI by its affiliate (petitioner).

The internal financial statements of PPGI indicate net income from the sale of glass products, paint products, and chemicals for the month of December 1959 as follows:

(In thousands)

| | Total | Glass | Paint | Chemicals |
|---|---|---|---|---|
| Gross sales | $1,457.9 | $1,027.6 | $45.9 | $384.4 |
| Less: Retail and allowance, freight, etc. | 76.6 | 18.0 | 0.3 | 58.3 |
| Net sales | 1,381.3 | 1,009.6 | 45.6 | 326.1 |
| Cost of sales | 1,153.0 | 823.9 | 37.6 | 291.5 |
| Gross income before volume discount | 228.3 | 185.7 | 8.0 | 34.6 |
| Volume discount | 56.0 | 53.8 | 2.2 | |
| Gross income after volume discount | 284.3 | 239.5 | 10.2 | 34.6 |
| Selling and administrative expenses | 100.1 | 66.8 | 4.0 | 29.3 |
| Net income | 184.2 | 172.7 | 6.2 | 5.3 |

For the 12-month period ending December 31, 1960, the net sales, gross profits, and net profits of PPGI, as shown by its internal financial statements, are as follows:

(In thousands)

| | Total | Glass | Paint | Chemicals |
|---|---|---|---|---|
| Net sales | $15,291.6 | $10,296.3 | $693.8 | $4,300.9 |
| Cost of sales | 13,171.5 | 8,639.2 | 557.1 | 3,975.2 |
| Gross income before volume discount | 2,120.1 | 1,657.1 | 136.7 | 325.7 |
| Volume discount | 485.1 | 458.3 | 26.8 | |
| Gross income after volume discount | 2,605.2 | 2,116.0 | 163.5 | 325.7 |
| Net profit—13-month period ending 12/31/60 | | 1,708.6 | (28.1) | (135.3) |
| Net profit—month of December 1959 | | 172.7 | 6.2 | 5.3 |
| Net profit—12-month period ending 12/31/60 | | 1,535.9 | (21.9) | (130.0) |

In 1960 PPGI received commissions in the amount of $63,700 from sales of Pittsburgh Corning products which were not included in income in the preceding schedules for 1960. However, the expenses incurred in earning such commissions were included in the preceding schedules for 1960.

The internal financial statement of PPGI for the year ending December 31, 1961, shows net income from the sale of glass products, paint products, and chemicals as follows:

(In thousands)

| | Total | Glass | Fiber glass | Paint | Chemicals |
|---|---|---|---|---|---|
| Net sales | $12,297 | $8,905 | $107 | $716 | $2,569 |
| Cost of sales | 10,692 | 7,460 | 100 | 579 | 2,553 |
| Gross income | 1,605 | 1,445 | 7 | 137 | 16 |
| Percent of sales | 13.1 | 16.2 | 6.6 | 19.1 | 0.6 |
| Volume discount | $455 | $420 | $6 | $29 | |
| Gross income after volume discount | 2,060 | 1,865 | 13 | 166 | 16 |
| Percent of sales | 16.8 | 20.9 | 11.6 | 23.2 | 0.6 |
| Commissions | $159 | $131 | | $3 | $25 |
| Total gross income | 2,219 | 1,996 | 13 | 169 | 41 |
| Selling expenses | 708 | 445 | 2 | 121 | 140 |
| Net income from sales [1] | 1,511 | 1,551 | 11 | 47 | (99) |

[1] Other income or (deduction) items shown on Exhibit CS are omitted.

The internal financial statements of PPGI show gross income from sales of petitioner's glass products to CPI, Duplate, and other customers during the years ended December 31, 1960 and 1961, as follows:

(In thousands)

| | Total | CPI | Duplate | Other |
|---|---|---|---|---|
| *1960* | | | | |
| Net sales | $10,296.9 | $779.7 | $6,247.6 | $3,265.5 |
| Cost of sales | 8,639.2 | 619.5 | 5,407.2 | 2,612.3 |
| Gross income before volume discount | 1,657.7 | 160.2 | 840.4 | 657.2 |
| Volume discount | 458.13 | 35.2 | 282.8 | 140.2 |
| Gross income after volume discount | 2,116.0 | 195.4 | 1,123.2 | 797.4 |
| Percent of net sales after volume discount | 20.5 | 25.1 | 18.0 | 24.4 |
| *1961* | | | | |
| Net sales | $8,905 | $1,206 | $5,075 | $2,624 |
| Cost of sales | 7,460 | 960 | 4,357 | 2,173 |
| Gross income before volume discount | 1,445 | 246 | 748 | 451 |
| Volume discount | 420 | 49 | 250 | 121 |
| Gross income after volume discount | 1,865 | 295 | 998 | 572 |
| Percent of net sales after volume discount | 20.9 | 24.5 | 19.7 | 21.8 |

The internal financial statements of petitioner's paint and brush division show that it sustained a loss of $24,300 on net sales of paint products to PPGI during the year 1960 in the amount of $496,400. In the computation of such loss none of the research, development, and

advertising costs were allocated to the products sold to PPGI. Moreover, the loss of $24,300 in the year 1960 was computed before the allowance of the volume discount under the agreement between petitioner and PPGI.

The internal financial statements of petitioner's paint and brush division reflected the following net income on its net sales of paint products to PPGI: $42,000 (actual) on net sales of $579,000 in 1959 and $69,000 (forecast) on net sales of $670,000 (forecast) in 1961.

A summary of PPGI's balance sheet as of December 31, 1960 (covering a 13-month period ending on 12/30/1960), and December 31, 1961, as it appears in the audited financial statements is as follows:

PPGI BALANCE SHEET, DEC. 31, 1960

*Assets*

Current assets:

| | |
|---|---|
| Cash | $214,291.32 |
| Funds available to wholly owned subsidiary | 229,000.00 |
| Accounts receivable | 4,216,657.05 |
| Notes receivable | 419,500.00 |
| Merchandise (at cost) shipped to customers but not billed | 102,575.70 |
| Total current assets | 5,182,024.07 |
| Noncurrent accounts receivable | 56,366.04 |
| Investments | 3,079,880.72 |
| Rights to technical data and know-how (at cost, less accumulated amortization) | 1,906,530.00 |
| Property—at cost, less accumulated depreciation (machinery and equipment; furniture and fixtures) | 346,829.28 |
| Deferred charges other assets | 193,511.44 |
| | 10,765,141.55 |

*Liabilities and equity*

Current liabilities:

| | |
|---|---|
| Notes payable | $506,037.27 |
| Accounts payable | 2,490,114.09 |
| Accrued taxes | 51,292.79 |
| Total current liabilities | 3,047,444.15 |
| Noncurrent accounts payable | 2,200,000.00 |
| Deferred income | 482,166.86 |
| Stockholders' equity | 5,035,530.54 |
| Total | 10,765,141.55 |

PPGI BALANCE SHEET, DEC. 31, 1961

### Assets

Current assets:

| | |
|---|---|
| Cash | $2,209,745.47 |
| Accounts receivable | 3,239,869.64 |
| Notes receivable | 834,750.00 |
| Finished goods (cost) | 57,494.27 |
| Merchandise (cost)—shipped to customers but not billed | 59,947.70 |
| Total current assets | 6,401,807.08 |
| Noncurrent accounts receivable | 87,727.79 |
| Investments | 8,956,086.19 |
| Rights to technical data and know-how (cost less accumulated amortization) | 4,802,262.00 |
| Property (cost less depreciation) | 59,369.84 |
| Deferred and other charges | 47,250.53 |
| Total | 15,354,503.43 |

### Liabilities and equity

Current liabilities:

| | |
|---|---|
| Notes payable | $311,389.96 |
| Accounts payable | 2,981,592.44 |
| Accrued taxes | 52,888.76 |
| Total current liabilities | 3,345,871.16 |
| Noncurrent accounts payable | 5,997,560.10 |
| Deferred income | 539,127.20 |
| Stockholders' equity | 5,471,944.97 |
| Total | 15,354,503.43 |

A combination export manager (hereinafter called CEM) engages in the business of handling the exports of more than one domestic manufacturer. A CEM generally performs two functions: (1) The export mechanics, i.e., paperwork necessary in the export of various products and (2) a limited selling function by selecting and dealing through foreign commission agents and distributors to fill a prevailing demand for a particular product. A CEM generally does not perform a marketing function in that it does not attempt to develop new markets, does not decide price policies in foreign markets, and does not sell at a loss to gain a foothold in new markets. In general, a CEM is an intermediary between a domestic manufacturer and foreign sales agents and distributors.

There are approximately 5,000 manufacturers in the United States who are represented in foreign markets by combination export managers. The total annual volume of export sales handled by combination export managers is approximately $500 million. There are from 500 to 600 combination export managers in the United States, with most of them concentrated in New York City, Philadelphia, Baltimore, Chicago, San Francisco, and Los Angeles.

A CEM will operate in nearly all foreign markets except those in the eastern bloc countries and in the underdeveloped countries (such as the African republics). A CEM does not operate in countries where the manufacturers themselves handle their exports, such as Puerto Rico, Canada, and in some cases, Mexico, where the manufacturers do not require the services of a CEM. Omni Products, the largest CEM in the United States, has never made a sale in the Canadian market.

A CEM employs salesmen who travel outside the United States and also employs a complement of clerical employees to prepare export documents, invoices, and shipping documents. A freight forwarder may at times be used by a CEM to prepare bills of lading, export declarations, and dock receipts.

A function performed by a CEM is the determination of the credit standing of foreign customers through indirect means, i.e., banks, inspection of the customers' plants, and inquiries made of various trade sources. A CEM performs another function by providing foreign customers with a broad line of products at a dependable price.

When a CEM takes on a new product it will spend some time in the manufacturer's laboratory and sales department to become acquainted with the product and if necessary would employ someone familiar with the technical nature of the product. However, the sales approach and the functions of a CEM are substantially the same for all products.

A CEM is limited in the extent to which it can adjust prices in a foreign market. It can adjust prices only within the framework of the discount granted to the CEM by the domestic manufacturer. A CEM obtains a combined discount of from 8½ percent to 25 percent from the manufacturers' domestic prices and in turn pays commissions of from 3 percent to 10 percent to its foreign distributors and agents.

A CEM may act as a merchant exporter, i.e., it gets title to the products it receives from the domestic manufacturer and thus incurs some credit risks when it sells the products. A CEM who acts as principal may determine the markup in foreign markets and invoices its customers under its own name. It does not maintain an inventory. Instead, all goods are shipped from the factories and warehouses of the manufacturer.

A CEM may also act as an agent, in which case the CEM is paid a commission only after the purchaser makes payment to the manufacturer. By the nature of its operation a CEM is generally limited in its ability to extend credit.

A CEM usually makes only limited market studies. It does not advertise extensively but will generally translate existing advertising and promotional literature for the foreign market.

Generally, a CEM earns a net profit before tax of from 2 percent to 5 percent of sales. A few CEMs that perform broader functions than the usual CEM, such as licensing and direct marketing activities, earn a net profit before tax of from 5 percent to 15 percent of sales. Typically, the income of a CEM as a percentage of invested capital ranges from 30 percent to 70 percent.

When its exports exceed anywhere from $200,000 to $600,000 a domestic manufacturer will generally terminate its use of a CEM and will establish its own export department. Many large manufacturers have progressed from export departments to international divisions or subsidiaries. Large manufacturers use a CEM only for products unrelated to their main line of products and involve only a small volume of sales.

International subsidiaries are distinguishable from CEMs in that they perform certain functions, including the following, which are not normally performed by a CEM: (1) Management responsibility for all foreign operations; (2) coordination of foreign marketing; (3) in-depth market studies; (4) extension of credit as a marketing tool; (5) warehouse operations; (6) significant post-sales services to customers; (7) holding equity investments in foreign subsidiaries; (8) manufacturing operations in foreign countries; (9) licensing patents, trademarks, and know-how; and (10) providing technical services to foreign subsidiaries and licensees.

In the statutory notice of deficiency (dated July 28, 1966) respondent determined that pursuant to the provisions of section 482 of the 1954 Internal Revenue Code it was necessary to allocate gross income in the amounts of $1,032,999 and $866,749 from PPGI to petitioner in the years 1960 and 1961, respectively. The determination was based upon the adjustments recommended by William F. English, a revenue agent with the Office of International Operations. He based the adjustments on the U.S. Treasury Department's "Source Book of Statistics of Income" for 1960 and 1961.

The basic approach in the Statistics of Income is that the organizations or companies filing Federal income tax returns are grouped into major and minor industry classifications. Within each classification the companies are grouped into size categories based upon the amounts of their assets. The classifications of the data in the Statistics of Income is derived from the Standard Industrial Classification Manual used by the Department of Commerce and the Bureau of the Budget for classifying industries. The actual statistics used by the revenue agent were under the heading: "Returns with Net Income-Wholesale and Retail Trade: Wholesale Trade: Other Wholesalers: Drugs, Chemicals, and Allied Products-Minor Industry 493."

The Standard Industrial Classification Manual describes the companies constituting the manual's group 502 ("Other Wholesalers: Drugs, Chemicals and Allied Products") as follows:

Drugs, drug proprietaries, and druggists' sundries

Establishments primarily engaged in the wholesale distribution of drugs, drug proprietaries, druggists' sundries, and toiletries. Establishments primarily engaged in the wholesale distribution of surgical, dental, and hospital equipment are classified in Industry 5086.

Paints and varnishes

Establishments primarily engaged in the wholesale distribution of paints and varnishes in paste or powder form or ready for use. Glass and wallpaper are frequently handled.

Chemicals and allied products, not elsewhere classified

Establishments primarily engaged in the wholesale distribution of chemicals and allied products, not elsewhere classified, such as acids, ammonia, industrial and heavy chemicals, dyestuffs, industrial salts, insecticides, naval stores, plastics materials, rosin, and turpentine. Establishments primarily engaged in the wholesale distribution of ammunition and fireworks are classified in Industry 5099.

The revenue agent computed the 1960 and 1961 income allocable from PPGI to petitioner as follows: (1) On the basis of PPGI's balance sheets as of December 31, 1960 and 1961, he placed PPGI within the category of the 10 corporations in 1960 and the 8 corporations in 1961 that comprised the group under the above-mentioned heading in the statistics source book with total assets from $10 million to $25 million. (2) He then determined the 1960 and 1961 ratios of net profit before tax to business receipts of such group of corporations as follows:

**1960**

| | |
|---|---|
| $300,041,000 | (total business receipts) |
| 289,247,000 | (total compiled deductions) |
| 10,794,000 | (total net profit) |

$10,794,000÷$300,041,000=3.59 percent

**1961**

| | |
|---|---|
| $256,342,000 | (total business receipts) |
| 250,090,000 | (total compiled deductions) |
| 6,252,000 | (total net profit) |

$6,252,000÷$256,342,000=2.43 percent

(3) The revenue agent applied these percentages to the amounts treated by him as gross sales of PPGI for 1960 and 1961 ($17,793,900 × 0.0359 for the year 1960 and $12,989,900 × 0.0243 for the year 1961) and thus determined the profit which he deemed appropriate for those years, i.e., $638,801 for 1960 and $315,632 for 1961. (4) The revenue

agent then determined the income allocable to petitioner under section 482 of the 1954 Internal Revenue Code by subtracting the amount of $638,801 from $1,671,800 (the purported earnings of PPGI) in 1960 and the amount of $315,632 from $1,182,381 (the purported earnings of PPGI) in 1961, i.e., $1,032,999 in 1960 and $866,749 in 1961.

The amounts used in the above computations by the revenue agent as gross sales of PPGI in 1960 and 1961 did not include PPGI's commission sales on behalf of petitioner and PPGI's commission sales on behalf of Pittsburgh Corning.

On May 13, 1968, after both parties had presented their evidence on the section 482 issue, respondent filed a motion to amend his answer to conform the pleadings to the proof. This Court granted the motion and in respondent's second amendment to his answer he alleged that additional allocations of PPGI's income to petitioner should be made in the amounts of $437,501 in 1960 and $623,451 in 1961 pursuant to the provisions of section 482 of the 1954 Internal Revenue Code, or total income allocated from PPGI to petitioner in the amounts of $1,470,490 ($1,032,999 plus $437,501) in 1960 and $1,490,200 ($866,749 plus $623,451) in 1961. Consequently, respondent claimed additional deficiencies in petitioner's income tax of $227,500 in 1960 and $324,194 in 1961. Respondent alleged in his second amendment to his answer that (1) all of PPGI's income on sales to petitioner's Canadian subsidiaries (Duplate and CPI) was actually earned by petitioner and (2) that PPGI earned no more than 2 percent (a percentage derived from the testimony of the combination export managers) on its sales to unrelated customers.

During the period 1958 to 1961 petitioner entered into three separate agreements whereby it transferred the foreign rights in certain technology to PPGI. Petitioner had accumulated such technology over the years with respect to its paint and coating products, its Duracron and Duracryl products and its all-glass Twindow products. In 1958 and 1959 Columbia-Southern entered into two separate agreements whereby it transferred to PPGI the foreign rights to certain technology involving chemical processes.

Petitioner and Columbia-Southern did not develop paint, glass, or chemical technology for sale to customers. All of their research and development programs were directed toward the creation of new products and the improvement of existing products. Excluding the agreements with PPGI, petitioner made one other sale of technology during the period from 1944 to 1961.

When petitioner and Columbia-Southern obtained U.S. patents for their paint, glass, or chemical technology, they often filed foreign patent applications to protect their discoveries against foreign appropriation by others who might thereby compete with the petitioner

974

in domestic and foreign markets. Other reasons for seeking foreign patents were (1) the prospect of selling such foreign patents and (2) the prospect of licensing such patents.

On November 17, 1958, petitioner and PPGI entered into an agreement relating to petitioner's paint and coating technology. Petitioner agreed to transfer to PPGI the "technical data now in [petitioner's] possession" relating to paint and coating products. Petitioner and PPGI each agreed to transfer to the other "technical data hereafter coming into its possession during the term of this Agreement" relating to paint and coating products. Section 7 of the agreement provided that "This Agreement shall terminate within five (5) years from the date hereof," but under certain circumstances the agreement could be extended for additional periods not to exceed 10 years. Upon termination of the agreement none of the paint and coating technology transferred to PPGI would revert to petitioner.

Under the November 17, 1958, agreement petitioner granted PPGI "an irrevocable, royalty-free, transferable, exclusive right to use in the Benelux [countries] and France for the manufacture of paint and coating products the technical data not covered by patents * * * with the right in [PPGI] to transfer or disclose and to sublicense such technical data to others for like use in the Benelux [countries] and France." Petitioner also granted PPGI "an irrevocable, royalty-free, transferable, exclusive license, with right to sublicense others, to make, use and sell paint and coating products under the licensed patents of the Benelux [countries] and France * * * subject, however, to the reserved right in [petitioner] to sell such products under such licensed patents."

Under the November 17, 1958, agreement PPGI agreed to pay petitioner a total cash consideration of $600,000 for the rights transferred by petitioner to PPGI. This amount was payable in installments as follows: $50,000 in 1960; $100,000 in 1961; and $150,000 in each of the successive 3 years. Petitioner and PPGI also agreed to make available to each other technology developed or acquired during the term of the agreement.

Under the agreement "technical data" was defined as "the following intangible capital assets relating to commercial developments [in the manufacture and sale of paint and coating products—not including resins] : Trade secrets, research and development data, technical information and know-how, whether or not patentable, including chemical, engineering, scientific, commercial and practical information and formulae, methods of sales promotion, sales techniques, manufacturing data and procedure, machinery, plant and equipment designs, information on materials and commercial sources thereof, technical

information recorded in research reports, on drawings, blueprints, and in specifications and in other writings." The term "licensed patents of the Benelux [countries] and France" in the agreement referred to patents of such countries covering the technical data that petitioner was obligated to transfer to PPGI under the agreement.

Petitioner has transmitted to PPGI after-acquired paint and coating technology over a 10-year period following the effective date of the above agreement.

Petitioner's paint and coating technology (which was the subject of an agreement between petitioner and PPGI dated November 17, 1958) involved thousands of unique formulations. The products made from this technology fall into two groups, industrial products and trade products. Industrial products encompass automotive finishes, industrial maintenance finishes, and general industrial coatings. Industrial maintenance finishes are corrosion-resistant coatings protecting industrial buildings from fumes, liquids, and other corrosive matter. General industrial coatings are sold to be applied as finishes to products (such as appliances) of other manufacturers. Trade products are decorative coatings, such as indoor and outdoor house paints. Neither foreign nor domestic patents were major factors in paint and coating technology and petitioner relied on secrecy for protection. Petitioner had such a broad line of paint and coating products that each individual product had small sales value. It was therefore uneconomic to obtain individual patents for each product. Each of petitioner's chemists signed a confidentiality agreement. To further assure secrecy all of the two or three thousand materials petitioners used in its paint and coating products were coded and only a limited number of people had access to the code book.

The paint and coating technology that petitioner transferred to PPGI by the agreement of November 17, 1958, included formulae for commercial items that had been reduced to practice and sold over a period of many years prior to the agreement. Since 1950 petitioner has spent approximately $35 million in research and development of paint and coating products.

Prior to the November 17, 1958, agreement, petitioner had transferred certain rights in its paint and coating technology to a Venezuelan company for $150,000. In 1964 petitioner licensed the paint and coating technology in Italy for a 10-year period and received $375,000 in royalties in the first 3 years of that agreement.

Late in 1958 PPGI transferred a portion of the paint and coating technology for an equity interest in Les Usines J. G. deConinck & Fils S.A. (a Belgian corporation). PPGI granted deConinck an exclusive right to use such technology in Belgium.

Duracron technology (which was the subject of an agreement between petitioner and PPGI dated May 29, 1959) is unique and it is considered one of the outstanding developments in the paint industry. Duracron is a thermosetting material having a high resistance to stain and weathering. Duracron-coated aluminum and steel sidings have good exterior durability and with their resistance to detergents and stains Duracron coatings are useful in laundry equipment and refrigerators. Duracron coatings can be applied to a broad strip of aluminum before the strip is formed into a finished product and can survive the machine bending required to form the product, thus substantially reducing cost.

Duracryl technology (which was also the subject of the May 29, 1959, agreement) is also unique. Duracryl coatings are thermoplastic materials which, when applied to automobiles, produce a fine gloss.

Patents form the most important part of Duracron technology while both patented and unpatented technology are equally important factors in Duracryl technology. Duracryl technology would be extremely difficult to duplicate by laboratory analysis.

Duracron and Duracryl technology became usable in 1956. Duracron and Duracryl products were sold commercially as early as September 1957 when petitioner registered trademarks for these names in foreign countries. The basic patents were applied for in foreign countries as early as 1955. Petitioner has spent from $7 million to $8 million in developing Duracron and Duracryl technology.

On May 29, 1959, petitioner and PPGI entered into an agreement relating to Duracron and Duracryl technology. Petitioner agreed "to transfer * * * [to PPGI] technical data now in [petitioner's] possession relating to [Duracron and Duracryl products]." Petitioner and PPGI each agreed "to transfer to the other technical data hereinafter coming into its possession during the term of this Agreement and relating to [Duracron and Duracryl products]." Section 7 of the agreement provided that "This Agreement shall terminate five (5) years from the effective date hereof," but under certain circumstances the agreement could be extended for additional periods not to exceed 10 years. Upon termination of the agreement none of the Duracron and Duracryl technology transferred to PPGI would revert to petitioner.

Under the May 29, 1959, agreement petitioner granted PPGI "an irrevocable, royalty-free, transferable, exclusive right to use [outside the United States and Canada] for the manufacture of [Duracron and Duracryl products] the technical data not covered by [patents] * * * with the right in [PPGI] to transfer or disclose and to sublicense such technical data to other * * *." Petitioner also granted PPGI "an irrevocable royalty-free, transferable, exclusive license, with right to sublicense to others, to make, use and sell [Duracron and Duracryl

products] under the licensed PPGI patents of countries other than the United States * * * subject, however, to the reserved right in [petitioner] to sell such subject matter under the licensed patents."

Under the May 29, 1959, agreement PPGI agreed to pay petitioner $800,000 for the rights transferred to it by petitioner. This amount was payable in 10 installments as follows: $50,000 in each of the years 1960 through 1964; $75,000 in 1965 and 1966; $100,000 in 1967; and $150,000 in 1968 and 1969.

Under the May 29, 1959, agreement, the term "technical data" referred principally to the "following intangible capital assets [relating to certain thermosetting and thermoplastic resins]: Trade secrets, research and development data, technical information and know-how, whether or not patentable, including chemical, engineering, scientific, commercial and practical information and formulae, methods of sales promotions, sales techniques, manufacturing data and procedures, machinery, plant and equipment designs, information or materials and commercial sources thereof, technical information recorded in research reports, or drawings, blueprints, and specifications and in other writings, all relating to the subject matter of this Agreement." The term "licensed PPG patents of countries other than the United States" referred to "patents of [all countries except the United States and Canada] * * * covering the technical data which [petitioner] shall be obligated to transfer to [PPGI]."

Advances made by petitioner in the Duracron and Duracryl technology have been transferred to PPGI during the years subsequent to the May 29, 1959, agreement.

Duracryl coating is used by General Motors Corp. on its automobiles. Petitioner has licensed duracron technology to DuPont, Sherwin-Williams, and DeSoto, Inc. (a subsidiary of Sears, Roebuck and Co.). Through the year 1967 PPGI has granted between 20 and 25 licenses of the Duracron and Duracryl technology for which it has received more than $1 million in royalties.

All-glass Twindow technology (which was the subject of an agreement between petitioner and PPGI dated January 1, 1961) is unique and is used by petitioner to produce an all-glass double-glazed insulating unit. This unit, referred to as all-glass Twindow, consists of two pieces of glass welded together at the edges and separated by a dead airspace of approximately $\frac{3}{16}$ of an inch. All-glass Twindow is made from two large pieces of glass, one of which is slightly larger in area than the other. A hole is drilled in one of the pieces and a metal eyelet is inserted in the hole and soldered to it by melting a glass frit. The two pieces of glass are then striped on the edges with electroconductive material through which an electric current is passed. The resulting heat causes the glass adjacent to the strips to melt, and as

the glass melts it becomes electroconductive, generating an intense heat that welds the edges of the two pieces of glass together. The two pieces of glass are then pulled about $\frac{3}{16}$ of an inch apart and the entire unit is run through an annealing lehr to remove strains and stresses in the glass. Plastic pipe is put into the metal-edged hole and inert dry gas is forced into the airspace for the purpose of removing the moisture which would otherwise condense inside the unit and cause frosting which would destroy its visual property. When this is completed the eyelet is closed.

Patents were the major factor in all-glass Twindow technology. The electric welding process, the metal eyelet and the method of fastening the eyelet, the closing of the eyelet, the striping material, and the method of applying the striping material are all protected by patents.

In the 1930's the Corning Glass Works developed the technology that led to the development of all-glass Twindow and petitioner acquired the rights to such technology for about $900,000. Shortly after World War II the Pittsburgh Corning Corp. made further development in the technology in this area and petitioner acquired Pittsburgh Corning's all-glass Twindow technology in 1952 for $500,000. In addition to the amounts paid to the Corning Glass Works and to the Pittsburgh Corning Corp. petitioner spent more than $1,500,000 in research and development of all-glass Twindow.

By 1952 petitioner had marketed all-glass Twindow commercially and since then petitioner's sales of this product have grown rapidly. In 1952 petitioner began with one production line for the all-glass Twindow and by 1968 it had nine production lines in operation.

On January 1, 1961, petitioner and PPGI entered into an agreement relating to all-glass Twindow technology. The agreement stated (in section 2.3 that petitioner "hereby transfers, grants, assigns and conveys to PPGI, with full right of ownership in Western Europe, all of the Technical Data now in the possession of [petitioner] relating to [all-glass Twindow products]." Section 3.2 of the agreement provided that "For a period terminating five (5) years from the effective date hereof * * * [petitioner] and PPGI each covenants and agrees to transfer to the other, with full rights of ownership in the United States and Canada, as to [petitioner], and in Western Europe, as to PPGI, all Technical Data relating to [all-glass Twindow products] hereafter coming into its possession." Similar rights were granted as to patented technology. Section 3.4 of the agreement provided as follows:

3.4 The obligations of [petitioner] and PPGI to exchange Patent rights and Technical Data under this Section 3 shall terminate five (5) years from the effective date hereof; provided, however, that in the event that any agreement between PPGI and a sublicensee of PPGI, made within five (5) years from effective

date hereof provides for the acquisition, exchange or transfer of Technical Data and/or Patent rights relating to [all-glass Twindow products] for a period extending beyond said five-year term, said term shall be automatically extended; and provided further that such automatic extension shall not be beyond ten (10) years from the latest effective date of any such agreement between PPGI and a sublicensee of PPGI.* * *

Western Europe was defined in the January 1, 1961, agreement to include Belgium, France, Italy, Luxembourg, the Netherlands, West Germany, Austria, Denmark, Norway, Portugal, Spain, Sweden, Switzerland, and the United Kingdom.

Under the January 1, 1961, agreement petitioner granted PPGI "an irrevocable, transferable, exclusive right to use [unpatented all-glass Twindow technical data in Western Europe], to manufacture [all-glass Twindow products], and to transfer and disclose and sublicense such Technical Data to others for like use." Petitioner also granted PPGI "an irrevocable, transferable, exclusive license, with the right to sublicense others, to make, use and sell [all-glass Twindow products] under the Licensed Patents of Western Europe owned by [petitioner] or under which [petitioner] has the right to grant such license." Under the agreement petitioner obtained from PPGI the right to sell in Western Europe products under the licensed patents subject to payment of royalties.

By an amendment effective June 1, 1963, petitioner extended the scope of PPGI's all-glass Twindow license to include all countries other than the United States and Canada.

PPGI agreed to pay a total purchase price of $500,000 under the January 1, 1961, agreement in 10 installments as follows: $20,000 in each of the years 1961 through 1963; $40,000 in 1964; $50,000 in 1965 and 1966; and $75,000 in each of the years 1967 through 1970.

Under the January 1, 1961, agreement the term "Technical Data" was defined to include "the following intangible capital assets: Trade secrets, research and development data, technical information and know-how, whether or not patentable, including engineering, scientific and practical information and formulae, manufacturing data and procedures, machinery, plant and equipment designs, information or materials and commercial sources thereof, technical information recorded in research reports, or drawings, blue prints, and in specifications and other writings." The term "licensed patents" referred to petitioner's patents in Western Europe relating to all-glass Twindow.

All of petitioner's 67 Western European patents as well as its 17 Western European patent applications transferred to PPGI by the January 1, 1961, agreement had been obtained or filed more than 6 months before the effective date of the agreement.

PPGI has licensed all-glass Twindow technology acquired from petitioner to the two largest glass manufacturers in Western Europe,

Saint Gobain Glass Co. of France, and Pilkington Bros., Ltd., of the United Kingdom. By 1968 PPGI had earned approximately $400,000 in royalties from these two licenses.

Columbia-Southern's soda ash technology (which was the subject of an agreement between Columbia-Southern and PPGI under date of July 17, 1958) employed the Solvay Process. Briefly described, the process involves the following stages: A brine solution is first saturated with ammonia. Carbon dioxide is pumped into the solution, precipitating bicarbonate of soda which is then calcined into soda ash. Columbia-Southern had made a considerable number of improvements in its soda ash technology, particularly in the distillation and calcination portion of the process. Columbia-Southern has been in the soda ash business for many decades. Its basic soda ash technology dates back to 1898.

Patents were not a major factor in Columbia-Southern's soda ash technology. The know-how in the soda ash industry is held by each manufacturer in great secrecy.

On July 17, 1958, Columbia-Southern and PPGI entered into an agreement relating to the sale of Columbia-Southern's soda ash technology. Under the agreement Columbia-Southern agreed to transfer to PPGI "technical data now in Columbia-Southern's possession relating to [the process for manufacturing soda ash.]" Columbia-Southern and PPGI each agreed to transfer to the other "technical data hereinafter coming into its possession during the term of this agreement relating to the [process for manufacturing soda ash]." Section 6 of the agreement provided that "This Agreement shall terminate five (5) years from the effective date hereof," and under certain circumstances the agreement could be extended for additional periods not to exceed 10 years. Upon termination of the agreement none of the soda ash technology transferred to PPGI would revert to petitioner.

Under the July 17, 1958, agreement Columbia-Southern granted to PPGI "a royalty-free, transferable, exclusive right to use in the European Economic Community and the [European] Free Trade Area * * * the unpatented [soda ash] technical data * * * with the right in [PPGI] to transfer or disclose and to sublicense such technical data to others." Such grant was to "become irrevocable with respect to any country or countries in which [PPGI], within five (5) years from the effective date of this agreement, either itself utilizes such right * * * and/or grants a sublicense or sublicenses hereunder." The agreement covered after-acquired or after-developed technical data coming into the possession of petitioner during the term of the agreement and relating to the subject matter of the agreement.

Under the July 17, 1958, agreement Columbia-Southern granted PPGI "a royalty-free, transferable, exclusive license, with right to

sublicense others, to make, use and sell [soda ash] under the licensed patents of the European Economic Community and the [European] Free Trade Area owned by Columbia-Southern or under which Columbia-Southern has the right to grant such license." Such grant to PPGI was to become "irrevocable with respect to any country or countries in which [PPGI], within five (5) years from the effective date of this agreement, either itself utilizes such * * * license * * * and/or grants a sublicense or sublicenses hereunder." Columbia-Southern obtained from PPGI under the July 17, 1958, agreement the right to sell products in the subject countries under the licensed patents.

Under the July 17, 1958, agreement PPGI agreed to pay Columbia-Southern a total purchase price of $1 million in six installments as follows: $50,000 in 1959; $100,000 in 1960; $200,000 in each of the years 1961 through 1963; and $250,000 in 1964.

The term "technical data" was defined in the July 17, 1958, agreement to include "the following intangible assets [relating to the manufacture of soda ash according to the ammonia soda process]: Trade secrets, the studies and results of research and development work, * * * chemical, engineering [and] scientific * * * information and formulae, manufacturing data and procedures, machinery, plant and equipment designs, * * * drawings, blueprints and * * * specification." The term "licensed patents of the European Economic Community and of the [European] Free Trade Area" was defined to include the patents of those designated regions covering the technical data which Columbia-Southern was obligated to transfer to PPGI under the July 17, 1958, agreement.

Under the July 17, 1958, agreement Columbia-Southern transferred 18 European patents and patent applications to PPGI, and in each case a corresponding United States patent application had been filed more than 6 months prior to the agreement.

Prior to the formation of PPGI, Columbia-Southern negotiated with Soudieres Reunies with respect to the transfer of certain rights in the soda ash technology to the French corporation. On July 17, 1958, PPGI granted the French corporation an irrevocable, royalty-free, nontransferable exclusive right to use the patented and unpatented soda ash technology in France and also granted the French firm an irrevocable, royalty-free, nontransferable, nonexclusive right to use the patented and unpatented soda ash technology in certain other European countries. The agreement was to terminate 10 years from the effective date thereof. This was the only agreement made by PPGI to license the soda ash technology.

PPGI received a 7½-percent equity interest in Soudieres Reunies under the agreement, with an option to acquire an additional 2½-percent stock interest. The 7½-percent equity interest in Soudieres

Reunies had a fair market value of about $450,000 when PPGI acquired it in 1958, and about 10 years later it had reached a fair market value of $1 million.

The DH Process (which was the subject of an agreement between Columbia-Southern and PPGI dated March 11, 1959) is unique. It is the most economical process for purifying diaphragm cell caustic soda to enable it to compete with mercury cell caustic soda for use in the rayon, soap, phosphate, and other industries that cannot use straight diaphragm cell caustic soda because of its impurities. The DH Process was designed by Columbia-Southern to remove salt and chlorate from diaphragm cell caustic soda. These impurities are eliminated by injecting liquid ammonia into the base of a tall column of 50-percent caustic soda solution. The ammonia, being lighter, rises and extracts the impurities from the caustic soda. The purified caustic soda falls to the base of the column and the ammonia is then siphoned off and distilled to eliminate the impurities so that it can be used again. Columbia-Southern began research on the DH Process in 1936, completed the development work and pilot plant work in about 1940 and began commercial purification of diaphragm cell caustic soda using the DH Process in 1942.

Columbia-Southern or petitioner granted nonexclusive licenses to six domestic corporations to use the DH Process in the United States. As a result of a judgment entered in 1951 by the U.S. District Court for the Southern District of New York in an antitrust action in which petitioner was one of the defendants, the six licensees were permitted to export DH purified caustic soda. By 1967 the aggregate royalties paid by the licensees amounted to approximately $3 million. The DH Process is still used by petitioner and by the six domestic licensees.

Prior to March 11, 1959, Columbia-Southern had executed an agreement dated January 15, 1959, with Western Chemicals, Ltd. (a Canadian corporation), for the licensing of the DH Process technology in Canada. A provision in this agreement specifically denied Western Chemicals, Ltd., the right to disclose any of the unpublished technical data disclosed to it. This license agreement with Western Chemicals, Ltd., was assigned by Columbia-Southern to PPGI on March 11, 1959.

On March 11, 1959, Columbia-Southern and PPGI entered into an agreement relating to the DH Process. Columbia-Southern agreed to transfer to PPGI "technical data in Columbia-Southern's possession relating to the DH Process." Columbia-Southern and PPGI each agreed to transfer to the other "technical data hereinafter coming into its possession during the term of its agreement and relating to the DH Process." Section 6 of the agreement provided that the agreement was

for a term of 10 years. Upon termination of the agreement none of the DH Process technology transferred to PPGI would revert to petitioner.

Under the March 11, 1959, agreement Columbia-Southern granted PPGI "an irrevocable, royalty-free, transferable, exclusive right to use in foreign countries the [unpatented] technical data * * * with the right in [PPGI] to transfer or disclose and to sublicense such technical data to others." Columbia-Southern also granted PPGI "an irrevocable, royalty-free, transferrable, exclusive license, with right to sublicense to others, to purify and/or concentrate [caustic soda] and to use and sell the [caustic soda] so purified and/or concentrated under the licensed foreign patents owned by Columbia-Southern or under which Columbia-Southern has the right to grant such license * * * subject, however, to the reserved right in Columbia-Southern to sell such products under the licensed patents."

Under the March 11, 1959, agreement PPGI agreed to pay Columbia-Southern a total purchase price of $500,000 in 10 annual installments of $50,000 beginning in 1960. The term "technical data" was defined in the agreement to include "the following intangible capital assets: trade secrets, research and development data, technical information and know-how, whether or not patentable, including chemical, engineering, scientific and practical information and formulae, manufacturing data and procedures, machinery, plant and equipment designs, information or materials and sources thereof, technical information recorded in research reports, on drawings, blueprints, and in specifications and in other writings * * * all relating to the DH process." "Licensed foreign patents" was defined to include Columbia-Southern's foreign patents relating to the DH process.

Although four foreign patents and patent applications were transferred by Columbia-Southern to PPGI under the March 11, 1959, agreement, only one of these patents (a Canadian patent issued in 1954) was material to the use of the DH process in purifying caustic soda. The major part of the value of the rights transferred by Columbia-Southern to PPGI pursuant to the March 11, 1959, agreement was attributable to the rights in the unpatented technical data.

By 1968 PPGI had earned approximately $250,000 from licensing the foreign rights to the DH process that it acquired under the March 11, 1959, agreement, PPGI entered into a licensing agreement relating to the DH process in France with Progil S.A. on October 17, 1961, and also entered into a licensing agreement relating to the DH process in the Far East with Blaw-Knox Co. (a Delaware corporation) on December 6, 1966.

The term "exclusive" was defined in each of the above agreements to mean exclusive with respect to all persons including the petitioner.

The termination sections contained in the paint and coating products agreement (November 17, 1958), the Duracon and Duracryl agreement (May 29, 1959), and the DH process agreement (March 11, 1959) each provided as follows:

Notwithstanding termination of this Agreement in accordance with the provisions of any Subsection of this Section * * *

(a) All rights, licenses and immunities granted by either party to the other or by either party to any person not a party to this Agreement * * * prior to the date of termination, may continue for the full term of the respective patents involved. * * *

On December 14, 1962, each of the five technology agreements outlined above was amended to provide that in lieu of installment obligations PPGI would pay petitioner annually 70 percent of the gross licensing fees it received each year. On November 21, 1963, petitioner and PPGI further amended each of the five agreements by reducing the payments PPGI was to make to petitioner from 70 percent to 50 percent of gross licensing fees and by providing that PPGI was to make up the additional 20 percent by way of dividends. The amount that PPGI was obligated to pay under these various amendments could not exceed, in the aggregate, the amount that PPGI was originally obligated to pay under the five original agreements. The November 21, 1963, amendments were made retroactive to January 1, 1962, and they were executed in order to qualify PPGI under the Swiss tax conventions. The December 14, 1962, amendments stated that PPGI had not received sufficient income from licensing activities to meet the scheduled payments set forth in the original technology agreements.

In its financial statements for the taxable years ending November 30, 1959, and December 31, 1960, PPGI treated the total consideration it was required to pay under each technology agreement as amortizable over a period of 5 years for the paint and coatings, Duracron and Duracryl, and the soda ash process agreements and over a period of 10 years for the DH process agreement. As of December 30, 1961, the consideration required to be paid under each technology agreement was amortized by PPGI over a period of 10 years.

The Paris Union Convention for Protection of Industrial Property of March 30, 1833, is the major source of international rules applicable to nondisclosure and unauthorized use of unpatented industrial technology. Article 10(b) of the Paris Convention requires all members (including the United States) to give nationals of other member countries effective protection against unfair competition. Implementing their obligations under the Paris Convention (and, if signatories, the Pan American Convention for Trademarks and Commercial Protection of 1929), the industrial countries of the world have followed three different systems: (1) The German system, (2) the French system, or

(3) the common law system. Under the German system, special statutes contain specific references to various acts of unfair competition and contain provisions for penal sanctions, injunctions, and damages. The French system provides for repression of unfair competition through general case law development applying the general tort articles of the Civil Code. In addition, in the case of manufacturing secrets, penal sanctions are found in the Penal Codes. In the common law system the protection of industrial know-how is developed through doctrines of breach of trust and violation of confidential relations.

In countries employing any one of the three systems a manufacturing secret is a sufficiently identifiable right to be assigned, licensed, paid in to a corporation as a contribution to capital, pledged or expropriated. Its characteristic as a property interest, the right to exclude others from knowledge thereof, is protected by penal and civil remedies. A manufacturing secret is secret technical knowledge, capable of oral or written communication, that has sufficient value to represent a competitive industrial advantage. A manufacturing secret is not confined to new methods of manufacturing but also includes manufacturing details, including ingenuity, that are the product of experience.

Petitioner was a defendant in *United States* v. *Libbey-Owens-Ford Glass Co.* (Civil Action No. 24–464, S.D. N.Y.), a civil antitrust suit in which the Government sought to divest each manufacturing defendant of all but one of its glass plants and further sought to divest petitioner of all of its company-owned distribution branches. On October 30, 1948, a judgment was entered which, in part, enjoined petitioner from entering into any license or other contract that would restrict the exportation of flat glass from, or the importation of flat glass into, the United States. The judgment specifically required that petitioner grant to domestic licensees under its flat glass patents an immunity from suit under its corresponding foreign patents.

With respect to licensing of patented and unpatented technology relating to flat glass the judgment included the following order: "A. The corporate defendants [including petitioner] * * * are severally * * * enjoined and restrained from entering into * * * directly or indirectly, any * * * agreement * * * with any person * * * engaged, outside the United States, either in the manufacture of flat glass, or in any patent licensing or exploitation * * *: (1) to restrict or prevent * * * the export of flat glass from the United States, or the import of flat glass into the United States. * * * B. The corporate defendants [including petitioner] * * * are enjoined and restrained from causing or permitting any wholly-owned or controlled foreign subsidiary to become or be a party to, any agreement * * * containing provisions enjoined in Subsection A of this Section."

Petitioner was also a defendant in *United States* v. *United States Alkali Export Association, Inc.* (Civil Action No. 24–464, S.D. N.Y.), a civil antitrust action. The judgment in this action, which applied to all of petitioner's subsidiaries, was entered on January 22, 1951, and enjoined petitioner from entering into any contract that would restrict the export of alkalis from the United States. The alkalis covered by the judgment included caustic soda and soda ash.

During the period 1960 through 1966 petitioner's direct exports of paint and coating products into the Benelux countries and France amounted to at least $6,922. Petitioner's direct exports of Duracron and Duracryl products in countries outside of the United States and Canada amounted to at least $1,507, with direct exports of such products to PPGI's licensees in such countries amounting to at least $25,890.

From 1958 through 1967 petitioner did not make any direct export sales of all-glass Twindow products. During this same period Columbia-Southern's and petitioner's direct exports of soda ash to France, Germany, Italy, Belgium, Holland, Luxembourg, the Netherlands, England, Sweden, Norway, Denmark, Austria, Switzerland, Algeria, Togo, the Cameroons, Laos, Cambodia, Vietnam, Morocco, and Tunisia amount to at least $590. From March 1, 1959, through October 1967 petitioner's and Columbia-Southern's direct exports of DH caustic soda amounted to at least $4,864,639.

During the years 1960 and 1961 PPGI paid to petitioner or to Columbia-Southern the following amounts pursuant to the payment schedules in the five technology agreements:

|  | 1960 | 1961 |
|---|---|---|
| Paint and coatings | $50,000 | $100,000 |
| Duracron and Duracryl | 50,000 | 50,000 |
| All-glass Twindow | ------- | 20,000 |
| Soda ash | [1]100,000 | 200,000 |
| DH process | [1]50,000 | 50,000 |

[1] Received by Columbia-Southern.

Petitioner and Columbia-Southern reported these amounts as long-term capital gains.

Respondent determined in his statutory notice of deficiency that the amounts received by petitioner in 1960 under the paint and coatings agreement and the Duracron and Duracryl agreement and the amounts received by petitioner in 1961 under all five of the technology agreements were taxable as ordinary income.

---

Companhia Pittsburco di Vidros e Cristais Ltda. (hereinafter called Pittsburco) is a Brazilian corporation wholly owned by petitioner.

Pittsburco was a holding company. During 1960 Pittsburco had investments in the capital stock of several corporations in the amount of $3,838,378. During 1960 Pittsburco realized dividend income in the amount of $141,051, interest income of $14,508 and gains from the sale of bonds in the amount of $9,476.

From 1956 through 1961 Dr. Sebastiao Paes de Almeida was Brazil's Minister of Finance and prior to this period he served as president of the Bank of Brazil. In 1961 Cia Comercial de Vidros de Brazil (hereinafter called CVB) was a Brazilian glass distributor. As of November 1961 Almeida and his associates owned 72.75 percent of CVB while petitioner indirectly owned 27.25 percent of CVB through its wholly owned subsidiaries, Pittsburco and PPGI. As of December 1960, Pittsburco owned 21.63 percent of the CVB stock and PPGI owned 5.62 percent of the CVB stock.

CVB regularly paid stock dividends to its shareholders. In Brazil a shareholder's basis in stock is increased by the value of stock received as a dividend.

On November 21, 1961, Pittsburco's 21.63-percent interest in CVB represented 138,179 shares of stock. Pittsburco's basis for these shares of stock was 136,314,411 cruzeiros for Brazilian tax purposes and $1,279,187 for Federal income tax purposes. Many of Pittsburco's CVB shares were acquired as stock dividends. On November 21, 1961, PPGI's 5.62-percent interest in CVB represented 35,902 shares of stock. Its dollar basis in the CVB stock was $231,823.

From November 1949 until November 1961 when Pittsburco sold its investment in CVB to PPGI the Brazilian cruzeiro declined in dollar value from $0.055 to $0.0033. In 1952 petitioner, as the sole stockholder of Pittsburco, established a reserve of $236,129 in anticipation of dollar losses brought about by the devaluation of the cruzeiro.

In 1959 and 1960 petitioner, anticipating a favorable change in the political and economic climate of Brazil, was considering additional investments in Brazil both in the glass industry and the paint industry. In the last half of 1960 and in 1961 the political and economic climate in Brazil deteriorated markedly, with rigid exchange controls adopted in 1961. Under these circumstances petitioner decided against any further investments in Brazil.

Brazilian corporate law is based upon the principle of absolute majority control. The minority interests have no rights and cannot block a decision by the majority.

In 1960 Almeida notified the CVB stockholders that he planned to call for capital contributions from them so that CVB could build new branch distribution facilities. Petitioner and its subsidiaries were unwilling to contribute any additional capital. Almeida then made a series of offers in 1960 and 1961 to purchase outside Brazil the CVB

stock held by Pittsburco and PPGI. Almeida was willing to pay $1,150,000 for the 27.25-percent interest in CVB held by Pittsburco and PPGI. Pittsburco's share was $912,755 or the equivalent of 276,592,424 cruzeiros for its 138,179 shares of CVB stock. Since its basis was 136,314,411 cruzeiros, Pittsburco would realize a gain, for Brazilian tax purposes of 140,278,013 cruzeiros. Since its dollar basis was $1,279,187, Pittsburco would have a dollar loss of $366,432 on the sale of the CVB stock to Almeida.

In 1961 Brazil levied a tax of 23 percent on gains from the sale of securities.

Pittsburco could not have distributed or sold its CVB shares of stock to petitioner without adverse tax and exchange consequences. Therefore, on the advice of counsel, Pittsburco executed an option agreement granting PPGI the right to purchase Pittsburco's 138,179 shares of CVB stock for the amount of 149,945,852 cruzeiros. The option agreement was dated November 21, 1961. Accordingly, Pittsburco sold its 138,179 shares of CVB stock for the stated cruzeiro obligation of 149,945,852. This amount represented Pittsburco's cost for Brazilian tax purposes plus a profit of 10 percent of that cost. Brazilian taxes on the transaction were thus minimized and, in addition, the amount of sales proceeds that remained subject to Brazilian exchange controls was also minimized. On November 24, 1961, immediately after purchasing the CVB stock from Pittsburco, PPGI sold (in Switzerland) all of its CVB stock (the CVB stock acquired from Pittsburco together with the CVB stock previously owned by PPGI) to Almeida for $1,150,000.

PPGI gave Pittsburco a note in the amount of 149,945,852 cruzeiros representing the purchase price of the 139,179 shares of CVB stock. The exchange value of such amount was $494,000.

Respondent in his statutory notice of deficiency determined that petitioner realized a dividend in 1961 from Pittsburco in the amount of $455,959.07 as a result of the transfer of the CVB stock by Pittsburco to PPGI.

---

During the year 1960 Pittsburco was indebted to petitioner in the amount of $546,086. The debt arose prior to 1960 as a result of advances by petitioner to Pittsburco. The debt was not evidenced by a note, it was unsecured and it did not bear interest in the year 1960.

Respondent in his statutory notice of deficiency determined that pursuant to section 482 of the 1954 Internal Revenue Code gross income in the amount of $27,304 should be allocated from Pittsburco to petitioner. The amount of $27,304 allocated to petitioner was computed by multiplying Pittsburco's indebtedness to petitioner by 5 percent.

In 1951 Columbia-Southern and an unrelated third party were the joint owners of Distribuidora Quimica S.A. (hereinafter called DQ), an Argentine corporation engaged in the business of selling glass and chemical products. Columbia-Southern owned 51 percent of DQ. About 1952 DQ acquired property in a suburb of Buenos Aires for use in the unloading, storage, and distribution of soda ash and other chemicals. In 1957 Columbia-Southern and the minority stockholder decided to terminate their venture and to divide the assets of DQ. At that time DQ was commercially inactive and the property referred to above was its only asset of value. The property held by DQ was ratably divided and Columbia-Southern retained the right to use the company name. Thereafter, DQ was a wholly owned subsidiary of Columbia-Southern, DQ was inactive in 1957 and 1958 and resumed sales in 1959.

In 1957 the property held by DQ was carried on its books in the amount of 15 million pesos which represented the original cost less depreciation. In 1952 the dollar was the equivalent of 13.8 pesos. In 1960 the exchange rate of Argentina pesos to dollars was approximately 83 to 1.

Throughout 1959 PPGI wanted to acquire the properties of DQ in connection with its investment and selling activities in Argentina. PPGI was considering the construction of steel tanks to store liquid caustic soda as a means of reducing the cost of caustic in Argentina and expanding the market there. On September 28, 1959, at a meeting of the shareholder's executive board of PPGI, $385,000 was appropriated for investment in storage tanks in Argentina. The original plan, adopted at this meeting, called for the creation of a new subsidiary which would construct the tanks on property to be leased from DQ. However, the leasing of property by a new subsidiary from DQ was found to be impractical under the laws of Argentina and, as a consequence, a second plan was adopted under which the new subsidiary would purchase the property from DQ.

At a meeting of the board of directors of DQ held on July 27, 1960, the president of DQ stated that he had been advised by Columbia-Southern that arrangements should be initiated for the transfer of the assets and liabilities of DQ to Pittsburgh Plate Glass Argentina S.A. (hereinafter called PPGA), then in the process of formation as a wholly owned subsidiary of PPGI. The transfer price was to be equal to the net value of the capital account of DQ reflected by its balance sheet.

On August 1, 1960, the president of DQ reported to its board of directors that the necessary steps had been taken to secure the legal status and registration of PPGA. Whereupon the board of directors of DQ authorized the transfer of all of its assets (effective as of

August 1, 1960) to PPGA. PPGA would also assume the existing liabilities of DQ. The exchange of the assets was to be made for 23,446,107.12 pesos (approximately $282,482) and PPGA was to issue to DQ 24 promissory notes payable after August 1, 1961, with interest of 12 percent per annum. PPGA acquired the DQ assets in 1960.

The first meeting of the board of directors of PPGA was held on August 1, 1960, at which time the acting president advised the board that PPGA had been formed on a provisional basis on July 25, 1960, and that it was now necessary to authorize individuals to operate its bank accounts. The board then authorized certain individuals to open and operate bank accounts, to open letters of credit, to sign contracts of purchase and sale of foreign exchange, and to sign documents relating to the exportation and importation of merchandise.

At the second meeting of the board of directors PPGA held on August 16, 1960, the acting president stated that although PPGA was still in the process of being formed it was necessary to initiate full commercial activities following the transfer to it of the assets of DQ. The board then granted a general power of attorney to the manager of the company, Paul A. Mills, to carry on its business operations.

On August 1, 1960, Columbia-Southern had accumulated earnings and profits of $123,966,665.29 and, during the year 1960, the corporation realized earnings in the amount of $24,364,954.46.

In 1962, PPGA, in an arm's-length transaction, purchased from the former minority shareholder of DQ his portion of the properties originally held by DQ. The purchase price was $222,000.

Respondent, in a third amendment of his answer, alleged that the transfer of assets in 1960 from DQ to PPGA resulted in a constructive dividend to petitioner in the amount of $938,000 [2] and, based upon such allegation, respondent claimed an additional deficiency for 1960 in the amount of $73,064. In his amended answer respondent alleged that the fair market value of the transferred assets was 90 million Argentina pesos which had an exchange value of $1,125,000, while the consideration paid to DQ by PPGA was 15 million Argentina pesos with an exchange value of $187,500.

OPINION

PPGI is the wholly owned foreign subsidiary of the petitioner. The first issue involves the correctness of the respondent's allocation under section 482 of the Internal Revenue Code of 1954 of a portion of PPGI's gross income to the petitioner in 1960 and 1961. Section 482 authorizes the allocation of income and deductions between related

---

[2] Respondent in his opening brief reduces this figure to $899,456 ($1,086,956 less $187,500).

entities to prevent the evasion of taxes by shifting of profits, the making of fictitious sales, and other methods usually used to "milk" a taxable entity. *Ballentine Motor Co.*, 39 T.C. 348 (1962), affd. 321 F. 2d 796 (C.A. 4, 1963). Respondent has considerable discretion in applying section 482 and his determination must be sustained unless that discretion has been abused. *Grenada Industries, Inc.*, 17 T.C. 231 (1951), affd. 202 F. 2d 873 (C.A. 5, 1953). It is the shifting of income from one controlled entity to another that the respondent is authorized to correct so that income and deductions are attributed to that entity which has earned or sustained them. *Spicer Theatre, Inc.*, 44 T.C. 198 (1964), affd. 346 F. 2d 704 (C.A. 6, 1965). Where the respondent applies section 482 the burden is usually on the taxpayer to show that the respondent's reallocation of income or deductions was unreasonable, arbitrary, or capricious. *Nat Harrison Associates, Inc.*, 42 T.C. 601 (1964).

One of the difficulties encountered in this case is the episodic unveiling of new positions by the respondent at various stages in the proceedings. In the statutory notice of deficiency, respondent originally made allocations of gross income from PPGI to petitioner in 1960 and 1961 in the respective amounts of $1,032,999 and $866,749. In making these allocations, the respondent relied upon the Source Book of Statistics of Income compiled by the U. S. Treasury Department for 1960 and 1961. The statistics were based upon corporation income tax returns in the following category: "Returns with Net Income—Wholesale and Retail Trade: Wholesale trade: Other wholesalers: Drugs, Chemicals, and Allied Products." Using the statistics in the corporate category of 10 to 25 million assets, the respondent computed a net profit of 3.59 percent of gross sales in 1960 and 2.43 percent of gross sales in 1961. He then applied these percentages to gross sales figures for PPGI for 1960 and 1961 in the respective amounts of $17,793,900 [3] and $12,989,-000 and obtained the amounts of $638,801 and $315,632 which respondent regarded as appropriate net profits for PPGI in the years 1960 and 1961. Subtracting $638,801 from PPGI's income of $1,671,800 for 1960, the respondent determined that the difference, or $1,032,999 was allocable under section 482 to the petitioner in 1960. Similarly the respondent subtracted $315,632 from PPGI's income of $1,182,381 for 1961 and determined that the difference, or $866,749, was allocable under section 482 to the petitioner in 1961.

At the trial respondent announced a new position to the effect that (1) PPGI's activities were comparable to those of a combination export manager (CEM) with a nominal net profit margin of 2 percent

[3] The revenue agent incorrectly used a 13-month gross sales amount covering the period from Dec. 1, 1959, through Dec. 31, 1960. It also appears that the 1961 gross sales figure was incorrect.

of sales, and (2) PPGI's sales of petitioner's glass products to petitioner's two Canadian subsidiaries (CPI and Duplate) were merely "paper shuffling" and in effect share transactions. The net result of this new position was that *all* of PPGI's income from the Canadian sales would be allocated to petitioner and that any earnings of PPGI in excess of 2 percent on its remaining sales would also be allocated to the petitioner. Respondent also states on brief that he does not claim any allocation of income from PPGI to petitioner with respect to chemical sales.

To reflect his new posititon, the respondent amended his answer to show an allocation of gross income from PPGI to petitioner in 1960 and 1961 in the respective amounts of approximately $1,470,500 and $1,490,200, or a total allocation of $2,960,700.[4] This allocation of income represents all of PPGI's income from its sales of glass products to the Canadian subsidiaries and all of its income from its sale of glass and paint products to customers other than the Canadian subsidiaries in excess of 2 percent of such sales. Respondent also claimed increased deficiencies in his amended answer for each of the years 1960 and 1961 based upon the increased allocations of income. As to these the respondent has the burden of proof. Rule 32, Tax Court Rules of Practice.

PPGI was incorporated in July 1958 under the laws of Switzerland as a wholly owned subsidiary of petitioner for the purpose of (1) expanding the sale of petitioner's products outside the United States, (2) developing opportunities outside the United States for the exploitation of petitioner's technology in the glass, paint, and chemical fields, and (3) to develop opportunities outside the United States for investments where equity interests could be built around the manufacture of products using petitioner's technology. It was also petitioner's intention that PPGI would manage petitioner's existing foreign investments. Petitioner deemed it essential, in order to accomplish these various aims, to place all of its export sales and its foreign licensing and investment activities into a single autonomous unit under independent management.

Price guidelines were devised by petitioner's executives to yield petitioner a profit of at least 10 percent of sales. In no event were goods to be sold at less than inventoriable cost plus 25 percent. Preliminary pricing studies were made relating to the projected sales of glass products and it appeared that such projected sales, based upon proposed prices to PPGI and using the 1957 export sales volume, would yield an estimated net income of about 7 percent of sales.

---

[4] In respondent's brief, the amounts of gross income to be allocated to petitioner are increased once again, this time to $1,520,000 in 1960 and $1,500,000 in 1961.

A detailed basic agreement was executed between petitioner and PPGI (effective as of January 1, 1959) establishing prices, terms, and discounts in the sale of glass and paint products to PPGI and defining the obligations, rights, and duties of each party. A similar basic agreement was executed between Columbia-Southern [5] and PPGI covering all facets of the sales of chemical products to PPGI. We have made detailed findings concerning these basic agreements and it will not be useful to repeat them here.

We are convinced that respondent's original allocation of income based upon the Source Book of Statistics of Income was arbitrary and unreasonable. There is no indication in the record to show that the operations of the unnamed corporations in the $10 to $25 million asset category were in any way comparable to the operations of PPGI and, in fact, the evidence that does appear in the record emphasizes this lack of comparability. Moreover, it appears that the revenue agent resorted to these statistics only "Because this was the best available source to me at the time of the examination." The revenue agent admitted he had no idea of the nature of the operations of the corporations in the asset category used by him. It also appeared at the trial that in computing the 3.59 percent and the 2.43 percent as the proper return on gross sales in 1960 and 1961 he misapplied the statistical information appearing in the compilation so that the lack of comparability with PPGI, both as to its operations and to its capital structure, was aggravated.

Petitioner introduced extensive evidence to show that its sales of products to PPGI in 1960 and 1961 were at arm's-length prices within the meaning of the regulations under section 482. Section 1.482-1 (b) (1) of the regulations states that the "purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer." Section 1.482-1 (a) (6) of the regulations provides "The term 'true taxable income' means * * * the taxable income * * * which would have resulted to the controlled taxpayer, had it in the conduct of its affairs * * * dealt with the other * * * members of the group at arm's length." Section 1.482-2 (e), which relates to sales of tangible property, sets forth detailed criteria for determining arms-length prices between controlled taxpayers. Three methods are described for the determination of arm's-length prices: (1) The comparable uncontrolled price method; (2) the resale price method; and (3) the cost plus method. Section 1.482-2 (e)-(1) (ii) provides that "If there are comparable uncontrolled sales * * * the comparable un-

---

[5] Columbia-Southern, petitioner's wholly owned subsidiary, was merged into petitioner on Dec. 31, 1960.

controlled price method must be utilized because it is the method likely to result in the most accurate estimate of an arm's length price * * *."

Under the comparable uncontrolled price method, the arm's-length price of a controlled sale is equal to the price paid in comparable sales between a seller and a buyer who are not members of the same controlled group. Uncontrolled sales are considered comparable if the physical property and circumstances involved in the uncontrolled sales are identical to those involved in the controlled sales, or are so nearly identical that any differences either have no effect on price or appropriate adjustments can be made for such differences. See sec. 1.482–2(e)(2)(ii), Income Tax Regs.

Petitioner introduced evidence showing the prices paid for ¼-inch plate glass by Courcelles, a Belgian subsidiary of petitioner, in its purchases from Franiere, a Belgian subsidiary of Saint Gobain (a large scale producer of plate and window glass). In 1960 and 1961 most of PPGI's profit was earned from the sale of glass, which highlights the significance of the price comparison with Courcelles, and it appears from the evidence that during this period more than one-half of the glass sold by petitioner to PPGI was ¼-inch and ⅛-inch plate glass generally sold at the same price.

Courcelles was a distributor of plate glass. It cut and packed the uncut glass it purchased from Franiere and resold it chiefly to European customers. Courcelles' marketing operation of glass was similar to that of PPGI, and it appears that Saint Gobain was comparable in size to the petitioner. In 1960 and 1961 Courcelles paid an average of approximately $0.20 per square foot for stock sheets of ¼-inch plate glass and its cost of cutting and packaging averaged 7.7 cents in 1960 and 8.4 cents in 1961. Petitioner's *minimum* price to PPGI for uncut and unpacked ¼-inch glass in the significant size category was about $0.29 per square foot. In 1960 and 1961 petitioner cut and packed ¼-inch plate glass in this same size category for $0.09 per square foot. In 1960 PPGI paid a net price of $0.34 per square foot for the ¼-inch plate glass it purchased from petitioner and in 1961 PPGI paid a net price of $0.32 per square foot for the same product. Thus, while Courcelles purchased uncut stock sheets and did its own cutting and packing whereas PPGI purchased ¼-inch plate glass from petitioner in cut sizes already packed, the adjustments contemplated by the regulations can readily be made. Accordingly, the above figures—against the background of our findings—amply demonstrate that the price paid by Courcelles for the glass products in question was significantly lower in either the cut or the uncut form than the prices petitioner charged PPGI. In making the comparison we have been mindful of the differences that exist in the operations of Courcelles and Saint Gobain and those of PPGI and petitioner.

There is also evidence that in 1960 and 1961 petitioner sold a substantial amount of plate glass products to the Franklin Glass Co. at prices lower than those it charged PPGI. Franklin Glass Co. in those years was a domestic manufacturer and distributor of plate glass and was unrelated to petitioner. On $\frac{1}{4}$-inch plate glass petitioner charged Franklin Glass Co. from $0.01 to $0.06 per square foot less than it charged PPGI, depending on the size bracket, and on solar gray glass petitioners' prices to Franklin Glass Co. were from $0.03 to $0.17 per square foot less than the prices it charged PPGI, again depending on the size bracket.

As to the comparable prices for paint products sold by petitioner to PPGI, there is evidence in the record indicating that in 1960 and 1961 Dupont sold Dulux and Duco automotive refinishing materials to outside distributors at lower prices than PPGI was able to purchase comparable products from petitioner. It also appears that during this same period PPGI bought Federal specification paints, including such items as spray can coatings, from unrelated suppliers at prices lower than those PPGI paid petitioner.

As we have indicated, the comparable prices discussed above cover the bulk of petitioner's glass sales to PPGI and much of its paint sales. The record also establishes that most of PPGI's net profits in 1960 and 1961 were earned from the sale of glass products. We are satisfied, upon an examination of the entire record (which is voluminous), that the sales of both glass and paint products made by petitioner to PPGI were at arm's-length prices and that substantially all of PPGI's net profits were earned from the resales of products purchased at arm's-length prices.

Petitioner also introduced evidence to indicate the reasonableness of the net profits earned on sales to PPGI. One of the difficulties encountered was the fact that, except for some paint sales, petitioner normally made no determinations in its books and records or in its financial statements of its pretax profits for 1960 and 1961 from sales to PPGI or from commission export sales.[6] Instead, petitioner's method of accounting was to compute net profits only for the major profit centers which in the glass division consisted of window glass, plate glass, and building and optical products. Petitioner's chemical division in 1960 and 1961 was divided into 15 profit centers, while its fiber glass division and its paint and brush division each constituted a profit center.

Petitioner therefore undertook to determine the net profit on its export sales (covering sales to PPGI as well as commission export

---

[6] Respondent concedes on brief that there was no determination of pretax net profits on the sales of glass products to PPGI in petitioner's internal financial statements, trial balance or ledger.

sales) through C. Paul Jannis, a certified public accountant retained for that purpose. Jannis testified at length at the trial and, upon careful examination of all the evidence, we have adopted his net profit computations which appear in our Findings of Fact. The net profit on petitioner's export sales was computed by Jannis through the use of the profit-contribution method.[7] There was convincing testimony by another of petitioner's witnesses that the profit-contribution method was "one of several methods, which has been used for this kind of purpose, which is recognized in standard works on cost allocation and which surely is among those that are suitable for this kind of computation." Jannis used the byproduct accounting method in the portion of his computation dealing with the net profits realized by petitioner in its export sales of caustic soda.[8] We think this was fully justified under the facts of this case. There was ample evidence establishing to our satisfaction that caustic soda was, in fact, a byproduct in petitioner's manufacture of chlorine. Furthermore, there was convincing evidence that the byproduct method of accounting was a recognized method of accounting.

Petitioner also found it necessary to compute PPGI's trading profit for 1960 and 1961 for purposes of the trial. PPGI's audited financial statements for 1960 and 1961 did not show trading profit by profit lines and, furthermore, the record contains strong indications that the unaudited internal financial statements (apparently prepared by PPGI personnel) for 1960 and 1961 purporting to show trading profit by product lines were unreliable.[9] In preparing the computation of PPGI's trading profits for 1960 and 1961, Jannis made reclassifications in the accounting treatment of several items which in his opinion would be consistent with better accounting methods and which would portray more accurately and conservatively the true trading profits by product lines. Our Findings of Fact indicate the recomputation in detail. We are persuaded that such reclassifications (which include such items as (1) freight equalization, outgoing transportation and duty, and cash discounts, (2) commissions allowed by affiliates, (3) selling, general, and administrative expenses allocable to other income, and (4) the reversal of a bad debt expense which had been claimed by

---

[7] Profit contribution is the excess of net sales over inventoriable costs (cost of goods sold). Under the profit-contribution method, all costs of a profit center that can be directly traced to a particular type of sale are allocated to that sale and all common costs of a profit center are allocated to a particular type of sale by the ratio of the profit contribution of that type of sale to the total profit contribution of that profit center.

[8] Under the byproduct method of accounting, no cost is assigned to the byproduct up to the point at which it splits off from the other products.

[9] The evidence shows that a public accounting firm refused to certify PPGI's first financial statement for its fiscal year ended Nov. 30, 1959. As a result, personnel changes were made. New executives were employed by PPGI in the middle of 1960 to straighten out the accounting department. Against this background, the unaudited financial statements for 1960 and 1961 do not inspire much confidence.

PPGI prior to 1960) were necessary to properly reflect PPGI's trading profits and that they were in accord with good accounting practice.

The reasonableness of the pricing policies adopted between petitioner and PPGI is further demonstrated by certain ratios drawn from the above computations dealing with their 1960 and 1961 operations. A comparison of the pretax net profit earned respectively by petitioner and PPGI on consolidated net export sales is revealing. When the profit earned by both petitioner and PPGI on export sales is combined to give us a consolidated export sales figure (as revealed by tables in our findings) it appears PPGI is only receiving a fair percent of such consolidated profit. In 1960 and 1961 petitioner's profits were 11.2 percent and 9.7 percent, respectively, of consolidated export sales while PPGI's profits for the 2 years were 7.8 percent and 7.7 percent of consolidated export sales. Another pertinent comparison shows that in 1960 and 1961, petitioner received 58.7 percent and 55.8 percent, respectively, of the consolidated profits on net export sales while PPGI received 41.3 percent and 44.2 percent of the consolidated profits on export sales in 1960 and 1961, respectively.[10] A further indication bearing upon the reasonableness of petitioner's pricing policies with respect to PPGI is that petitioner earned a pretax profit of 14.6 percent and 12.6 percent on its net export sales in 1960 and 1961, respectively, while PPGI's profits on its net export sales were 7.8 percent and 7.7 percent, respectively, in those 2 years.

We cannot agree with the position taken by respondent at the trial that PPGI was comparable to a CEM in its functions and operations and that the reasonable earnings of PPGI should not exceed those of a CEM, i.e., 2 percent of net sales. The functional disparity between the two is amply demonstrated by the record. Unlike PPGI, a CEM normally does not make any serious attempts to develop new markets or perform marketing functions other than to fill a prevailing demand for a particular product. The marketing function performed by PPGI is shown by the increase in its non-Canadian sales of glass products from $2,500,000 in 1959 to about $7,500,000 in 1967, during which period PPGI increased its glass customers from 86 in 1959 to more than 700 in 1967. PPGI also increased its sales of paint products from

---

[10] The relevance in sec. 482 cases of the division of profits realized on export sales is illustrated in *Eli Lilly & Co. v. United States,* 372 F. 2d 990 (Ct. Cl. 1967), where the court, in upholding the reallocation of profits between a domestic parent and its Western Hemisphere corporation subsidiary, pointed out that prior to the reallocation the subsidiary received a share of total profits from Western Hemisphere sales ranging from 92.84 percent to 97.68 percent while the parent corporation's share of such profits ranged from 0.61 percent to 5.65 percent, whereas after the reallocation the subsidiary's share of the profits ranged from 62.07 percent to 74.56 percent while the parent corporation's share increased to a range of from 22.90 percent to 28.30 percent. (A second subsidiary was also involved in the reallocation of profits.)

approximately $600,000 in 1960 to about $3 million in 1968, with an increase in its paint customers from 154 in 1959 to over 300 in 1968.

While PPGI determined prices for its products in the different markets in order to remain competitive, reducing prices where necessary and even selling at a loss to gain a foothold in new markets, the ability of a CEM to make price adjustments was severely limited, in keeping with its basic role as an intermediary between a domestic manufacturer and foreign sales agents and distributors. PPGI maintained a fully qualified staff which made constant postsales efforts to service its customers, a function which is normally not performed by a CEM. PPGI, in its role as an international subsidiary, was responsible for all of petitioner's operations abroad, including foreign marketing of products, licensing technology outside the United States, and acquiring and managing foreign investments. A CEM does not perform this function of coordinating and managing all of a manufacturer's operations abroad. Other material differences between a CEM and PPGI are outlined in our Findings of Fact in addition to the significant difference here indicated. On the basis of the entire record, it is quite obvious that the functions of PPGI were not comparable to those of a CEM and consequently there exists no justification for limiting the earnings of PPGI to those of a CEM.

In fact, the record shows that in one minor aspect of the operations PPGI did in fact perform functions comparable to a CEM—the sale by PPGI of the products of Pittsburgh Corning. Under an agency agreement with respect to such products, PPGI performed a limited selling function and certain export mechanics—similar to those of a CEM—and by 1964 PPGI was compelled to terminate the agency with respect to at least one product—Foamglass—because it became unprofitable at the 7½-percent commission rate.

Nor is there any merit in respondent's position that PPGI did not earn any of the profits realized on the sales to petitioner's Canadian subsidiaries and that consequently all of such income is allocable to the petitioner. This contention, revealed by respondent for the first time at the trial, is not supported by the record. Respondent appears to be taking an inconsistent position. On the one hand he admits that PPGI is not a sham corporation and on the other hand he would deprive PPGI of a large segment of its income-producing activities. A bizarre result of respondent's reallocation of all of the income from Canadian sales to petitioner would be to leave PPGI with a total *loss* from its operations in 1960 and 1961 in the amount of about $265,700. On its face, therefore, respondent's allocation would be unreasonable and arbitrary.

PPGI maintained a fully qualified staff in 1960 and 1961 to perform its various functions. When it began operations, PPGI took over the

export business formerly handled by petitioner's export department and by petitioner's Western Hemisphere trade corporation (PPGE). Most of the personnel in petitioner's export department and in PPGE became employees of PPGI. One of its top executives had been petitioner's general export manager from 1945 until the end of 1958 and, during the period from 1955 through 1958, he had also served as president of PPGE.

The operation of the Canadian subsidiaries (CPI and Duplate) was autonomous. PPGI made substantial efforts in marketing products to the Canadian subsidiaries, making adjustments in terms and prices to permit the Canadian subsidiaries to remain competitive in the Canadian market and making efforts to tailor the products for the special marketing needs of the Canadian subsidiaries. Neither of the Canadian subsidiaries was obligated to fill all of its needs for glass products from PPGI and in fact both of the subsidiaries met some of their requirements by purchasing glass products from other suppliers in 1960 and 1961. PPGI's selling efforts in marketing products to the Canadian subsidiaries are reflected in the sales figures. In 1960 PPGI made net sales of glass products to CPI in the amount of $814,990 and in 1961 the net sales of CPI increased to $1,335,709. During the period from 1959 through 1967, PPGI's sales to CPI have approximately tripled.

We find, on the basis of the entire record, that the operations of PPGI in 1960 and 1961 were not comparable to those of a CEM and we also find that PPGI did in fact earn the net profits it realized on the sale of petitioner's products to the Canadian subsidiaries. As we have indicated earlier in this opinion, the petitioner has established to our satisfaction that its pricing policies with regard to the sales of its products to PPGI were arm's-length prices and that the profits earned by PPGI and petitioner were reasonable. Therefore, no justification exists on this record for any reallocation of the profits of PPGI to petitioner in the years 1960 and 1961. We hold for the petitioner on this issue.

The next issue is whether petitioner received a constructive dividend in the amount of $455,959.07 in 1961 from Pittsburco as a result of the transfer of CVB stock from Pittsburco to PPGI. Pittsburco is a wholly owned Brazilian subsidiary of petitioner. In 1960 Pittsburco, a holding company, had investments in the stock of several corporations in the amount of $3,838,378. One of its investments was in the stock of CVB, a Brazilian glass distributor. As of December 1960, Pittsburco owned 21.63 percent of the CVB stock and PPGI owned 5.62 percent. The remaining 72.75 percent was owned by Dr. Sebastio Paes

de Almeida and his associates. Almeida was Brazil's Minister of Finance from 1956 through 1961 and prior to that period had served as president of the Bank of Brazil.

On November 21, 1961, Pittsburco granted an option to PPGI to purchase the 138,179 shares of CVB stock held by Pittsburco for 149,-945,852 cruzeiros, which amount represented Pittsburco's cost basis for Brazilian tax purposes (136,314,411 cruzeiros) plus a profit of 10 percent of that cost. On November 24, 1961, immediately after purchasing the 138,179 shares of CVB stock from Pittsburco, PPGI sold in Switzerland all of its CVB stock (representing a 27.25-percent interest in CVB—the 21.63-percent interest acquired from Pittsburco, and its own 5.62-percent interest) to Almeida for $1,150,000. PPGI gave Pittsburco a note in the amount of 149,945,852 cruzeiros ($494,-000) in payment for the 139,179 shares of CVB stock.

It is respondent's contention that as a result of the transfer of the 138,179 shares of CVB stock in November 1961, from Pittsburco to PPGI, the petitioner received a constructive dividend of $455,959.07. Respondent's primary argument in support of his constructive dividend theory is based upon the premise that the sale of the CVB stock to Almeida in Switzerland was negotiated by Pittsburco, not by PPGI, and that under the principles of *Commissioner* v. *Court Holding Company*, 324 U.S. 331 (1945), Pittsburco (and not PPGI) is deemed to have made the sale to Almeida. Respondent's explanation takes the following steps: (1) The portion of the final sales price of $1,150,000 to Almeida (which covered the CVB stock held by PPGI as well as the CVB stock transferred by Pittsburco to PPGI) attributable to the 138,179 shares of CVB stock that originated with Pittsburco was $971,398.37; (2) the amount paid by PPGI to Pittsburco for the 138,179 shares of CVB stock (149,945,852 cruzeiros) was equivalent to $494,000; (3) PPGI therefore received from Almeida $477,398.37 in excess of the price that PPGI had paid to Pittsburco for the 138,179 shares of CVB stock ($971,398.37 less $494,000); and (4) Pittsburco, in effect, transferred funds in the amount of $477,398.37 to PPGI, which transfer resulted in a constructive dividend to petitioner.[11]

Respondent also makes an alternative argument. He contends that if this Court should find that the sale of the CVB stock to Almeida was made by PPGI rather than Pittsburco, the transfer of the 138,179 shares of CVB stock by Pittsburco to PPGI at a bargain price resulted in a distribution of a dividend in kind by Pittsburco to petitioner.

---

[11] Although the figure of $477,398.37 which appears in respondent's brief exceeds the amount of the constructive dividend to petitioner which was determined by respondent in the statutory notice of deficiency ($455,959.07), respondent does not make any claim for an increased deficiency.

Respondent argues that the amount of the dividend taxable to petitioner under the alternative theory would be the same as under his primary theory, i.e., $455,959.07.[12]

The sale of the CVB shares by Pittsburco and PPGI to Almeida took place against a background of a deteriorating political and economic climate in Brazil in the last half of 1960 and 1961. Rigid exchange controls were ultimately adopted by Brazil in 1961. Under these conditions, when Almeida (the majority stockholder of CVB) notified the CVB stockholders that he planned to call for additional capital contributions from them in order to build new facilities, petitioner and its subsidiaries decided not to contribute any additional capital. Almeida then offered to buy the CVB shares held by the Pittsburgh group and from 1960 to November 1961, made a series of offers to purchase the stock. Almeida was willing to pay $1,150,000 for the CVB stock held by Pittsburco and PPGI, with the purchase to be made outside Brazil and payment to be made in a foreign (i.e., non-Brazilian) currency.

Pittsburco's basis in its 21.63-percent interest in CVB stock was 136,314,411 cruzeiros and its share of the proposed total purchase price of $1,150,000 amounted to $912,755, or the equivalent of 276,-592,424 cruzeiros. Pittsburco would therefore realize a gain, for Brazilian tax purposes, of 140,278,013 cruzeiros which was taxable at the rate of 23 percent. [13] However, Pittsburco's dollar basis in its holdings of CVB stock amounted to $1,279,187 so that it would actually suffer a dollar loss of $366,432 ($1,279,187 minus 912,755) on the sale of its CVB stock to Almeida.

Pittsburco sought to avoid a sizable Brazilian tax on a sale that would actually result in a dollar loss and also wanted to minimize the amount of funds that would remain subject to the strict exchange controls. Against this background and faced with Almeida's condition that the sale take place outside Brazil, Pittsburco and petitioner examined various alternatives. It was found that Pittsburco could not distribute or sell its CVB stock to petitioner without adverse tax and exchange control consequences in Brazil. On November 21, 1961, Pittsburco executed an option agreement giving PPGI the right to buy Pittsburco's CVB stock for 149,945,852 cruzeiros, which represented Pittsburco's cost basis in the CVB stock for Brazilian tax purposes plus a profit of 10 percent. On November 24, 1961, immediately

---

[12] Respondent recognizes that where a distribution of property is made to a corporate shareholder, the amount of the distribution for purposes of sec. 301 is the fair market value of the property or its adjusted basis in the hands of the distributor, whichever is less. See sec. 301(b)(1)(B). Respondent contends that the fair market value of the CVB share was not less than the sales price to Almeida. Respondent also contends that "petitioner failed to prove that the adjusted basis of the stock in the hands of Pittsburco was less than the sales price to Almeida."

[13] The Brazilian tax on a gain of 140,278,013 cruzeiros would be 32,263,943 cruzeiros. or a dollar cost of $106,471 (32,263,943 × 0.0033).

after buying the CVB stock from Pittsburco for the stated amount, PPGI sold such CVB stock together with its own CVB stock (a total interest of 27.25 percent) in Switzerland to Almeida for $1,150,000.

We need not decide whether, under the rationale of *Commissioner* v. *Court Holding Co.*, *supra*, Pittsburco (rather than PPGI) must be deemed to have made the sale of its CVB stock to Almeida and then to have transferred the net sales proceeds to PPGI. Even if we should assume that respondent's interpretation of the sales transaction is correct, we do not believe that the purported transfer of the net sales proceeds in the amount of $477,398.37 [14] from petitioner's Brazilian subsidiary to its Swiss subsidiary for demonstrable business reasons resulted in a constructive dividend taxable to petitioner.

We believe this case is ruled by our decision in *Columbia Rope Co.*, 42 T.C. 800 (1964). There, the taxpayer's wholly owned Philippine subsidiary diverted a portion of its proceeds from its world-wide sales of fibers to taxpayer's wholly owned Panama subsidiary. The Panama subsidiary had been formed by taxpayer to alleviate some of the dollar shortage difficulties faced by the Philippine subsidiary as a result of Philippine exchange restrictions. Among the functions of the Panama subsidiary were (1) to settle claims (in dollars) made by customers of the Philippine subsidiary and (2) to provide travel expenses in dollars for business trips outside the Philippines made by executives and employees of the Philippine subsidiary. Respondent determined that the sales proceeds diverted by the Philippine subsidiary to the Panama subsidiary were taxable to the parent corporation. We rejected respondent's contention, stating as follows at pages 812, 813:

> If [the Panama subsidiary] had not been formed and, instead, all of the proceeds from the world sales of fiber were remitted directly to the Philippine subsidiary, it is clear * * * that its profits would not be includable in petitioner's taxable income until they were actually distributed to the petitioner. We do not see how the presence of [the Panama subsidiary] calls for any different result. Nothing is changed: the income is still generated by the same fiber sales by the Philippine subsidiary on the world markets, except that now some of the income, instead of returning to the Philippines, comes to rest in Panama.

No argument can be made that the present transaction involving petitioner's two foreign subsidiaries somehow discharged a corporate obligation of the petitioner. Nor can we view the transaction as a device for siphoning off corporate profits. In fact, we cannot perceive how the method chosen as most advantageous by the two foreign subsidiaries in disposing their CVB stock to a third party resulted in any direct benefit to petitioner which could be construed as a constructive dividend. Any benefit that could possibly accrue to petitioner, as a parent corporation,

---

[14] See fn. 11 *supra*.

would be purely derivative in nature. See *W. B. Rushing*, 52 T.C. 888, 894 (1969) ; see also *Commissioner* v. *Offutt*, 336 F. 2d 483 (C.A. 4, 1964), affirming a Memorandum Opinion of this Court.

Respondent cites several cases as authority for treating as a constructive dividend the transfer of sales proceeds from Pittsburco to PPGI. See *Worcester* v. *Commissioner*, 370 F. 2d 713 (C.A.1, 1966) ; *Equitable Publishing Co.* v. *Commissioner*, 356 F. 2d 514 (C.A.3, 1966) ; *Mahransky* v. *Commissioner*, 321, F. 2d 598 (C.A.3, 1963) ; *Biltmore Homes, Inc.* v. *Commissioner*, 288 F. 2d 336 (C.A.4, 1961) ; *Byers* v. *Commissioner*, 199 F. 2d 273 (C.A.8, 1952) ; and *Helvering* v. *Gordon*, 87 F. 2d 663 (C.A.8, 1937). These cases are distinguishable and are clearly not applicable to the fact situation before us. They do not stand for the simplistic proposition, as respondent seems to suggest, that any transfer of funds or property between subsidiaries will give rise to a constructive dividend taxable to the parent corporation simply because the subsidiaries are under a common control. Instead, the cases that have found constructive dividends have for the most part involved various devices for siphoning off corporate profits, sham corporations, or corporate funds diverted for the direct benefit of the taxpayer-stockholder.

We think that respondent's alternative argument must also fail. As we have indicated above, this alternate argument is that Pittsburco made a bargain sale of the CVB shares to PPGI and, according to respondent's brief, the "bargain sale of the CVB shares by Pittsburco to PPGI must be viewed as though it were made to petitioner, at whose behest the bargain sale was made." The result, respondent contends, "was a transfer of property through petitioner to PPGI" and that such transfer is taxable as a constructive dividend to petitioner. Respondent's theory for taxing the transfer of property to petitioner as a constructive dividend is the same as under his primary argument. Our reasons for rejecting respondent's primary arguments are equally applicable here. It would appear that respondent's alternate argument is even less tenable depending as it does upon a highly artificial recasting of the actual transaction, i.e., a bargain sale of the CVB stock by Pittsburco to petitioner followed by a second bargain sale of the same stock by petitioner to PPGI.

We conclude that the disposition of Pittsburco's CVB stock in 1961 did not result in a constructive dividend to petitioner.

The next issue again involves the question whether petitioner received a constructive dividend as a result of a transfer of assets between foreign subsidiaries, except that the subsidiaries here involved (DQ and PPGA) are even more removed from petitioner in that they are both second-tier foreign subsidiaries of the petitioner. After 1957 DQ (an Argentine corporation) was the wholly owned subsidiary of

Columbia-Southern, itself a wholly owned domestic subsidiary of petitioner during the year 1960.[15] PPGA was the wholly owned Argentine subsidiary of PPGI, the petitioner's Swiss subsidiary.

In 1951 Columbia-Southern and one Williams were joint owners of DQ, with Columbia-Southern holding a 51-percent interest. In 1952 DQ acquired land and buildings in a Buenos Aires suburb for use in unloading, storage, and distribution of soda ash and other chemicals. In 1957, Columbia-Southern and Williams decided to terminate their venture and divide the assets of DQ. At that time DQ was commercially inactive and the property acquired in 1952 was DQ's only asset of value. The property held by DQ was ratably divided and Columbia-Southern retained the right to use the company name. DQ, thereafter a wholly owned subsidiary of Columbia-Southern, was inactive in 1957 and 1958 and resumed sales in 1959.

In 1957 the property held by DQ was carried on its book in the amount of 15 million pesos which represented the original cost less depreciation. In 1952 the dollar was the equivalent of 13.8 Argentine pesos and in 1960 the exchange rate of pesos to dollars was approximately 83 to 1.

In 1960 PPGI initiated steps leading to the formation of a wholly owned Argentine subsidiary, PPGA, whereupon PPGA acquired all of the assets of DQ (effective as of August 1, 1960) and assumed the existing liabilities of DQ. The transfer of assets was to be made for 23,446,107.12 pesos (approximately $282,482) and PPGA was to issue in payment 24 promissory notes payable after August 1, 1961, with interest at 12 percent.

Respondent's position is that the transfer of assets in 1960 from DQ to PPGA was a bargain sale which resulted in a constructive dividend to petitioner in the amount of $899,456. The issue is similar to the above issue involving the transfer of the CVB shares from Pittsburco to PPGI, except that in the present instance the respondent is relying entirely on the alternate argument made by him above on the CVB stock issue, i.e., that the purported bargain transfer of property between the two foreign subsidiaries resulted, in effect, in a distribution of a dividend in kind to petitioner. Respondent first raised this issue in his third amended answer and consequently has the burden of proof. Rule 32 of the Tax Court Rules of Practice.

Section 301(b)(1)(B) provides that in a distribution of property other than money made by a corporation to a corporate distributee the amount of the distribution for purposes of section 301 is the fair market value of the property or its adjusted basis in the hands of the distributor, whichever is less. Respondent contends that the fair mar-

---

[15] Columbia-Southern was merged into petitioner on Dec. 31, 1960.

ket value in 1960 of the assets transferred by DQ to PPGA was between 80 million and 100 million Argentine pesos and, based upon a median value of 90 million pesos and using an exchange rate of 80 to 1, the fair market value of the transferred assets would be $1,125,000. To compute the adjusted basis of the assets in 1960 in the hands of DQ the respondent used DQ's adjusted book value (original cost less depreciation) of such assets in 1960, or 15 million pesos, and using the exchange rate of 13.8 to 1 which prevailed when the assets were acquired by DQ in 1952, the respondent obtained an adjusted basis for the assets in 1960 in the amount of $1,086,956. Therefore, respondent states, the bargain sale of the assets to PPGA resulted in a distribution from DQ to Columbia-Southern (DQ's parent corporation) in an amount equal to the adjusted basis of such property in the hands of DQ ($1,086,956) less the price paid by PPGA ($187,500). The next step in respondent's thesis is to compute the amount of the constructive dividend received by petitioner. Employing the relevant provisions of section 301 the respondent contends that the adjusted basis of the assets in the hands of Columbia-Southern remains unchanged and, therefore, that the amount of the distribution which petitioner received from Columbia-Southern would be the same as that received by Columbia-Southern from DQ, i.e., $899,456. ($1,086,956 less $187,500).

At the outset we must decide whether the transfer of assets to PPGA took place in 1960, as respondent argues, or whether it occurred in a subsequent year, as petitioner contends. We believe the record establishes that the transfer took place in 1960. The chief executive officer of both DQ and PPGA testified that the DQ property was transferred to PPGA in 1960 and that PPGA was operating the property in 1960. The minutes of the board of directors meeting of DQ indicate that the transfer was made as of August 1, 1960. The audit report of PPGA's public accountants (Deloitte, Plender, Haskins & Sells) for the period ended November 30, 1960, states that PPGA acquired the DQ assets on August 1, 1960. We conclude that the transfer took place in 1960.

We do not believe, however, that respondent has met his burden of showing that the transfer of property to PPGA was a bargain sale. In fact, the evidence that we do have in the record appears to place the fair market value of the property in 1960 much closer to the consideration paid by PPGA (approximately $282,482) than to the figure put forth by respondent as the fair market value (approximately $1,125,-000). We have indicated above that when Columbia-Southern and Williams, with respective interests in DQ of 51 percent and 49 percent, decided to terminate their DQ venture in 1957 they divided the DQ property ratably. Paul A. Mills, the chief executive officer of DQ (and subsequently of PPGA), testified that "since the ownership was about 50

percent each * * * the two parties got together and negotiated what was considered essentially a fair and even division of the assets." Columbia-Southern kept the name DQ for its part of the property and Williams (an Argentine businessman for some 30 years in the chemical field) designated his share of the property as Williams Quimica-Tecnica.

In 1962 PPGA needed the Williams property in connection with its expanded activities and decided to purchase the property. After negotiations with Williams PPGA was able to purchase the property in November 1962 for $222,000. Mills testified that the Williams property in 1962 was essentially the same property, with the same facilities, as in 1957 (when the division took place) and 1960 (when the transfer here in issue occurred). Finally, Mills testified that due to "severe political and economic problems" the real estate market in the Buenos Aires area was in a depressed state in 1960. He also testified that the real estate market in that area late in 1962 was "essentially the same" as it was in 1960 due to continuing political unrest in Argentina which had an adverse effect upon all business and commercial activities. Under these circumstances it would appear that the 1962 sale represents a comparable sale for the purpose of determining the fair market value of the property transferred in 1960 by DQ to PPGA.

Respondent's evidence in support of a fair market value in excess of $1 million is extremely ambiguous and we find it wholly unconvincing. Respondent relies upon the testimony of Mills who was examined by respondent concerning an estimate of the value of the transferred property attributed to Mills in 1960. This estimate (placing the value between 80 and 100 million pesos) appears in a memorandum of a third party which is not in evidence. We have given careful consideration to the testimony of Mills and we are not at all certain that his estimated figure of 80 to 100 million pesos represented true fair market value.

In Argentina the value of the peso depreciated dramatically from 1952, when the exchange rate of pesos to dollars was 13.8 to 1, to 1960 when the exchange rate was approximately 83 to 1. In other words, the peso had devaluated to one-sixth of its 1952 value in terms of the dollar. It appears that Mills, in arriving at his 1960 estimate of 90 million pesos for the transferred property, was merely making an arbitrary mathematical computation to restate the net book value (15 million pesos) of the transferred property, which was the original cost of the property in 1952 less depreciation, in terms of the devalued 1960 peso. Mills' testimony was as follows:

"I believe that the book value was indicated as 15,000,000 pesos, something like that. What you really need in order to know what the value was on the same kind of currency, would be to take the 15,000,000 and

multiply it by 6, then, which is 90,000,000, and I think I had indicated that the fair market value in 1960 was 80 to 100,000,000 pesos."

There is no indication that market conditions entered at all in the estimate made by Mills and, as we have seen, there was evidence that the real estate market in Buenos Aires was depressed during this period. It is obvious that a valuation estimate reached in this fashion has very little to do with fair market value as judicially defined, i.e., the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell. See *Fitts' Estate* v. *Commissioner*, 237 F. 2d 729 (C.A. 8, 1956). At another point in his testimony Mills indicated his approach in somewhat different terms: "The basis we use for estimating the fair market value is what it would cost on the date in 1960 to have built those facilities and allowing some reasonable amount for depreciation for the eight years that it had existed." Under the circumstances of this case any assumption that the replacement cost of the transferred property was equivalent to fair market value is completely unwarranted.

We conclude that respondent has failed to meet his burden that the transfer of assets in 1960 from DQ to PPGA for a consideration of 23,446,107.12 pesos (approximately $282,482) was a bargain sale which would result, under respondent's theory, in constructive dividend taxable to petitioner in that year. We should add that even if respondent did establish the fair market value of the property, we do not believe that as a matter of law the transfer of property between the two second-tier foreign subsidiaries would result in a constructive dividend to petitioner. Our discussion above in connection with the constructive dividend issue involving Pittsburco and PPGI is equally applicable here and no purpose would be served to repeat the discussion here. We need only add that there is no indication in the record that the transfer from DQ to PPGA was in any way a sham transaction or a device used to siphon off corporate earnings. On the contrary, the legitimate nature of the transaction—which was entered into to meet PPGA's requirements for additional facilities in its expansion program in Argentina—is clearly demonstrated by the record. We hold for petitioner on this issue.

The next issue is whether respondent properly allocated the amount of $27,304 as income in 1960 from Pittsburco (petitioner's wholly owned Brazilian subsidiary) to petitioner under the provisions of section 482. During the year 1960 Pittsburco was indebted to petitioner in the amount of $546,086. The unsecured debt which existed since 1940 and which arose as a result of advances made by petitioner to Pittsburco was not evidenced by a note and it did not bear interest. Pittsburco was a holding company and during 1960 had investments

in the capital stock of several corporations in the amount of $3,838,378. In 1960 Pittsburco realized dividend income in the amount of $141,051, interest income of $14,508, and gains from the sale of bonds in the amount of $9,476.

The rationale (as stated on brief) behind respondent's allocation of income to petitioner is that "a portion of the income derived by Pittsburco from its investments was attributable to the advances to Pittsburco by petitioner and its forbearance to demand repayment thereof."

It appears that the revenue agent based the section 482 adjustment solely upon the existence of the interest-free advances and the fact that Pittsburco had income (dividends, interest, and gains from the sale of bonds) in 1960. He did not examine the books and records of Pittsburco but, instead, relied upon some general information supplied to him in response to his inquiries during the examination of petitioner. The revenue agent testified that he "used a five percent figure of the total advance of $546,000 * * * [as] a method of arriving at the allocation of income." He explained his use of the five percent figure as follows: "I had asked [petitioner] * * * on loans that PPG had made, what interest was paid on those loans and he gave me a figure of five per cent to the Mellon National Bank."

On brief the respondent also relies upon the provisions of section 1.482–2, Income Tax Regs., which were adopted April 15, 1968, by T.D. 6952, 1968–1 C.B. 218,[16] while the trial of this case was in progress.

Petitioner's position is that the adjustment made here by respondent was actually nothing more than an imputation of interest income on an interest-free loan, rather than a valid allocation of income, and that such imputation of income was not allowed under the existing law

---

[16] Sec. 1.482–2. DETERMINATION OF TAXABLE INCOME IN SPECIFIC SITUATIONS.—
(a) *Loans or advances*—(1) *In general.* Where one member of a group of controlled entities makes a loan or advance directly or indirectly to, or otherwise becomes a creditor of, another member of such group, and charges no interest, or charges interest at a rate which is not equal to an arm's length rate as defined in subparagraph (2) of this paragraph, the district director may make appropriate allocations to reflect an arm's length interest rate for the use of such loan or advance.

(2) *Arm's length interest rate.* For the purposes of this paragraph, the arm's length interest rate shall be the rate of interest which was charged, or would have been charged at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances. All relevant factors will be considered, including the amount and duration of the loan, the security involved, the credit standing of the borrower, and the interest rate prevailing at the situs of the lender or creditor for comparable loans. If the creditor was not regularly engaged in the business of making loans or advances of the same general type as the loan or advance in question to unrelated parties, the arm's length rate for purposes of this paragraph shall be—

*       *       *       *       *       *       *

(ii) 5 percent per annum simple interest if no interest was charged or if the rate of interest charged was less than 4, or in excess of 6 percent per annum simple interest, unless the taxpayer establishes a more appropriate rate under the standards set forth in the first sentence of this subparagraph. * * *

as it pertained to the year 1960. Respondent denies that his allocation of income to petitioner is equivalent to the creation of interest income where none was contemplated by the parties. He insists that he merely used a relevant interest rate as a formula for allocating to petitioner part of the earnings of Pittsburco attributable to the interest-free advances. The purported distinction eludes us. We do not see how respondent can seriously deny that he is creating an artificial interest charge when the very regulation he relies upon contemplates an adjustment to income based upon an "arm's length interest rate."

In *Smith-Bridgman & Co.*, 16 T.C. 287 (1951), a corporate subsidiary made interest-free loans to its parent corporation and respondent, purporting to act under section 45 of the 1939 Internal Revenue Code (the predecessor section of section 482), added to the subsidiary's income the equivalent of 4 percent of the outstanding interest-free loans. In rejecting the respondent's contention this Court stated that the application of section 45 of the 1939 Internal Revenue Code was predicated on the existence of income and that the courts had "consistently refused to interpret section 45 as authorizing the creation of income out of a transaction where no income was realized by any of the commonly controlled businesses." See also *Brandtjen & Kluge, Inc.*, 34 T.C. 416, 447 (1960), and *Society Brand Clothes, Inc.*, 18 T.C. 304, 320 (1952).[17]

Respondent contends that *Smith-Bridgman & Co., supra,* is distinguishable. In that case the respondent increased the income of the subsidiary by the equivalent of 4 percent of the interest-free loans to the parent without making any corresponding adjustment to the income of the parent, while in the present case the respondent has decreased the gross income of Pittsburco by the amount allocated to petitioner.

We do not believe that this distinction is helpful to respondent. We recognize of course that in a valid allocation of income under section 482 the respondent must make a corresponding adjustment in the income or deductions of a second entity. We need not decide whether respondent may, under the authority of section 482, make an allocation of income which is indistinguishable from the imputation of an interest charge. Our concern here is whether section 482 can be applied at all under the circumstances of this case. The record shows that the balance of advances or loans from petitioner to Pittsburco existed since 1940. We cannot possibly conceive even the most tenuous connection between this 1940 balance and Pittsburco's income some 20 years later in the form of dividends ($141,051), interest ($14,508),

---

[17] This Court has also rejected respondent's contention, in another context, that an interest-free loan resulted in income to the borrower. *J. Simpson Dean*, 35 T.C. 1083 (1961).

and gain from the sale of bonds ($9,476). We cannot agree with the respondent that these sundry gains and items of income are attributable to the 1940 advances. As this Court indicated in the *Smith-Bridgman* case, the courts in this area of the law have consistently refused to authorize the creation of income *out of a transaction* where no income was realized. We do not see how the advances made to Pittsburco in 1940 can be considered as the transaction out of which came the 1960 allocable income. We cannot believe that section 482 and the regulations thereunder are to be applied in so broad a manner. To so apply the statute constitutes, we believe, an abuse of the respondent's discretion. We hold for petitioner on this issue.

The next issue is whether certain payments received by petitioner from PPGI in 1960 and 1961 pursuant to the transfer of patented and unpatented technology are taxable as long-term capital gains or as ordinary income. Secs. 1221 and 1231; see also sec. 1235. Five separate agreements are involved under this issue. During the period 1958 to 1961 petitioner transferred to PPGI the foreign rights in certain technology with respect to paint and coating products (agreement dated November 17, 1958), Duracron and Duracryl products (agreement dated May 29, 1959), and all-glass Twindow products (agreement dated January 1, 1961).[18] In 1958 and 1959 Columbia-Southern (which merged into petitioner on December 31, 1960) entered into two separate agreements whereby it transferred to PPGI the foreign rights to certain technology involving chemical processes—soda ash technology employing the Solvay Process (agreement dated July 17, 1958) and the technology involved in the DH Process (agreement dated March 11, 1959).[19]

Each of the five agreements stated a total cash consideration to be paid by PPGI under specified payment schedules. During the years 1960 and 1961 PPGI paid to petitioner or to Columbia-Southern the following amounts pursuant to the payment schedule in the five agreements:

|  | 1960 | 1961 |
|---|---|---|
| Paint and coatings | $50,000 | $100,000 |
| Duracron and Duracryl [1] | 50,000 | 50,000 |
| All-glass Twindow | | 20,000 |
| Soda ash | [1]100,000 | 200,000 |
| DH Process | [1]50,000 | 50,000 |

[1] Received by Columbia-Southern.

---

[18] Duracron is a thermosetting material which, when applied as a coating, provides a high resistance to stain and weathering. Duracryl coatings are thermoplastic materials which, when applied to automobiles, produce a fine gloss. All-glass Twindow technology, which is unique, is used to produce an all-glass double-glazed insulating unit.

[19] The DH Process is used to purify diaphragm cell caustic soda to enable it to compete with mercury cell caustic soda for use in certain industries that cannot use straight diaphragm cell caustic soda because of its impurities.

Each of the five agreements involved the transfer of both patented and unpatented technology.[20] Two agreements—the all-glass Twindow agreement and the Duracron and Duracryl agreement—involved primarily patented technology while the remaining three agreements involved primarily unpatented technology. All of the agreements made grants of both patented and unpatented technology in specifically designated foreign territories. Generally, the agreements granted to PPGI an irrevocable, transferable, exclusive license with right to sublicense others, to make, use, and sell under the licensed patents and also granted to PPGI an irrevocable, transferable exclusive right to use the unpatented technology in the specified territory. Each of the five agreements provided that both parties to the agreement would transfer to the other all after-acquired technology relating to the subject matter of the respective agreements. All of the agreements except the Twindow agreement contained a section which provided that the agreement would terminate within a fixed period. Under the Twindow agreement, a section provided for termination only upon default by either party or upon certain other circumstances beyond the control of the parties.

Respondent makes five separate arguments to support his contention that the payments received by petitioner in 1960 and 1961 are taxable as ordinary income rather than as long-term capital gains. Some of the arguments are directed to only designated agreements. Respondent argues (1) that petitioner failed to transfer all substantial rights in the patented and unpatented technology under any of the agreements—with the exception of the Twindow agreement; (2) payments attributable to after-acquired technology under the agreements do not qualify as long-term capital gains because such after-acquired technology lacked the requisite 6-month holding period at the time of its transfer; (3) petitioner held the foreign patent rights and the unpatented technology for sale to customers in the ordinary course of business; (4) the process transferred under the Soda Ash agreement was a widely known process and therefore did not qualify as "property" for purposes of capital gains treatment; or (5) a portion of the transfers made under each of the agreements involved miscellaneous nonexclusive rights and nonproperty items which do not qualify for capital gains treatment, thus requiring an allocation of a portion of the payments to be taxed as ordinary income.

Respondent's first argument, i.e., that petitioner did not transfer all substantial rights in the patented and the unpatented technology under any of the agreements except the Twindow agreement, consists

---

[20] Unpatented technology was defined in all of the agreements to include trade secrets, research and development data, technical information and know-how, formulae, manufacturing data and procedures, and other miscellaneous information.

of four parts: (A) Petitioner failed to transfer the rights in the unpatented technology for their entire useful life; (B) petitioner failed to transfer the right to control disclosure of the trade secrets covered by the agreements in question; (C) petitioner retained the right to sell the *patented* products which were part of the subject matter under the paint and coating products agreement and the Duracron and Duracryl agreement; or (D) petitioner retained the right to sell products utilizing the *unpatented* technology which was transferred to PPGI in the paint and coating products agreement and in the Duracron and Duracryl agreement.

In *Bell Intercontinental Corp.* v. *United States*, 381 F. 2d 1004, 1010 (Ct. Cl. 1967), which involved the transfers of patents and other rights, the Court stated that a "patent confers upon the owner the right to exclude others from making, using or selling the invention during the life of the patent, and in order that a transfer constitute a sale, there must be a grant of all substantial rights of value in the property" and that the "transfer of anything less is a license which conveys no proprietary interest to the licensee." See also *E. I. Du Pont de Nemours & Co.* v. *United States*, 432 F.2d 1052 (C.A. 3, 1970). In determining whether a transfer of rights in unpatented technology constitutes a sale within the meaning of sections 1221 and 1231 the courts have applied the tests developed in the cases involving transfers of patent rights. In *Pickren* v. *United States*, 378 F. 2d 595, 599 (C.A. 5, 1967), the court also stated that "Secret formulas and trade names are sufficiently akin to patents to warrant the application, by analogy, of the tax law that has been developed relating to the transfer of patent rights, in tax cases involving transfers of secret formulas and trade names." See also *E. I. Du Pont de Nemours & Co.* v. *United States*, 288 F. 2d 904 (Ct. Cl. 1961), and *Commercial Solvents Corporation*, 42 T.C. 455 (1964).

Respondent argues that in all of the agreements except the Twindow agreement the transfer of rights to unpatented technology is only for a limited period and that since such limited grants fail to transfer all substantial rights in the unpatented technology the transfers in question cannot qualify as sales within the meaning of sections 1221, 1222, and 1231. Section 7 of the Duracron and Duracryl agreement provides in part as follows:

Section 7—Termination

7.1 This Agreement shall terminate five (5) years from the effective date hereof unless earlier terminated as provided in this Section 7, provided, however, that in the event that any agreement between [PPGI] and a sublicensee of [PPGI], made within five (5) years from the date hereof, provided for the acquisition, exchange or transfer of technical data and/or patent rights relating to the subject matter of this Agreement for a period extending beyond the five (5) year term of this Agreement, said term shall be automatically extended; and

provided further that such automatic extension shall not exceed beyond ten (10) years from the latest effective date of any such agreement between [PPGI] and a sublicensee of [PPGI]. [PPGI] shall furnish to [petitioner] a conformed copy of each agreement of [PPGI] with sublicensees of [PPGI] promptly after the execution of such agreement.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

7.9 Notwithstanding termination of this Agreement in accordance with the provisions of any Subsection of this Section 7 to and including Subsection 7.8:

(a) All rights, licenses and immunities granted by either party to the other or by either party to any person not a party to this Agreement, pursuant to Sections 3 [grant of unpatented technology], and 5 [grant of patented technology], prior to the date of termination, may continue for the full term of the respective patents involved. Any such right, license or immunity may be cancelled by the party entitled thereto upon two (2) months' written notice to the licensor or its election so to do;

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Similar termination provisions appear in the DH process agreement (10 years), the soda ash agreement (5 years), and the paint and coatings agreement (5 years). Petitioner contends that the only function of these provisions was to establish the period of years during which future technology was to be transferred. We cannot agree with petitioner that the termination provisions have so narrow a scope.

Each of the four agreements is divided into sections which clearly pertain to the whole agreement. The termination section in each of the four agreements explicitly states that "This Agreement shall terminate," obviously referring to the subject matter of the whole agreement rather than to a fragment of it. Each of the four agreements may be automatically extended beyond the original termination date if sublicenses are granted. But such an extension is only for a limited period. As indicated in the termination provisions quoted above the extension cannot go beyond 10 years from the date of any sublicensing agreement or it may be geared to the remaining term of the patents that we associated with the particular sublicensing agreement entered into by PPGI. We have examined the four agreements carefully and while the wording in the termination sections do contain some differences we do not feel that such differences militate against our interpretation.[21]

We have given due consideration to the terms employed in the granting clauses of the agreements ("irrevocable" and "exclusive") and we have also considered the testimony of petitioner's witness bearing upon the construction to be given to the agreements. We find the

---

[21] In the soda ash technology agreement, subsec. 6.8 provides that the rights, licenses, and immunities granted to PPGI pursuant to the agreement would become irrevocable with respect to any country or countries in which PPGI, within 5 years, granted a sublicense. On July 17, 1958 PPGI granted to a French corporation an exclusive right to use the soda ash technology in France and a nonexclusive right to use such technology in certain other European countries. Sec. 7 of the sublicense provided that it would terminate 10 years from the effective date thereof. The irrevocable grant in subsec. 6.8 of the soda ash agreement merely insured that PPGI would retain its rights for the full term of the sublicense granted to the French corporation.

testimony vague and couched in ambiguous generalities that do not throw much light on the meaning intended. As for the terms used in the agreements, we believe they are compatible with our interpretation of the agreements in their entirety as terminable grants of technology.

We are not convinced by petitioner's labored interpretation which treats the four agreements as perpetual grants of the unpatented technology involved. Petitioner argues that perpetual nature of the grants of the unpatented technology to PPGI is confirmed by the fact that, under the agreements, none of the technology was to revert to petitioner. We do not regard this as meaningful—it merely states the obvious fact that when the grant of unpatented technology is terminated PPGI cannot eradicate the knowledge gained by it under such grant. We do not see how it could be otherwise.

Finally, the record presents a cogent refutation of petitioner's contention that the termination clause was concerned solely with after-acquired technology. In fact, the evidence shows that petitioner was quite capable of drafting an instrument which intended that particular result. In the all-glass Twindow agreement section 2 provides for the "Sale of Patent Rights and Technical Data." Section 3 provides specifically for the "Exchange of Future Patent Rights and Technical Data" and further provides in subsections 3.1 and 3.2 that such exchanges of future patent rights and unpatented technology shall continue for a period of 5 years from the effective date of the agreement. Section 5 of the agreement deals with "Termination and Default" and obviously applies to the entire agreement and outlines the rights and obligations of the parties in the event of default in performance by either party or in the event that performance is rendered impossible by events beyond the control of the parties. Unlike the termination section in each of the other four agreements, section 5 of the Twindow agreement contains no provision terminating the agreement after a period of years.

We conclude that the transfer of unpatented technology under each of the four agreements was for a fixed period of years and that such transfers did not convey all substantial rights in the subject matter covered by the agreement. See *Pickren* v. *United States, supra.*[22] In view of our conclusion we do not deem it necessary to consider the remaining arguments directed by respondent against these four agreements. We hold that the transfers of rights in the unpatented technology for a limited period did not constitute sales of such property

---

[22] In the *Pickren* case the taxpayer transferred the "exclusive" right to certain unpatented technology throughout the United States and all foreign countries for a period of 25 years. The Court of Appeals for the Fifth Circuit held that such a limited transfer did not convey all substantial rights to the unpatented technology and hence did not constitute a sale of such property.

and, consequently, the payments received by petitioner under such agreements do not qualify for capital gains treatment under the statute.[23]

The remaining technology agreement in issue involves the transfer of all-glass Twindow technology (primarily patented) from petitioner to PPGI. Respondent first argues that a substantial portion of the payments by PPGI under this agreement was for the right to receive after-acquired technology and that such payments do not qualify for long-term capital gains treatment for two reasons: (1) Such after-acquired technology was not held for the requisite 6-month period within the meaning of section 1222; and (2) the right to receive after-acquired technology was not a capital asset within the meaning of section 1222 but was nothing more than a right to receive petitioner's future services for research and development. Respondent directs this argument, as well as the arguments which will be discussed immediately below, at all five agreements but, where feasible, we shall only consider such arguments as they pertain to the all-glass Twindow agreement.

We do not agree with the respondent's first argument. Initially, we note that nothing in the record supports respondent's assertion that a substantial portion of the payments under the all-glass Twindow agreement was for the after-acquired technology. The evidence shows that the technology transferred under this agreement was primarily patented technology. Furthermore, the entire consideration payable by PPGI under this agreement is tied in directly to the sale of patent rights and *existing* technology under section 2 of the agreement. The transfer of future technology (for a limited period) is provided for in section 3.

In *Heil Co.*, 38 T.C. 989 (1962), the taxpayer assigned all existing patents and the necessary manufacturing know-how pertaining to the manufacture of two-wheel tractors and further agreed to transfer patents, patent applications, and inventions acquired *after* the date of the contract together with manufacturing know-how pertinent thereto. The Tax Court held that the entire consideration paid under the agreement qualified for long-term capital gains treatment. In rejecting respondent's argument that the major portion of the consideration was paid by the transferee for services rendered and to be rendered throughout the term of the contract the Tax Court stated that the engineering and manufacturing know-how transferred under

---

[23] We recognized that the four agreements transferred not only the rights to unpatented technology but also patent rights relating to the subject matter of each agreement as well as certain ancillary and subsidiary information. Petitioner makes no serious effort to allocate the payments received under the agreements to any particular category of rights. Petitioner has the burden of proving such an allocation and has not come forward with any such proof. See *Redmond L. Turner*, 47 T.C. 355 (1967).

the agreement "was an incident of the patents, took on the nature of such property, and constituted a long-term capital asset that was also sold."

In *Kronner* v. *United States*, 110 F. Supp. 730 (Ct. Cl. 1953), the taxpayer granted the exclusive right to "manufacture, vend, sell, license or re-license * * * the inventions * * * for the life of the patent, when issued, or any patents which may be taken in the future, as well as any improvements which may be made in the future." Respondent argued that, as to the future improvements to the patent, the requisite 6-month holding period requirement was not met. The court rejected the argument, stating as follows:

[Respondent] contends that since under the agreement the rights to the improvements passed immediately upon their perfection, it cannot be said that the [inventor] held them for any period of time. In so urging, we believe that the [respondent] has failed to recognize an important right which the inventor acquires when he perfects his invention. This is the right to patent any future improvements which he might make. If anyone else had created an improved version of his [invention], he would not have been able to place it on the market without infringing upon the [inventor's] patent. In order to put it to use it would be necessary to secure [the inventor's] consent. * * *

We believe the above cases are applicable by analogy to the fact situation here involved. Under the all-glass Twindow agreement, which involved primarily patented technology, the petitioner transferred its existing patents and technology relating to the all-glass double-glazed product as well as future patent rights and technical data relating to the same product. We conclude that the after-acquired technology covered by the provisions of the all-glass Twindow agreement was an incident of the existing patents and technology transferred under the agreement, took on the nature and attributes of such property, and, under the circumstances, satisfies the requisite 6-month holding period requirement.

Respondent also argues that petitioner's foreign patent rights and its foreign rights in unpatented technology relating to all-glass Twindow technology, as well as its foreign rights in the technology (both patented and unpatented) relating to the subject matter of the other four agreements, were held by petitioner primarily for sale to customers in the ordinary course of its trade or business and therefore do not qualify for capital gains treatment. See secs. 1221 and 1231. The issue is a factual one.

There is no merit in respondent's argument. In *Malat* v. *Riddell*, 383 U.S. 569 (1966), the Supreme Court held that "primarily," as used in the pertinent statute, means "of first importance" or "principally." The record clearly shows, and we have so found, that neither petitioner nor Columbia-Southern developed technology for sale to

customers and the record further shows that their research and development programs were directed toward the creation of new products and the improvement of existing products. It also appears from the record that petitioner and Columbia-Southern, upon obtaining U.S. patents for their paint, glass, and chemical technology, often sought foreign patents to protect their discoveries against foreign appropriation by others who might thereby compete with the petitioner in domestic and foreign markets. Although petitioner and Columbia-Southern recognized the prospect of selling or licensing such foreign patents, we believe that the record as a whole establishes overwhelmingly that the principal reason for acquiring the foreign patents was as stated above.

We have held that the four agreements covering the foreign rights to technology (both patented and unpatented) covering paint and coating products, Duracron and Duracryl products, the DH process, and the soda ash process constituted licenses, rather than sales, of such technology to PPGI. Apart from these agreements, petitioner made one sale of technology during the period from 1944 to 1961 which certainly does not indicate that the purpose of acquiring and holding such technology was for sales to customers. Respondent relies upon some scattered testimony of petitioner's and Columbia-Southern's executive officers who indicated their awareness of a foreign market potential for their accumulated technology in glass, paints, and chemicals. We do not see how this helps respondent. It is apparent that PPGI was created to fully utilize this great body of technology abroad but we see no justification for attributing the activities of PPGI, a separate corporation, to the petitioner. We find, on the basis of the entire record, that petitioner did not hold the foreign rights in the all-glass Twindow technology (patented or unpatented) for sale to customers in the ordinary course of a trade or business.

Respondent makes a final argument that the transfer of miscellaneous nonexclusive rights and nonproperty items by petitioner under the all-glass Twindow agreement (as well as under the other four agreements) precludes capital gains treatment for the payments made by PPGI. Respondent's brief indicates that these nonexclusive rights and nonproperty items involve (1) the nonexclusive right granted to PPGI under all five agreements to sell products under petitioner's patents in countries other than those comprising the exclusive territory and (2) certain miscellaneous data which respondent admits are "essential parts of the technology package." It will suffice to consider this argument only as it applies to the Twindow agreement. Under the provisions of section 2 of the Twindow agreement a separate and distinct consideration is payable by PPGI for this nonexclusive right "at the same rate of royalty paid by other sublicensees * * *" It is

apparent therefore that no portion of the payments made by PPGI for the patented and unpatented Twindow technology in the exclusive territory can be attributed to the nonexclusive rights described above.

Nor do we find any merit in respondent's argument that a portion of the total consideration is allocable to the miscellaneous data which respondent regards as nonproperty items that do not qualify for capital gains treatment. We believe that the materials in question merely implemented the transfer of the patented and unpatented Twindow technology to PPGI and made possible the effective utilization of such technology. Consequently, such materials were ancillary and subsidiary to the technology transferred and we see no justification for attributing to them any portion of the consideration. See *United States Mineral Products Co.*, 52 T.C. 177 (1969), and *Heil Co.*, *supra*.

We find that the transfer by petitioner of its all-glass Twindow technology (patented and unpatented) constituted a sale, rather than a license of such technology, and we hold that the payments received in consideration for such transfer qualify for long-term capital gains treatment.

*Decision will be entered under Rule 50.*